Arman Gabaee
Fed. Reg. No.: 76335-112
FCC Lompoc Camp
3705 West Farm Road
Lompoc, CA 93436-2756

**NO FEE**



```
                    FILED
          CLERK, U.S. DISTRICT COURT

          DEC 13 2023

       CENTRAL DISTRICT OF CALIFORNIA
       BY:      rsm           DEPUTY
```

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CV: **2:23-CV-10627-GW** |
| | ) | |
| Plaintiff - Respondent, | ) | CRIMINAL CASE |
| | ) | NO: CR-18-331-GW |
| v. | ) | |
| | ) | **MOTION TO VACATE, SET ASIDE** |
| ARMAN GABAEE, | ) | **OR CORRECT SENTENCE UNDER** |
| | ) | **18 U.S.C. § 2255** |
| Defendant - Petitioner. | ) | |
| | ) | |
| _____ | ) | |

### MOTION

Petitioner Arman Gabaee, a federal prisoner without counsel, moves this Honorable Court on his Motion To Vacate, Set Aside, Or Correct Sentence under 18 U.S.C. § 2255 and in support states the following:

This motion is based on the attached memorandum of points and authorities, accompanying exhibits, the files and records of this case, and such other evidence or argument as may be requested by the Court.

Respectfully submitted,

Dated:

12/10/2023

Arman Gabaee,
Defendant.

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

## I.    COURSE OF THE PROCEEDINGS

In 2018, Petitioner was charged in the United States District Court for the Central District of California in the cause known as <u>United States v. Arman Gabaee</u>, No. 2:18-CR-0331-GW.

The Five Count indictment charged Petitioner with violation of 18 U.S.C. §§ 1343, 1346 Honest Service Wire Fraud and 18 U.S.C. § 666(a)(2) Federal Program Bribery.

Petitioner pled guilty on the advice of counsel on May 2, 2020, to Count Four, Federal Program Bribery. Counts One, Two, Three and Five were dismissed.

On December 15, 2022, the district court entered judgment as Petitioner was sentenced to 48-months imprisonment and a fine in the amount of $1,149,000.

Petitioner did not appeal his sentence or conviction, and no writ of certiorari was filed.

The grounds being brought in this motion are claims involving ineffective assistance of counsel that were not known until now.

## II.    SUMMARY

This case on its face appears to be a simple matter of bribery. That's what the government wants the Court to believe. However, what the government intentionally withheld from the defense and the Court, was information that Petitioner was a victim, used as a pawn in a scheme to catch a suspected corrupt Los Angeles County Supervisor, who was later indicted, when, on the advice of counsel, he did not agree to cooperate with the government and did not participate in deliberate deception.

-2-

This newly discovered evidence reveals that Petitioner's generosity in helping a person who had fallen on hard times was twisted for self-serving purposes for prosecution after counsel advised Petitioner to not cooperate with the FBI to set up a County Supervisor. Defendant at no time willfully and knowingly committed bribery or participated in kickbacks.

Petitioner was used not only by a County employee, he did not receive benefit and there was no quid pro quo, as required under the bribery statute. The benefit went to the County. The facts and evidence show, this County individual was preying on others where he had control and was in a position to solicit bribes and kickbacks, unlike Petitioner.

The facts show the government engaged in misconduct to deprive Petitioner of his right to due process and fair proceedings. Defense counsel was ineffective for failing to investigate the misconduct.

These facts now weigh in favor of Petitioner's conviction to be set aside as a matter of law. The Court is urged to immediately correct this miscarriage of justice.

## III. <u>STATEMENT OF THE CASE</u>

Petitioner makes a claim of ineffective assistance of counsel and that there is the lack of a factual basis for the guilty plea. He contends that the government presented false facts and these facts do not support the evidence to convict Defendant of bribery charged in Count Four of the indictment, in violation of 18 U.S.C. § 666(a)(2). Next, his counsel failed to identify the factual deficiencies in the indictment and explain such deficiencies to Petitioner.

The government and Petitioner's attorney knew or should have known that the facts do not meet the elements of the offense which is a fundamental error, and prejudicial. These facts and information were withheld from the Court. The false evidence submitted was a violation of due process and a fundamental error which prejudiced Petitioner.

Because of these false facts there was no quid pro quo bribery scheme or intent, and the imposed fine was excessive and for the reasons set forth herein Petitioner's conviction should be vacated.

IV. **PERTINENT FACTS**

1. **Parties**

Petitioner is a real estate developer and partner in several real estate development companies. These various commercial and residential real estate properties are managed by Petitioner's companies which are leased by individuals, corporations and municipalities, such as the County of Los Angeles ("County"). Petitioner has been doing business with the County since 1994.

Petitioner's companies provide all in-house construction (i.e. electrical, plumbing, carpentry, etc.) and performs its own tenant-improvements.

Over the years Petitioner has worked with many County employees in the Real Estate Division.

Thomas Shepos ("Shepos") was employed as a construction consultant/manager by the County in 1998. In 2000, he was promoted to a full-time position in the Real Estate Division Leasing Section. His responsibilities then included finding space for County departments, negotiating lease terms with building

-4-

owners, and hiring construction contractors on buildings Shepos was responsible to maintain.

Shepos was a low-level County employee who reported to Chris Montana, Cheryl Fuerth and others as set forth herein. Shepos had no ability and no authority to approve leases.

## 2. Los Angeles County Real Estate Division

The County Real Estate Division includes (from the top down) the County Supervisors, made up of the first, second, third, fourth and fifth districts who all vote on the approved leases. Below is the Chief Executive Officer; Chief Administrative Officer; Director of the Real Estate Division; Real Estate Section Chief; Section Manager; Leases and Acquisitions; and Construction Manager. [See Exhibit 1].

Every County lease must go through the above individuals with approval before being submitted to the County Supervisors for the final vote of approval, and then the award of the lease.

## A. User Group Approval – Internal Process

A requesting County agency, referred to as "User Group" (i.e. Department of Public Social Services ("DPSS")), must first "show need" for the new space. This is an internal process referred to as Space Request and Evaluation ("SRE"). Once approval is granted the need is then sent to the next department.

## B. Real Estate Division

The requesting agency "User Group" must show the need is within its service area (zip code), they have the budget, and have meet other internal requirements. Upon approval the need goes to the next section.

-5-

(i)   Request for Public Bid

An announcement is made to the public that the County will be accepting bids for space.  The announcement sets forth various requirements that must be met (i.e. size of usable space, bus stop locations, parking, etc.).

(ii)  Facility Tour

The requesting User Group and the real estate representative visit the various facilities selected for review.  Once the visit is performed they select the facility.

(iii)  A formal proposal is requested and the group of facilities is narrowed down to 2 to 3 possibilities.

(iv)  A space planner visits the possible facilities and creates a space plan, to meet the User Group needs.

(v)  Negotiations begin with the property owners to find the lowest rate.

(vi)  Once approved, a draft lease is prepared for approval from the County.  These documents go to the Real Estate Commission for review and scrutiny.  The Commission is made up of five (5) or more non-county employees who are employed in the real estate industry.  They make changes, deny or approve the proposed draft lease.  If the lease is denied changes are recommended or the process begins again.  If approved it then goes to others for approvals.  No one from the County Real Estate Division is involved with this process, or thereafter.

(vii)  Chief Administrative Officer is next to review the term sheet and lease.  If approved it then goes for another approval.

-6-

(viii)   Chief Executive Officer then reviews the lease and either approves or rejects.  If approved the CEO puts it up on the up-coming calendar for the Los Angeles County Supervisors for final approval by vote.

(ix)   Once all these multiple approvals have been obtained with the Supervisors approval, then, the County issues the lease. The process can take up to 14-months.

At no time is a property owner/landlord involved with the approval process or has any contact with those involved in the approval process.  Once the proposed new lease is submitted by the Real Estate Division they are no longer involved.

3.   __Petitioner and County's Relationship__

Petitioner is a real estate developer who owns numerous commercial and residential properties in Los Angeles County and elsewhere.  His companies have been doing business with the County since 1994.  Petitioner's long history with County has been impeccable.  Due to the large number of commercial properties the County has been fortunate to lease space from Petitioner.  These properties are not only strategically located in the County but also meet all the County's requirements and needs (i.e. large available space, ample parking, bus stop), as desired locations for the County's services.  These leases are generally 5-10 year leases with options, and gross or modified gross leases with very low rents ($1.15 - $1.85 square foot).  There is little or no negotiation with the County.  The County dictates the amount and terms. "It's take it or leave it." Landlords are also required to provide all new furnishings (i.e. desks, chairs, tables, etc.). The outlay of up front costs are borne by the owners.  In some

-7-

instances the up front costs exceed several million dollars and to recoup the investment, the lease needs to be lengthy with the renewal viable.

From 1994 to 2017, the County leased approximately nine (9) properties resulting in over 350,000 square feet of office space. From 2000 to 2016, the County <u>did not enter into any new leases</u> with Petitioner.

Over the last 22-years, Petitioner has dealt with numerous County employees in the Real Estate Division. Specifically, Petitioner's involvement with the County is limited to the low-level construction managers, consultants and the leasing section, none of which, as previously illustrated, have any authority to approve leases or bind the County. [Refer to Exhibit 1].

In 1994, the County leased office space from Petitioner for the Department of Child Support Services, ("DCSS"), located in Encino, California.

On or about August 31, 1999, the County leased another building from Petitioner in El Monte, California. The lease was a 5-year term with option, full-service lease, represented by County employee Carol B. [See Dkt. 279-3].

Sometime in 2001, the County Supervisors awarded Petitioner with a lease on a property in Hawthorne, California. During these negotiations Petitioner solely dealt with Carlos Marquez and Maurice Salama. Shepos was a construction consultant on the project who, became involved after the lease was approved by the County Supervisors.

The Hawthorne property was the former Hawthorne Plaza Mall with nearly one-million square feet, over 3670 parking spaces,

-8-

(which Petitioner allocated 700 spaces), bus stop and the cost to the County was "below prevailing market rates." [Exhibit 2 Hawthorne Lease Abstract]. There were no caps on the tenant improvements. During the Hawthorne build-out Shepos insisted that Petitioner use certain venders even though Petitioner was paying the bill. In fact, Petitioner spent $4 million on furniture and fixtures for the County on the Hawthorne property. The build-out cost Petitioner $13 million and took 12 months to complete. On July 5, 2011, the County renewed the 2000 lease on the Hawthorne building and expanded its space to a total of 132,996 rentable square feet of office space. The lease was for 5-years with two 5-year renewal options, [Exhibit 3 Hawthorne Renewal Abstract].

4.    **Petitioner's Relationship with Thomas Shepos**

In 1999, Petitioner, while performing the tenant improvements on his El Monte property for the County, was introduced to Thomas Shepos, who was the User Group's consulting construction manager.

Petitioner's company, unlike other property owners, provides in-house construction on all build-outs. They do not use outside contractors. Because of this, Petitioner would have weekly meetings with the County's User Group at the El Monte building during the 9-month build-out. Shepos worked with Petitioner.

As the months went on, Shepos and Petitioner became friends. Shepos told Petitioner that his wife was Jewish and that he had recently converted to Judaism. Often Shepos sought advice from Petitioner about Judaism. They began to see each other socially. They often would meet for breakfast and on occasion, Shepos, a former chef, would come to Petitioner's building to make breakfast for the staff. On other occasions they would go on Petitioner's

boat in Marina Del Ray or spend the day driving in Petitioner's '64 Corvette Stingray. They shared family stories and confided in one another. Shepos confided in Petitioner that his wife was having trouble getting pregnant. Petitioner gave Shepos a name of a fertility specialist. Shepos told Petitioner that he smoked a lot of marijuana and loved to drink alcohol. Shepos would call it "becoming painless." Petitioner noticed that when Shepos was under the influence of marijuana that he would make up stories.

In 2000, Petitioner's wife had a child. Shepos was invited to the celebration of their son. Shepos wife thereafter had a daughter. They remained close friends.

Often Shepos sought Petitioner's advise on real estate purchases he was contemplating. Shepos took Petitioner to some of these properties.

On one instance, Shepos took Petitioner to a recent property he purchased in Bel-Air, California. Shepos wanted ideas on remodeling the residence. Petitioner asked how Shepos being a County employee was able to purchase such an expensive property. Shepos told him that his father-in-law, now deceased, owned a successful bakery and helped him buy the property.

In June 2011, Shepos appeared early one morning at Petitioner's office. He was disheveled, unshaven, unbathed and smelling of booze and marijuana. Crying, he told Petitioner that his wife of 17-years was filing for divorce. She kicked him out because he gambled away $500,000 in one night, and lost all his wife's inheritance.

Shepos said he was deep in debt, had no money and was living out of his car. He begged and pleaded to borrow money, desperate,

-10-

promising to pay him back. Shepos said the money was for living expenses and Petitioner was the only friend he had.

Out of friendship, Petitioner helped. Petitioner agreed to help Shepos and gave him cash, limited to approximately $1,000 to help with his living expenses.

A few months later, Shepos seemed to be coping with the divorce. Shepos was still drinking and using marijuana. He claimed he was barely surviving. He often told Petitioner that his life and credit was ruined. He had no money and would never be able to buy a home. Shepos pushed Petitioner to consider buying a home for him to live in when he retired.

From time-to-time as the years went by, Shepos continued to say he had no money and would Petitioner consider buying him a home. In April 2017, Petitioner did make a low-ball offer on a home in northern California to appease Shepos. He then realized it was not a good idea or investment, and the home was not available. Further, Shepos wasn't going to retire and Petitioner was being advised not to buy the home. Petitioner then considered an 8 acres ranch in northern California, a better addition to his real estate portfolio. He offered Shepos the opportunity to manage the ranch once he was retired. Their friendship continued.

In 2017, Shepos' ex-wife called the FBI telling them Shepos was taking bribes and kickbacks, corruptly misusing his position with the County in dealings with various contractors and furniture supply vendors. It is also likely she found out that Shepos, for the last 15 or more years, had been having extramarital affairs.

One woman Shepos was having an affair with was Michelle Lantz. She was an assistant to a large landlord real estate developer who was doing business with the County for many years.

Shepos, unbeknownst to Petitioner, was engaged in solicitation of bribes and kickbacks from subcontractors (i.e. plumbers, electrical, communications, etc.) under his authority and control as the construction manager.

On September 5, 2018, Shepos was arrested on a Two Count Information, alleging Count One, Making False Statements to Government Agent, and Count Two, Subscribing to False Tax Returns, in violation of 26 U.S.C. § 7206(1). See United States v. Shepos, No: 18-CR-00569-GW (C.D. Cal. 2018). Dkt. 1].

Shepos began cooperating with the government on or about December 16, 2016, in an effort to receive a lesser sentence. Shepos during his interview with the FBI admitted that Petitioner never did anything illegal or offer bribes or kickbacks. Shepos and Petitioner were only friends. During Shepos cooperations, it is believed that Shepos heard through the County or the government that Los Angeles County Supervisor Mark Ridley Thomas was suspected or under investigation for malfeasance.

Shepos was told the bigger the fish, the more favorable the government's recommendation would be for a lower sentence.

Shepos was aware that Petitioner knew Supervisor Thomas, but not what their relationship consisted of except that it went back some 25-years, before the Los Angeles Riots, where Petitioner's business suffered property losses.

In 2015, Petitioner began the entitlements to undergo a large mixed use redevelopment project, consisting of 655 apartment units, 546,000 feet of retail to include restaurants, theaters, shops and 800,000 feet of office space, which Shepos knew about, but was not involved, during his longtime friendship with

-12-

Petitioner.  Petitioner's team worked with Supervisor Thomas' team and the City of Hawthorne on the proposed redevelopment project.

Since Shepos had been soliciting bribes and kickbacks from subcontractors, he believed he could get Petitioner involved in an elaborate bribery scheme to set up Supervisor Thomas.  Shepos believed that if he slow-played the Hawthorne lease renewal from 2001, it would allow Shepos time to set up Petitioner to offer something in exchange.

When Petitioner pressured Shepos unexpectedly to move the renewal up the approval chain or give notice to move, Shepos told Petitioner he did not have the authority and there was nothing he could do.  Shepos did suggest that Petitioner contact Supervisor Thomas and see if he could help move the renewal along.

Petitioner met with Supervisor Thomas at which time Thomas was advised that he needed a decision on the renewal if the County agency was staying or moving elsewhere.  Thomas recommended that his Deputy, Mr. Riggetello, get involved and make a call to Shepos.  He didn't believe the County was interested in moving out of the building.

Mr. Riggetello knew about the mixed-use redevelopment project for the closed Hawthorne Mall.  Riggetello called Shepos and told him something to the effect "we want to get this deal done" and "move the renewal up the approval process."  Shepos told Petitioner about the call and that he [Shepos] was a low-level employee with no authority to approve the lease renewal, but would see what he could do.

Once the government confirmed there was no wrongdoing involving Petitioner and Thomas, Shepos then tried another scheme.

This time Shepos sought to entrap his friend. He used his friendship wanting Petitioner to buy a house in northern California where he would retire to live, making it look like a bribe.

Shepos urged Petitioner to contact a Realtor in northern California, who provided him with various brochures of available properties. Petitioner showed Shepos flyers of properties to satisfy him. He made a low-ball offer on a home on Barnes Road, which was declined. Petitioner then found a ranch on Annadel. He had his consultant, John Carroll, an in-house real estate broker, prepare the offer on April 17, 2017. The red-line offer was rejected and Carroll re-submitted another offer. The owner declined the offer due to the red-line. The offer was resubmitted and the owner made a counter offer. Petitioner, on April 24, 2017, changed his mind and was not going to purchase the Annadel property.

On the morning of April 25, 2017, the following day after Petitioner decided to not purchase the ranch, the FBI went to Petitioner's home. FBI agents played a wiretap of Shepos and Petitioner discussing the purchase of the ranch. The FBI during the 2-hour interview wanted Petitioner to cooperate by wearing a wire to set-up Supervisor Thomas. Petitioner then exercised his right to consult an attorney. On the advice of counsel and for fear of the types of crimes and people involved with Thomas, counsel advised Petitioner to not cooperate.

One year later, on May 30, 2018, the government filed its indictment against Petitioner.

-14-

It is important to note that the County continued renting the Hawthorne property for another 5-years until early 2023.

5. **Criminal complaint**

On May 10, 2018, a criminal complaint was filed in United States District Court for the Central District of California. This sworn complaint was filed by FBI Special Agent Brian C. Adkins, ("Adkins"). The Complaintant's statement of facts constituting the offense or violation stated: [18 U.S.C. § 666(a)(2)] On or about December 20,2016, in Los Angeles County ("County"), within the Central District of California, defendant Arman Gabaee ... corruptly gave, offered, and agreed to give a thing of value, that is $1,500 in United States Currency, to Cooperating Witness (CW1) intending to influence and reward CW1 in connection with a transaction and series of transactions of the County involving $5,000 or more, namely, the awarding of one or more County contracts." [See Dkt.1 pp.1-45].

This 45-page complain consisted of Adkins affidavit of probable cause involving "consensually recorded" bribe payments. The complaint makes reference to Adkins having "received training on public corruption and other white collar crimes." Id. p.4.

Agent Adkins stated in the affidavit that he was aware that Shepos was a substance abuser. "... during a debrief of CW1 [Shepos] FBI Special Agents noticed the scent of marijuana emanating from CW1's vehicle." [See Dkt.1 p.4 note 2].

6. **Indictment**

On May 30, 2018, the grand jury sitting in the Central District of California handed down a Five (5) Count Indictment charging: Counts One through Three - Honest Service Wire Fraud, in

violation of 18 U.S.C. §§ 1343, 1346, and Counts Four and Five,
Federal Bribery, in violation of 18 U.S.C. § 666(a)(2).

The primary basis for the indictment was the use of a
"Cooperating Witness 1" ("CW1") also known herein as "Thomas
Shepos."

Pertinent here is Count Four Federal Program Bribery (18
U.S.C. § 666(a)(2)) which Petitioner pled guilty to on the advice
of counsel.  The other counts were dismissed.

The indictment alleges that sometime about 2011 through April
17, 2017, Petitioner paid Shepos bribes and kickbacks of
approximately $1,000 monthly, in exchange for, among other things:
(a) Shepos provided non-public County information to Petitioner;
(b) Shepos resolved issues between Petitioner and County
departments or agencies on terms favorable to Petitioner; and, (c)
Shepos helped secure County leases for Petitioner and negotiated
terms in those that were beneficial to Petitioner. [See
Indictment, Dkt.1, p.3:17-25].

Shepos wore a wire and recorded six (6) different payments
totalling $6,000 (approximately $1,000 each). Id. p.4:1-9.

The indictment also states that the bribery/kickback
(collectively referred to "Bribery") was for the purpose of a $45
million dollar lease for the County to rent space for a term of
10-years from Petitioner who owned the property referred to as the
Hawthorne Mall, ("Hawthorne"), for a County agency, the
Development of Public Social Services ("DPSS"). Id. p.4:11-21.

The alleged bribery was to have taken place from 2016 thru
April 25, 2017. Id. at 22-23.  The bribery consisted of (a)
monthly payments of $1,000, and (b) "attempted purchase of a

-16-

residential property in northern California for Shepos' use, listed for sale at over $1 million, in exchange for Shepos performing various official acts related to the DPSS lease." Id.

The government's alleged "official acts" included, among other things: (a) Shepos exerting pressure on County departments to complete and submit Space Request Evaluations ("SRE"), an official request for office space that would have allowed Shepos to begin formal lease negotiations with Petitioner: (b) Shepos pretending to publicly engage in the normal County bidding process for County leases, but in fact, promising Petitioner that Shepos would give Petitioner favorable treatment to ensure that Petitioner received the DPSS lease; (c) Shepos exerted pressure on a subordinate employee ("County Employee 1") known as Mark Ridley Thomas ("Supervisor Thomas" or "Thomas") a Los Angeles County Supervisor in the Real Estate Division to draft the DPSS lease for Petitioner, and to do so expeditiously and no later than August 2017; (d) Shepos using his influence to pressure Thomas to draft the DPSS lease in such a way that it "looked good on paper," not to appear or raise concerns; (e) Shepos used his influence to pressure DPSS to agree to the terms in the DPSS lease; and, (f) Shepos ultimately obtained the signed DPSS lease for Petitioner. Id. p.5:1-6.

Further, the indictment set forth dates and statements made along with the amounts of money Petitioner gave him. Id. pp.5-10: at 5-22.

The government alleges "Concealment of Material Facts involving (a) Shepos provided 'non-public information,' (b) Shepos resolved 'issues between Petitioner and County,' and (c) Shepos

-17-

'secured County leases' for Petitioner." Id. pp.10-11. The indictment languished for 5-years unprosecuted.

## 7.    **Plea Agreement**

On or about April 26, 2022, the government presented Petitioner's attorney with a plea agreement. The government offered to dismiss Counts One, Two, Three and Five of the indictment which charged Petitioner with Honest Service Wire Fraud (18 U.S.C. §§ 1343, 1346) for a plea of guilty to Federal Program Bribery, in violation of 18 U.S.C. § 666(a)(2).

The government set forth the factual basis to which Petitioner plead guilty.

By agreeing to plead guilty, Petitioner waived several Constitutional and procedural rights, including his right to appeal or make a collateral attack on his sentence. The waiver, paragraph 16, read as follows:

### Waiver of Constitutional Rights

16. Defendant understands that by pleading guilty, defendant gives up the following rights:

a.    The right to persist in a plea of not guilty.

b.    The right to a speedy and public trial by jury.

c.    The right to be represented by counsel -- and if necessary have the court appoint counsel -- at trial. Defendant understands, however, that, defendant retains the right to be represented by counsel -- and if necessary have the court appoint counsel -- at every other stage of the proceeding.

d.    The right to be presumed innocent and to have the burden of proof placed on the government to prove defendant guilty beyond a reasonable doubt.

-18-

e.    The right to confront and cross-examine witnesses against defendant.

f.    The right to testify and to present evidence in opposition to the charges, including the right to compel the attendance of witnesses to testify.

g.    The right not to be compelled to testify, and if defendant chose not to testify or present evidence, to have that charge not to be used against defendant.

h.    Any and all rights to pursue any affirmative defenses, Fourth Amendment or Fifth Amendment claims, and other pretrial motions that have been filed or could be filed. [Plea Agreement pp.11-12].

8.    **Change of Plea Hearing**

On May 2, 2022, the Court held a change of plea hearing by way of video conference [Dkt.246 p.3 at 23-25] as to the plea agreement between the Petitioner and the government. Before the Court would accept a change of plea to Count Four of the indictment, the Court wanted to make sure Petitioner understood what he was pleading to and the Constitutional rights being waived. Id. p. at 6-13. The Court asked if he understood the waiver. Id. at 22. The Court asked if he talked to his attorney about these proceedings. Id. at 23-25. Petitioner answered yes. Id. p.5 at 1.

The Court then made inquiry as to whether Petitioner was fully competent and capable of entering into an informed plea, which Petitioner answered to satisfy the various questions made by the Court. Id. p.6 at 13-23. The Court found Petitioner to be capable of entering into an informed plea. Id. p.7 at 8-11.

Then, the Court invited Assistant United States Attorney Lindsey Dotson to explain the elements the government would have to prove beyond a reasonable doubt at trial to convict Petitioner of Federal Program Bribery. Ms. Dotson explained the three elements of the offense. Id. pp.7-8.

The Court asked if Petitioner understood "the nature of the charge" that he was "pleading to and its elements." Id. p.8 at 4-6. Petitioner answered yes, and that he discussed it with his counsel. Id. at 7-10.

Then the Court also explained that Petitioner waived various Constitutional rights set forth in the plea agreement. Id. pp. 8-10. Petitioner said he understood the waiver of those Constitutional rights by changing his plea. Id. at 15-24.

The Court then found the Petitioner to be informed and aware of the nature of the charges and the consequences of the plea agreement: and that the plea was knowing and voluntary. The Court once again asked the AUSA to "state those facts the government feels it could prove if your case went to trial, then I'm going to be asking you certain questions about those facts." Id. p.28 at 13-16.

At which time the AUSA in pertinent part and relevant here stated:

"... Cooperating Witness 1, that is CW1, [known as Shepos] was a public official employed by the County in the Real Estate Division.

CW1's duties involved negotiating leases between private building and property owners in various County departments.

-20-

Once a property was identified for a County department in need of space, CW1 was able to negotiate lease terms for the County and private owners, or direct others to do so.

Based on the CW1's level of seniority, CW1 had significant autonomy to contractually bind the County. In particular, CW1 had authority to negotiate contract terms on behalf of the County, although final contract approval to approve with others, change orders on contracts. Id. p.29 at 1-25.

... Beginning in or about 2010 or 2011, and continuing on or about April 11, 2017, defendant paid CW1 bribes and kickbacks of approximately $1,000 about every month in exchange for among other things:

A. CW1 providing non-public County information to defendant.

B. CW1 resolving issues between defendant and County departments or agencies on terms favorable to defendant, and,

C. CW1 helping to secure County leases for defendant and negotiating terms in those leases that were beneficial to defendant.

On or about the following dates during recorded meetings defendant paid CW1 the following cash bribes and kickbacks:

... On or about December 20, 2016, defendant paid CW1 a cash bribe and kickback in the amount of $1,500. Id. p.30 at 10-25.

The government continued with a list of alleged cash bribes as follows:

| December 30, 2016 | $1,500 |
| January 27, 2017 | 1,000 |

-21-

|  |  |
|---|---|
| March 1, 2017 | 1,000 |
| March 31, 2017 | 1,000 |
| April 11, 2017 | 100 |

Id. p.31 at 1-10.

... One of the County leases defendant sought was for the Hawthorne Mall ... Id. at 11-16. Defendant owned the Hawthorne Mall.

Beginning in or around 2016, defendant sought a contract to which the County would lease space from defendant for DPSS and other County departments or agencies in the Hawthorne Mall, the DPSS lease.

As drafted, the DPSS lease anticipated a term of ten years and payments to defendant in the form of rent and tenant improvements reimbursable by the County, in excess of $5 million.

To secure the DPSS lease, beginning in or about or no later than 2016, and continuing until on or about April 25, 2017, defendant attempted to bribe and did bribe CW1 with:

A, the monthly cash bribe payments.

and B, the purchase of a residential property in northern California for CW1's use.

In exchange for these bribes, defendant sought to have CW1 perform various official acts related to the DPSS lease, including among other things:

A, CW1 inserting pressure on County departments to complete and submit space request evaluations, also known as SRE's, which are an official request for office space that would have allowed CW1 to begin more formal lease negotiations with defendant.

-22-

B, CW1 pretending to publicly engage in the normal County bidding process for County leases, but in fact promising defendant that CW1 would give defendant favorable treatment to ensure that the defendant received the DPSS lease.

C, CW1 exerting pressure on a subordinate employee, that the County Employee 1, in the Real Estate Division to draft the DPSS lease for defendant, and to do so expeditiously and no later than August 2017.

D, CW1 using CW1's influence to pressure County Employee 1, to draft the DPSS lease in such a way that it, quote, looked good on paper, end quote, meaning it did not appear suspect or raise concerns.

E, CW1 using CW1's influence to pressure DPSS to agree to the terms in the DPSS lease.

And F, CW1 ultimately obtaining the signed DPSS lease for defendant.

To uphold his end of the quid pro quo arrangement, defendant first offered to purchase for CW1 a property on Barnes Road in Santa Rosa, California, listed at $1,199,000, but the property was already in escrow.

Thereafter, defendant offered to buy CW1 property on Annadel Heights Drive in Santa Rosa, which was originally listed for $1,199,000, but later reduced to $1,095,000.

In April of 2017, defendant made two purchase offers on the Annadel Heights Drive property.

The first offer was for $1,035,000, and the second offer was for $1,065,000.

-23-

Defendant intended to purchase the Annadel Heights Drive property for CW1. However, he rescinded the second purchase offer hours after he made it, because FBI agents had approached and informed him that the FBI was aware of his bribes to CW1. Id. pp.28-33."

After the AUSA finished, the Court asked Petitioner if he understood everything the AUSA said. Id. at 22-24. Petitioner said he did. Id. at 25.

The Court then asked: "Is everything that she said about your conduct, and your intent, true and correct?" Id. p.34:1-2.

Petitioner's attorney wanted to "point out, and I don't think it was disputed that the houses were never purchased. I think that is the only correction -- not correction, only clarification." Id. at 6-7.

The government then stated: "I want to be clear that is not what the factual basis ---." Id. at 8-9.

The Court then stopped the government: "Let me stop. As I understood what the AUSA had read, she indicated that the houses -- no houses were actually purchased. There was an attempt to purchase one house but that it was -- the attempt was stopped after the FBI agent told the defendant about the investigation. That is what I thought she said; is that correct? I'm asking the AUSA?" Id. at 10-16.

The AUSA said "yes." Id. at 17.

The Court then asked Petitioner: "Is everything that the AUSA has just said about your intent, about your conduct, and about your action, true and correct?" Id. 18-21.

-24-

Defense counsel then spoke to Petitioner. _Id_. at 22-23.

Off the record, Petitioner expressed his concern that the facts pertaining to the house was false and inaccurate.

Counsel told Petitioner not to worry and he would make a clarification that "he withdrew the offer." _Id_. P.35 at 6. Then counsel made an inaccurate statement: "He was going to withdraw the offer, even before the FBI came the day before. I don't think it affects --." _Id_. 7-8.

The AUSA then realized that their factual basis for the quid pro quo theory was no longer valid. Knowing that the whole plea was in jeopardy, the AUSA then pointed out: "The last sentence in the factual basis that defendant signed says: Defendant intended to purchase the Annadel Heights Drive property for CW1 [Shepos]. However, he rescinded his second purchase offer hours after he made it, because FBI agents had approached and informed him that the FBI was aware of his bribes to CW1 [Shepos]. That is in the factual basis, that is the evidence that the government is prepared to prove, and that is what defendant signed in the factual basis." _Id_. at 12-20.

On the urging of the Court, counsel and Petitioner discussed the inaccurate facts. Off the record, counsel said it didn't matter and the issue was clarified on the record. Counsel advised Petitioner to accept the government's rendition of the factual basis even though it was false. _Id_. at 21-25.

The Court asked if Petitioner was pleading guilty to the facts? _Id_. p.36:15-15 which Petitioner said he was. _Id_.at 17. The government then stated they were satisfied with the factual basis. _Id_. at 23-24.

The Court thereafter accepted the plea under Rule 11.

9.    <u>Sentencing</u>

Petitioner was sentenced and judgement entered on December 15, 2022, to a term of 48 months and a fine of $1,149,000, which was paid in full. The Court ordered Petitioner to fulfill a 2-year term of supervised release. [See Dkt. 284].

<div align="center">

**ARGUMENT**

</div>

V.    <u>LEGAL STANDARD</u>

The text of 28 U.S.C. § 2255(a) reads as follows:

A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence. 28 U.S.C. § 2255(a). The claimed error of law supporting a motion for relief from a sentence under Section 2255 must be "a fundamental defect which inherently results in a complete miscarriage of justice." <u>Davis v. United States</u>, 417 U.S. 333, 346 (1974)(quoting <u>Hill v. United States</u>, 368 U.S. 424, 429 (1967)).

A.    <u>Procedural Default</u>

A petitioner procedurally defaults his or her right to collaterally attack a conviction under Section 2255 when the petitioner fails to first address the claim on direct appeal. See <u>United States v. Frady</u>, 456 U.S. 152, 166 (1982). There are two exceptions to this rule. First, the petitioner can show his or

her claim under Section 2255 is exempt from the direct-appeal requirement. See <u>Massaro v. United States</u>, 538 U.S. 500, 504 (2003) (holding that ineffective assistance of counsel claims do not need to be directly appealed before asserted in a claim under Section 2255). Absent presenting a claim exempt from direct-appeal requirement, a petitioner must show that the procedural default is justified because (1) good cause excuses the failure to appeal; and (2) actual prejudice resulted from the errors of which the petitioner complains in collateral attack. <u>Frady</u>, 456 U.S. at 167-68.

B.    <u>**Waiver of Appeal Rights**</u>

Petitioner entered into a plea agreement which waives his right to appeal and to collaterally attack his conviction. Petitioner argues that he did not waive his right to collaterally attack his conviction because the plea was not knowing and therefore not voluntary.

"A waiver of appellate rights is enforceable if (1) the language of the waiver encompasses [the defendant's] right to appeal on the grounds raised, and (2) the waiver is knowingly and voluntarily made." <u>United States v. Medica-Carrasco</u>, 815 F. 3d 457, 461 (9th Cir. 2015) (internal citation omitted). "To discern whether a waiver is knowing and voluntary, the court must look to 'what the defendant reasonably understood to be the terms of the agreement when he pleaded guilty.'" <u>Id.</u> (quoting <u>United States v. De La Fuente</u>, 8 F. 1333, 1337 (9th Cir. 1993)). A voluntary plea is one in which the defendant enters when the defendant is fully aware of the direct consequences of the plea agreement, unless that agreement was induced by threat, misrepresentation, or bribery. <u>Brady v. United States</u>, 397 U.S. 742, 755 (1970).

When Petitioner entered his guilty plea pursuant to the plea agreement, he acknowledged that he was waiving his right to appeal and challenge his conviction, except for a claim based on ineffective assistance of counsel stemming from information that he could not have known at the time that he pleaded guilty. To prevail on an ineffective assistance of counsel claim, Petitioner will show that: (1) "counsel's performance was deficient," and, (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." Strickland v. Washington, 466 U.S. 668, 687-694 (1984).

Here, Petitioner's counsel knew or should have known that the government's presentation of the evidence is not supported by the actual facts to meet the elements of the offense set forth in Count Four, Federal Bribery (18 U.S.C. § 666)a)(2).

## C.  **Grounds For Relief**

Petitioner contends and the facts reflect that prosecutorial misconduct deprived him of his right to due process.

This misconduct allowed the prosecution to secure Petitioner's conviction by knowingly presenting false evidence through deliberate deception in the material facts set forth in the indictment, plea agreement and change of plea phases. The government knew or should have known that the withholding of exculpatory evidence violated Petitioner's right to due process.

These false statements now exposed, show there is insufficient facts to establish the elements of the offense.

Additionally, these facts now revealed, confirm that Petitioner did not knowingly and with intent to defraud, devise,

participate in, and execute a scheme to defraud the citizens of Los Angeles County.

This prosecutorial misconduct is of Constitutional proportion resulting in a miscarriage of justice requiring immediate setting aside of the conviction, dismissal of the indictment.

With these facts and the misconduct now brought to the Court it also reveals that defense counsel's representation was below the Constitutional standard for effective representation.

1.    **False and Deliberate Deception of Evidence**

The knowing use of false evidence and deliberate deception, and the failure to correct false evidence, violates due process. Napue v. Illinois, 360 U.S. 264, 296 (1959). A claim under Napue will succeed when a petitioner established three things: "(1) the testimony (or evidence) was actually false; (2) the prosecution knew or should have known that the testimony was actually false; and, (3) the false testimony was material." Jackson v. Brown, 513 F. 3d 1057, 1071-72 (9th Cir. 2008) (quoting Hayes v. Brown, 399 F. 3d 972, 984 (9th Cir. 2005) (en banc)). For purposes of Napue violation, evidence is 'material' if there is any likelihood that the false testimony could have affected the judgment.'" Jackson, 513 F.3d at 1076 (emphasis in original) (citation omitted).

Petitioner contends the government knowingly presented deceptive false facts as material evidence to support their indictment. The specifics of this misconduct are addressed herein-below.

To be convicted of 18 U.S.C. § 666 there must be a "quid pro quo."

Section 666(a)(2) of Title 18 provides that an individual commits bribery if he:

corruptly gives, offers or agrees to give anything of value to any person, with intent to influence or reward an agent ... of a state ... in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more. 18 U.S.C. § 666(a)(2). See generally United States v. Oros, 578 F. 3d 703, 710 (7th Cir. 2009).

The government alleged their theory in the indictment and the plea agreement which were knowingly false, inaccurate, and intentionally misleading as the basis to establish the material fact to which counsel advised Petitioner to plead guilty.

The whole case is based upon the government's cooperating witness ("CW1") known as Thomas Shepos ("Shepos"). This theory alleges that Shepos received "bribes" and "kickbacks" from Petitioner in exchange for among other things: (a) Shepos provided non-public County information to Petitioner; (b) Shepos resolved issues between the County and Petitioner on lease terms favorable to Petitioner; and, (c) Shepos helped secure County leases which were beneficial to Petitioner [Dkt. 14, Indictment p.3 at 20-25 and pp. 10-11].

A.    **Shepos Was A Low-Level County Employee With No Authority**

The government falsely built Shepos up to be a big and powerful County employee inside the Real Estate Division section, making all the decisions on the needs of Los Angeles County.

The actual truth is just the opposite. Shepos was a low-level County employee. The only control he had was the ability to

hire various subcontractors for tenant improvements on County buildings (i.e. plumbers, electricians, telecommunications, etc.). These trades through Shepos provided services on certain County buildings which Shepos was involved. Petitioner was a landlord to the County, not a trade subcontractor.

The evidence herein confirms facts contrary to the government's material facts set forth in the indictment and plea agreement.

According to an interview* of Chris Montana who was Shepos' direct supervisor from early 2015, Montana confirmed "that Shepos had no authority to bind the County and no real influence over the leases." In fact, Montana reiterated that Shepos was very hard on landlords and did not give up anything. He could not have increased and did not increase any rents in connection with any Gabay [Petitioner] leases. [See Exhibit 4, Montana Interview].

At no time has the government presented, "among other things -- Shepos provided non-public County information to Petitioner." Further, there has not been any evidence to show what "issues" were "resolved" by Shepos between Petitioner and the County or that the "lease terms were favorable to Petitioner."

The opposite was true. Maurice Salama worked for the County Department of Real Estate from 1984 to 2011. Salama's boss was Cheryl Fuerth. Salama never saw any unethical issues relating to Petitioner. "He always felt like they [Petitioner] performed

_____

* Interviews noted herein were all conducted by Peter Norell, Norell Consulting, Inc., an investigation company hired by Petitioner's counsel. Interviews took place between November 2017 and January 2019.

-31-

under the agreements and never offered anything in return." [See Exhibit 5, Salama Interview].

According to Salama, Shepos worked on County lease projects which already had approved budgets. Shepos found space and negotiated lease terms. Lease pricing was determined by looking at comps and the County was one of the lowest paying tenants. Id.

Salama, at one point became concerned about Shepos and the number of leases going to Petitioner. Salama knew Fuerth directed Shepos to deal with Petitioner whenever possible. When Fuerth left, she was replaced by Carlos Marquez, Manager, Lease Acquisitions, who also told Shepos to deal with Petitioner whenever possible. Salama asked Shepos why so many deals were going to Petitioner, and Shepos said because they were able to pay the lowest prices and provide space which was a premium. Id.

Cheryl Fuerth-Marx worked for the County in the Real Estate Division, retiring in 2005. [See Exhibit 6, Fuerth-Marx Interview]. Shepos worked directly for her in the Real Estate Division.

Fuerth-Marx reviewed all of the leasing contracts the County entered into and never noticed anything unusual about any contract, including those being processed by Shepos. Id. After Fuerth-Marx left, Shepos reported to Carlos Marquez.

Chuck West worked for the County Real Estate Division in March 2011. [See Exhibit 7, West Interview]. West was Fuerth's boss and Shepos did not report to West, but they did socialize with Shepos and his then-wife outside of their respective job duties. Id.

-32-

West was aware Petitioner was a landlord for the County: "He never saw anything inappropriate with respect to the Gabay's [Petitioner] or them being awarded contracts. West reviewed all of the leasing contracts the County entered into and would have noticed if someone received a deal too good for the landlord. Id.

Carlos Marquez stated he never saw anything inappropriate with respect to Shepos and Petitioner. "No specific advantages were provided by Shepos to the Gabay's [Petitioner] and he never saw any inside information given to the Gabay's [Petitioner] on what upcoming requirements were expressed. The Gabay's also received below market rent for their deals with the County. [See Exhibit 8, Marquez Interview].

Marquez said that Shepos did a lot of deals with Frank Visco out of Palmdale. Id. Visco was a landlord to the County. Shepos also had a property management business he owned which he did work on the week-ends. Id.

With regard to the Hawthorne Mall, Marquez stated "... the property and original lease went back to the early 2000's. Id. Before Shepos was involved. Marquez recalled Petitioner received less than market value for the lease on the Hawthorne property. Id.

All these County employees confirm the Petitioner never received: (a) non-public County information; (b) no lease terms were favorable to Petitioner; and, (c) The only one who benefitted was the County because the lease was below market.

Petitioner was actually loosing approximately $3 million per year on the Hawthorne Mall lease. [See Exhibit 9, Comparative Analysis].

The deliberate deception of a court by the presentation of known and false evidence is incompatible with the rudimentary demands of justice. Giglio v. United States, 405, U.S. 150, 153 (1972). There is the denial of due process when the prosecutor allows false evidence or testimony to go uncorrected. Napue v. Illinois, 360 U.S. 264, 269 (1959) (internal citations omitted). Here, Petitioner has demonstrated that his conviction was obtained by evidence that the government knew or should have known to be false. Petitioner has proved through these County employees that the government's statements were material, and that the government knew they were false. These statements show the government's allegations were "indisputably false," which support a claim of prosecutorial misconduct and the denial of due process. This is a Giglio violation. See Malcum v. Burt, 276 F. Supp. 2d 664, 684 (E.D. Minn. 2003). Shepos had no direct role, he had no influence over the County's decisions. The facts reveal Shepos had no "influence" and no "authority" over County employees. Shepos could not loosen or tighten the County's municipal-funding purse strings. See United States v. Loftus, 992 F.2d 793, 796 (8th Cir. 1993). Evidentiary hearing is required in this matter.

B. **There Was No Bribery Payments Made Between Petitioner and Shepos**

The government stated that Petitioner began "in or about 2010 or 2011, and continuing until on or about April 11, 2017" [Dkt. 14 p.3 ¶1 at 17-18] paying monthly bribe payments.

The definition of "payment" according to Black Law Dictionary is: 1 Performance of an obligation by the delivery of money or some other valuable thing accepted in partial or full discharge of

the obligation.   2. The money or other valuable thing so delivered in satisfaction of an obligation.   See Blacks Law Dictionary 11th ed. 2019 p. 1363.

The government stated in its Criminal Complaint dated May 10, 2018 [Dkt. 1 p.6 ¶10 at 1-9] that "[F]rom around that time April 11, 2017, Gabaee gave CW1 [Shepos] monthly cash payments of approximately $1,000 ... the relationship between CW1 and Gabaee changes shortly after CW1 began accepting these monthly payments. It went from friendship to an improper business relationship, where CW1 would provide assistance to Gabaee in return for Gabaee's monthly payments."   Id.

In other words, Petitioner was giving cash to his friend Shepos as "subsistence" for living expenses.

"Subsistence" is defined as: Support; means of support.   See necessaries [Id. p. 1728].   "Necessaries" are: things that are indispensable to living ... - also, termed necessities, necessities of life. 2. Things that are essential to maintaining the lifestyle to which one is accustomed to.   [Id. p. 1240].

Petitioner was providing subsistence to Shepos.   The government knew this, but chose to use a misleading term "payment" to fit the narrative.

FBI agent Atkins in his affidavit for probable cause  in the criminal complaint, admitted that the subsistence was made in friendship.   Not as a bribe.

Further, Atkins carefully stated that their relationship changed on or about April 11, 2017, from "a friendship to an improper business relationship."   [Dkt. 1 p.6 ¶ 10 at 5-9].

According to the government this "improper business relationship" began on April 11, 2017, and ended on April 24, 2017.

The government states that for 13-days (April 11, 2017 to April 24, 2017) Petitioner bribed Shepos and in doing so Shepos: (a) provided non-public County information to Petitioner; (b) Shepos performed official acts for Petitioner on existing and potential leases with the County; and, (c) "running interference" between Petitioner and the County when issues arise." [Id. ¶11].

According to the government all this occurred because of the delay on the DPSS Hawthorne Mall [renewal] lease served as the catalyst for Petitioner "to seek influence and non-public County information about County leases from" Shepos. [Id p.5 ¶9 at 22-26]. Shepos began to cooperate in December 2016 and sometime in February 2017, Shepos on the urging of the FBI delayed the renewal.

The government selectively mixed up two issues into one. Petitioner was subsidizing his friend who had fallen on hard times because of his divorce and unbeknownst to Petitioner at the time his out of control gambling addiction. According to Shepos, his ex-wife Karen Gluck was continuing to cause him all kinds of trouble, making threats of legal action if he didn't pay her. The Gluck harassment continued up to present with her involvement in various civil actions in the Superior Court of California and elsewhere. Petitioner gave him money around the end of the month so Shepos would be able to buy food.

Separate and apart from the living expense money, was the "renewal" of the Hawthorne lease. The government continues to

-36-

confuse this issue by making reference to a "new" lease. This is incorrect. At times herein this was a renewal of the County's DPSS lease. This was further evident by the County continuing to occupy the Hawthorne building up to 2023.

Either way, Shepos did <u>not</u> have the authority to enter into any lease. The facts set forth herein by all the County employee witnesses prove Shepos was a low-level County employee with little or no authority. These same County employees stated that Petitioner went through all the proper channels when dealing with the County.

Therefore, the government could not prove beyond a reasonable doubt that: (a) Shepos provided non-public County information to Petitioner; (b) Shepos resolved issues favorable to Petitioner; and, (c) Shepos helped secure County leases for Petitioner and negotiate terms beneficial to Petitioner.

The government knew or should have known these allegations were false and made to be deliberately deceptive.

Additionally, defense counsel knew or should have known the government produced deliberate deception in its presentation of the material facts.

"When the 'reliability of a given witness may be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility fall within the general rule: <u>Giglio</u>, 405 U.S. at 154 (citation omitted); see <u>Napue</u>, 360 U.S. at 269 ("The principle that a state may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, implicit in any concept or ordered liberty, does not cease to apply merely because the fake testimony goes only to the credibility of the witness.").

-37-

C.    **Hawthorne Mall**

First, the government has misled the Court by submitting false statements that the "DPSS" lease was in excess of $45 million. The 2000 lease between the County and Petitioner, (not involving Shepos), was a 10-year term with an early termination after 7-years with an option to renew for an additional 5-year term.

The allegations revolve around the "5-year renewal option" which the estimated value was considerably less, [Refer to Exhibit 2]. As previously stated, Shepos led Petitioner to believe that the County would lease more space in Hawthorne. The building had nearly 1 million feet of usable space. When it became apparent that the County, through Shepos, was not going to lease more space as promised. Petitioner as landlord then began to exercise his right for a decision as to whether the County would be renewing the lease or moving out of the property.

Shepos, while cooperating with the government, continued to lead-on Petitioner as to the renewal. In doing so, Shepos without County authorization, made-up a "new" "fake" lease, giving it to Petitioner. This was done on Shepos' own accord or the coaxing of the government. [Exhibit 10. Fake Hawthorne Lease]. Shepos personally delivered a fake lease to Petitioner. It was an incomplete lease.

After Petitioner received the lease he gave it to his administrator who then questioned the lease because it was blank and not sent electronically as is the County's policy, nor was it sent by the County's legal department, as was the custom. There were many other inaccuracies (i.e. no date, not signed, wrong square footage, etc.).          -38-

When Petitioner questioned Shepos, he told Petitioner not to worry, the lease would be sent electronically, which it never was.

D.    **Northern California Property**

In an effort to appease Shepos, Petitioner in early April 2017, began to consider the purchase of a home in northern California.  Gail Grove, a Petaluma, California Realtor provided Petitioner with several properties listed in the Santa Rosa area.

On or about April 10, 2017, Petitioner made an offer to purchase a home located at 4180 Barnes Road, Santa Rosa, California.  Petitioner was notified that the property was in escrow.  [See Exhibit 11 - Barnes Road].  Petitioner made a back-up offer.

On April 15, 2017, Petitioner found another property which consisted of approximately 8 acres.  An offer was made on the property located at 4780 Annadel Heights Drive, Santa Rosa, California.  [See Exhibit 12, Annadel Heights].  The following day the owner did not accept the offer.  The next day Petitioner made a counter offer.  The owner countered.

On April 24, 2017, Petitioner changed his mind  and decided not to purchase the property.  No further offers were made.

On April 24, 2017, Petitioner's secretary noted she cancelled the private jet to Santa Rosa where Petitioner was to see the property.  Petitioner's secretary Diane Leckner was interviews and stated she asked Petitioner "if he still needed a jet he requested a few weeks prior to go to northern California.  Gabay told Lockner he had been thinking about doing a deal up there but was not going through with the deal.  Leckner picked up a pencil from Gabay's desk and wrote "NO JET" in her notebook ..." [See Exhibit 13, Lockner Interview].        -39-

On April 25, 2017, the FBI arrived in the early hours of the morning at Petitioner's home. During a 2-hour conversation, special agent Brian Atkins played a recorded tape conversation between Shepos and Petitioner. Atkins wanted Petitioner to cooperate in a scheme to set-up County Supervisor Mark Ridley Thomas.

Atkins explained the FBI believed Thomas was involved in public-corruption. The FBI wanted Petitioner to wear a wire to record conversations that would be set up between Thomas and Petitioner in an effort to catch Thomas in some form of malfeasance. The FBI used threats to incentivize Petitioner into cooperating by telling him the government would take everything he owned and he would spend 10-years in prison if he did not cooperate.

On the advise of counsel, Petitioner declined to cooperate.

Shortly thereafter, the government indicted Petitioner. The federal indictment incorporated wire taps between Shepos and Petitioner beginning in December 2016, days after Shepos agreed to cooperate.

E.    **There Was No Quid Pro Quo**

The government alleged that Petitioner agreed to buy Shepos a house in northern California in exchange for a "new" 10-year lease involving the DPSS Hawthorne property.

As previously stated herein, there is no "new" lease. At all times the DPSS was a "renewal." It was Shepos who tried to make it a new lease by providing Petitioner with a fake new lease attempting to entrap Petitioner [refer to Exhibit 10]. "The purpose behind the entrapment defense is to prevent law

enforcement from manufacturing crime." <u>United States v. Hinton</u>, 908 F.2d 355, 358 (8th Cir. 1990).

Yet, the County continued to lease under the same terms of the original 2000 lease. They did not move out until early 2023.

Shepos could not and did not exert pressure on a subordinate County employee to draft the "fake" DPSS lease. It is likely Shepos made the fake lease on his own, or possibly with the government's involvement. On its face, anyone doing business with the County would know the lease was fake. A simple comparison between the fake lease and all the other County leases easily concluded that the County legal department did not issue the lease and most likely Shepos did not risk having someone else's involvement in making the false lease. If this was the case, Shepos had to have co-conspirators who intentionally sought to defraud Petitioner.

The FBI unequivocally states that Petitioner intended to purchase the Annadel Heights property (sometimes referred to as the "ranch") but that the offer was promptly withdrawn within hours <u>after</u> the FBI meeting with Petitioner. [Dkt. 1 p.42 n.27].

The indictment states that "on or about April 25, 2017, defendant Gabaee placed a second offer on the Annabel Heights property for approximately $1,065,000, again as a bribe for CW1 [Shepos]. [Dkt. 14 p.10 ¶22 at 10-12]. This is false. No offer was made on April 25, 2017.

The evidence as to the Annadel property is as follows:
April 18, 2017; 11:09 AM:
Waiting for contract to make offer from agent. [See Exhibit 14 e-mail].

-41-

April 18, 2017; 11:45 AM:

Agent resent contract.

April 18, 2017; 12:01 PM:

Cannot edit document. [See Exhibit 15 e-mail].

April 18, 2017; 12:37 PM:

Docusign document. Questions about printing. [See Exhibit 16 e-mail].

April 18, 2017; 1:40 PM:

Agent claiming counter offer is forthcoming. Wanting offer ASAP. [See Exhibit 17 e-mail].

April 18, 2017; 3:58 PM:

Agent wants offer ASAP.

April 18, 2017; 5:02 PM:

Doesn't know status of offer. [See Exhibit 18 e-mail]

April 18, 2017:

Residential Purchase Agreement with low-ball offer of $1,035,000. [See Exhibit 19 Purchase Agreement].

April 20, 2017:

Disclosures sent to agent. [See Exhibit 20].

April 24, 2017; 2:34 PM:

Agent questions why residential contract is redlined and won't be accepted and not allowed.

April 24, 2017; 2:36 PM:

Absolutely not true. [See Exhibit 21 e-mail].

April 24, 2017; 2:38 PM:

Discussions about changes to the contract. [See Exhibit 22 e-mail].

April 24, 2017; 4:30 PM:

John Carroll reported that they were having issues with the real estate agent.

April 24, 2017; 4:40 PM:

Petitioner told Carroll he changed his mind and the deal was off.

April 24, 2017; 4:45 PM:

Petitioner told his secretary to cancel the jet because he was not buying the property. [refer to Exhibit 15, Leckner Interview].

These exhibits clearly show that Petitioner changed his mind on April 24, 2017. It is believed that Petitioner's change of mind made through phone calls sparked the FBI to visit Petitioner's home on April 25, 2017, knowing there was no quid pro quo. Further, if Petitioner was actually going to purchase any property for Shepos, there would have been a conversation captured by the government. In all these recorded conversations, there was not one that discussed title of the property going to Shepos.

The government statement's in the criminal complaint were made to mislead the Court and defense counsel and violated due process. See Giglio, 405 U.S. 150 (1972).

The government is required to prove beyond a reasonable doubt that there was a quid pro quo to convict. As previously demonstrated, the government has failed by the evidence presented herein that Petitioner knowingly made a payment in return for an official act. [See Evans, 504 U.S. at 268.] and that the payment was made in return for performance of these dutiesd. See Garcia, 992 F.2d at 415.

-43-

FBI agent Atkins stated that Petitioner subsidizing Shepos was not illegal, but it somehow became illegal in Atkins mind when Shepos delayed the renewal.

The evidence shows Shepos did not hold a position to provide and influence to assist Petitioner. Petitioner was a landlord, not one of the many subcontractors Shepos shook down for bribes and kickbacks.

At no time did Petitioner knowingly participate in bribery or kickbacks. At the time he believed he was helping subsidize his friend with living expenses.

Petitioner did not know until FBI agent Atkins told him that Shepos had been receiving bribes and kickbacks from subcontractors working for the County.

These facts combined with Petitioner's low-balling of the offers and the red-lining of the contract show Petitioner had no intention to purchase the property. The simple fact is Shepos was jerking Petitioner around and Petitioner was doing the same to Shepos. There was never going to be a transfer of real property to Shepos.

The government's theory that Petitioner was involved in a scheme to defraud the County is false. These facts show: (1) Shepos was in no position to bind the County; (2) The Hawthorne DPSS lease was a renewal, which the County occupied until early 2023; and, (3) in order for this fraud to have occurred, there would have had to have been a vast conspiracy with multiple executives in the County's Real Estate Division. This was not the case. Further, Petitioner was losing monry on the lease.

-44-

Bribery excludes gifts for generalized good will and gifts given solely for friendship, See <u>United States v. Dimora</u>, 750 F.3d 619, 625 (6th Cir. 2014).

VI.    <u>CONCLUSION</u>

For the foregoing reasons of law Petitioner is entitled to reversal of his conviction.

Respectfully submitted,

Dated:

12/10/2023

Arman Gabaee,
Defendant.

-45-

EXHIBITS

| EXHIBIT # | DESCRIPTION | PAGE |
|-----------|-------------|------|
| 1 | County Real Estate Chart | 5 |
| 2 | Hawthorne Lease 2000 - Abstract | 9 |
| 3 | Hawthorne Renewal Lease 2011 - Abstract | 9 |
| 4 | Montana Interview | 31 |
| 5 | Salama Interview | 32 |
| 6 | Fuerth-Marx Interview | 32 |
| 7 | West Interview | 32 |
| 8 | Marquez Interview | 33 |
| 9 | Comparative Analysis | 33 |
| 10 | Fake Hawthorne Lease | 38 |
| 11 | Barnes Road Flyer | 39 |
| 12 | Annadel Heights Flyer | 39 |
| 13 | Leckner Interview | 39 |
| 14 | Email 4/18/2017; 11:09 AM | 41 |
| 15 | Email 4/18/2017; 12:01 PM | 42 |
| 16 | Email 4/18/2017; 12:37 PM | 42 |
| 17 | Email 4/18/2017; 1:40 PM | 42 |
| 18 | Email 4/18/2017; 5:02 PM | 42 |
| 19 | Email 4/20/2017 | 42 |
| 20 | Email 4/20/2017 | 42 |
| 21 | Email 4/24/2017; 2:36 PM | 42 |
| 22 | Email 4/24/2017; 2:38 PM | 42 |

Exhibit #1

Exhibit #1

## LOS ANGELES COUNTY
## REAL ESTATE DIVISION



Exhibit #2

Exhibit #2



County of Los Angeles
## CHIEF ADMINISTRATIVE OFFICE
713 KENNETH HAHN HALL OF ADMINISTRATION • LOS ANGELES, CALIFORNIA 90012
(213) 974-1101

DAVID E. JANSSEN
Chief Administrative Officer

**ADOPTED**
BOARD OF SUPERVISORS
COUNTY OF LOS ANGELES

**37**    SEP 2 5 2001

*Violet Varona-Lukens*
VIOLET VARONA-LUKENS
EXECUTIVE OFFICER

Board of Supervisors
GLORIA MOLINA
First District

YVONNE BRATHWAITE BURKE
Second District

ZEV YAROSLAVSKY
Third District

DON KNABE
Fourth District

MICHAEL D. ANTONOVICH
Fifth District

December 19, 2000

The Honorable Board of Supervisors
County of Los Angeles
383 Kenneth Hahn Hall of Administration
500 West Temple Street
Los Angeles, CA 90012

Dear Supervisors:

### TEN YEAR LEASE
### DEPARTMENT OF PUBLIC SOCIAL SERVICES
### 12000 HAWTHORNE BOULEVARD, HAWTHORNE
### (SECOND) (3 VOTES)

**IT IS RECOMMENDED THAT YOUR BOARD:**

1. Approve and instruct the Mayor, Los Angeles County, to sign the attached ten year lease with M & A Gabaee (Lessor), a California Limited Partnership, for up to 155,996 rentable square feet of office and child care space with up to 700 parking spaces for the Department of Public Social Services (DPSS) at an initial annual cost of $3,170,916 which is approximately 90 percent subvented by State and Federal funds.

2. Authorize the Director of the Internal Services Department (ISD) to acquire telephone systems for DPSS through competitive bids and to approve a lease agreement with the selected vendor in accordance with the established purchase agreements. The telephone equipment payments will not exceed $820,000 annually or $4,100,000 over a five year term and will commence upon completion of the installation by the vendor and acceptance of the system by the County.

The Honorable Board of Supervisors
December 19, 2000
Page 2

3.  Consider the Negative Declaration together with the fact that no comments were received during the public review process and find that the project will not have a significant effect on the environment, and find that the Negative Declaration reflects the independent judgement of the County and approve the Negative Declaration; and find that the project will have no adverse effect on wildlife resources and authorize the Chief Administrative Office (CAO) to complete and file a Certificate of Fee Exemption for the Project.

4.  Approve the project and authorize the CAO, DPSS and ISD to implement the project.  The lease will be effective upon completion and acceptance of the improvements.

## PURPOSE/JUSTIFICATION OF RECOMMENDED ACTION:

The proposed action herein will establish a regional facility housing Medi-Cal and In Home Support Services (IHSS) programs to service the South Central Los Angeles (SPA 6) and the Northern Section of the South Bay area  (SPA 8).  This consolidation will allow the County an opportunity to establish a child care center for County employees in a separate building at the proposed site.

The Gensler report has identified the need for an additional 851,000 rentable square feet of office space over the next four years to meet increased caseload and staffing requirements in the above cited SPA areas.

## STRATEGIC ASSET MANAGEMENT PRINCIPLES COMPLIANCE

As outlined on Exhibit "A", the recommendations herein are in compliance with the Strategic Asset Management Principles approved by your Board on November 17, 1998. This project allows an efficient consolidation of DPSS' staff into a central location housing both Medi-Cal and IHSS offices, which enables DPSS to better serve constituents in South Central Los Angeles and parts of the South Bay area.

•   Houses subvention funded County programs in leased space.

The Honorable Board of Supervisors
December 19, 2000
Page 3


- Staff was unable to identify any sites in the surveyed area that could accommodate this requirement more economically. Exhibit "B" shows all County-owned and leased facilities within the search area for these programs and there are no County-owned or leased facilities available for this program.

- Based upon said survey, staff has established that the rental range for similar property is between $21.00 and $23.40 per square foot per year full service gross. Thus, the rental of the proposed lease herein represents the low end of the market range.

## FISCAL IMPACT/FINANCING

| | 12000 Hawthorne Blvd., Hawthorne | |
| | MAIN Building | Freestanding Child Care Building |
|---|---|---|
| Area | 132,996 sq ft | 23,000 sq ft |
| Annual Rent | $2,792,916 | $427,800 |
| Annual Rent/Square Feet | $21.00 | $18.60* |
| Term of Lease | 10 years | 10 years |
| Cancellation | after 7 years upon 120 days notice | after 7 years upon 120 days notice |
| Option to renew | Two 5-year options | Two 5-year options |
| Tenant Improvement Allowance Included | Interior TI's Build to Suit | Interior TI's Build to Suit |

* $2.40/psf annually has been subtracted from the base rent to reflect the County's responsibility for the cost of utilities. The County intends to recover these expenditures by having the child care operator reimburse the County for these utility costs.

The Honorable Board of Supervisors
December 19, 2000
Page 4

- Funding for the proposed lease will be made available through the Rent Expense Budget and will be charged back to DPSS. Sufficient funding is available in the DPSS' adopted budget for Fiscal Year 2000-01 to cover the net County cost.

- The monthly rent is subject to an annual adjustment, after the 24th month, based on increases to the Consumer Price Index (CPI) capped at 4 percent annually.

- Per the established claiming process approximately 90 percent of the rent costs associated with the lease will be subvened by State and Federal funding.

## FACTS AND PROVISIONS/LEGAL REQUIREMENTS:

The proposed lease provides up to 132,996 rentable square feet of office space with up to 600 parking spaces and contains the following following provisions.

- The lease contains a cancellation provision allowing termination at or anytime after the 84th month, by providing the Lessor one hundred twenty days prior written notice.

- The rental rate provides the tenant improvement construction of the Premises on a build to suit basis by the Lessor. The build to suit includes standard office construction as well as inclusion of exterior windows, up to three additional elevators and upgrading of electrical to meet the DPSS LEADER requirements.

- An additional reimbursable tenant improvement allowance of $6,238,840 is provided for furniture and out of scope tenant improvements including but not limited to voice data cabling, card reader entry, security, paging and related components, child care play equipment, appliances, cabinetry and site improvements related to child care play areas (interior or exterior) in plans proposed by the County.

- The proposed lease was submitted for review to your Board's appointed Real Estate Management Commission on December 13, 2000. After careful review, it was the Commission's decision to approve the proposed lease.

The Honorable Board of Supervisors
December 19, 2000
Page 5

- The Department of Public Works has inspected this facility and has no objection to occupancy of the premises by the County.

- Additionally, the County has an option to acquire a separate free standing building with 23,000 rentable square feet of space to be used as a child care facility. The child care space has up to 100 parking spaces, which may be reduced to allow for circulation and drop-off as required by code.

### IMPACT ON CURRENT SERVICES (OR PROJECTS):

It is the finding of the CAO and DPSS that the proposed lease is in the best interest of the County and will adequately provide the necessary space for this County requirement. In accordance with your Board's policy on the housing of any County offices or activities, DPSS concurs in this lease recommendation.

- This consolidation of 682 staff to the new facility from the following offices: 73 staff from Compton Medi-Cal, 73 staff from Cudahy Medi-Cal, 75 staff from Norwalk Medi-Cal, 60 staff from Paramount Medi-Cal, 38 from Southwest Family Medi-Cal, 46 staff from Florence Medi-Cal, 80 staff from South family and growth for 25 future staff, will allow for GAIN expansion and related Welfare-to-Work services at each of the above mentioned offices that relocated staff to this regional center.

- Additionally, IHSS is consolidating 196 staff from the South and Southwest Districts in this facility and allowing for an additional growth of 16 new employees, which represents an 8 percent increase in projected caseloads.

The Honorable Board of Supervisors
December 19, 2000
Page 6

## NEGATIVE DECLARATION/ENVIRONMENTAL IMPACT REPORT:

The CAO has made an initial study of environmental factors and has concluded that this project will have no significant impact on the environment and no adverse effect on wildlife resources. Accordingly, a Negative Declaration has been prepared and a notice posted on the site as required by the California Environmental Quality Act (CEQA) and the California Administrative Code, Section 15072. Copies of the completed Initial Study, the resulting Negative Declaration, and the Notice of Preparation of Negative Declaration as posted are attached.

## CONCLUSION

It is requested that the Executive Officer, Board of Supervisors, return two certified copies of the Minute Order and the adopted, stamped Board letter to the Chief Administrative Office, Real Estate Division at 222 South Hill Street, 4th Floor, Los Angeles, CA 90012 for further processing.

Respectfully submitted

DAVID E. JANSSEN
Chief Administrative Officer

DEJ:SNY
CWW:TS:kb

Attachments (4)

c:    County Counsel
      Auditor-Controller
      Internal Services Department
      Department of Public Social Services

ATTACHMENT "A"

Asset Management Principles Compliance Form*

I.  Occupancy

    A.    Does lease consolidate administrative functions? If no, why not?    Yes_X_ No___ N/A____

    B.    Does lease co-locate with other County functions to better serve  Yes___ No_X_ N/A____
        clients? If no, why not? **The facility is being evaluated for future consolidations.**

    C.    Does this lease centralize business support functions? If no, why not?    Yes_X_ No___ N/A____

    D.    Does lease meet the building and space guideline of 200 sq. ft.    Yes_X_ No___ Ratio _195sf_
        of space per person? If higher than 200 sq. ft. per person, why?

II.  Capital

    A.    Does this lease involve a subvented program that should be in    Yes_X_ No____
        leased space to maximize State/Federal funding?

    B.    If not, is this a long term County program?    Yes___ No___ N/A_X_

    C.    Is it a net County cost (NCC) program? List % NCC    Yes___ No_X_ Partial _10_ %

    D.    If yes to either II B or C, is this a capital lease or an operating    Yes___ No_X_ N/A____
        lease with an option to buy?

    E.    If no, are there any County owned facilities available which are    Yes___ No_X_ N/A____
        suitable in project area?

    F.    If yes, why is lease being recommended over occupancy in County    Yes___ No_X_ N/A____
        owned space? (e.g. additional investment of capital).

    G.    Was Building Description Report (BDR) run on County
        owned and leased  facilities? If yes, (attach as Attachment "B")    Yes_X_ No____
        If no, why not?

    H.    Was build to suit or capital project considered? If not, why not?    Yes___ No_X_
        **Existing building available at a competitive, below market rate and the program is subvened.**

III  Portfolio Management

    A.    Did department originate request for space utilizing the CAO    Yes_X_ No___ N/A____
        Space Request Form (SRF)?  If no, why not?

    B.    Was the space need justified?    Yes_X_ No___ N/A____

    C.    Is this a renewal of an existing lease? If yes, were other    Yes___ No_X_
        locations examined for co-location with other County departments?

    D.    Why was this program not co-located?    Yes___ No___ N/A_X_

        1.    ____    The program clientele requires a "stand alone" facility.

        2.    _X_    No other suitable properties occupied by County
                    departments in project area.

        3.    ____    No County owned facilities available for the project.

        4.    ____    Could not get City clearance or approval.

        5.    _X_    **Program may be co-located in the future. Facility evaluation underway.**

    E.    Is lease a full service lease?  If not, why not?    Yes_X_ No____

    F.    Has growth projection been considered in space request?    Yes_X_ No____

    G.    Has the Dept. of Public Works completed seismic review/approval    Yes_X_ No____

(Please **BOLD** any written responses)

G:\shared\asset.wpd(12000)

## ATTACHMENT "B"

SPACE SEARCH: 5-MILES OF HAWTHORNE PLAZA AT 12000 HAWTHORNE BOULEVARD, HAWTHORNE

| LACO | FACILITY NAME | ADDRESS | SQUARE FEET GROSS | NET | OWNERSHIP | AVAILABLE SQUARE FEET |
|---|---|---|---|---|---|---|
| 6861 | FIRE-SOUTHERN SECTION LIFEGUARD HEADQUARTERS | 1201 THE STRAND (BASE OF PIER), HERMOSA BEACH 90254 | 2049 | 1114 | PERMIT | NONE |
| 5385 | PUBLIC LIBRARY-HERMOSA BEACH LIBRARY | 550 PIER AVE, HERMOSA BEACH 90254 | 6466 | 5094 | OWNED | NONE |
| F285 | PW FLOOD-REDONDO YARD OFFICE | 615 E. ANITA ST, REDONDO BEACH 90278 | 1080 | 972 | OWNED | NONE |
| A655 | PUBLIC DEFENDER-TORRANCE BRANCH OFFICE | 3833 TORRANCE BLVD, TORRANCE 90503 | 8106 | 4968 | LEASED | NONE |
| 5177 | TORRANCE COURTHOUSE | 825 MAPLE AVE, TORRANCE 90503-5058 | 153366 | 75242 | FINANCED | NONE |
| T825 | TORRANCE COURTHOUSE-JURY ASSEMBLY ROOM | 825 MAPLE AVE, TORRANCE 90503-5058 | 2880 | 2736 | OWNED | NONE |
| 5043 | TORRANCE COURTHOUSE-ANNEX | 3221 TORRANCE BLVD, TORRANCE 90503 | 16996 | 9560 | OWNED | NONE |
| T019 | TORRANCE COURTHOUSE-TRAFFIC DIVISION | 3221 TORRANCE BLVD, TORRANCE 90503 | 2880 | 2808 | OWNED | NONE |
| A414 | DCSFS-REGION II HEADQUARTERS/TORRANCE OFFICE | 2325 CRENSHAW BLVD (PARK DEL AMO), TORRANCE 90501 | 60904 | 57764 | LEASED | NONE |
| A357 | OFFICE OF THE OMBUDSMAN-IOWA COURTHOUSE OFFICE | 18411 CRENSHAW BLVD, TORRANCE 90504 | 1500 | 1425 | LEASED | NONE |
| 4478 | ANIMAL CONTROL #3-ADMINISTRATION BUILDING | 216 W VICTORIA ST, CARSON 90248 | 1495 | 704 | OWNED | NONE |
| 6587 | PUBLIC LIBRARY-VICTORIA PARK LIBRARY | 17906 S AVALON BLVD, CARSON 90746 | 5024 | 4084 | OWNED | NONE |

Exhibit #3

Exhibit #3



## County of Los Angeles
# CHIEF EXECUTIVE OFFICE
## Real Estate Division
222 South Hill Street, 3rd Floor, Los Angeles, California 90012
(213) 974-4300
http://ceo.lacounty.gov

**WILLIAM T FUJIOKA**
Chief Executive Officer

Board of Supervisors
GLORIA MOLINA
First District

MARK RIDLEY-THOMAS
Second District

ZEV YAROSLAVSKY
Third District

DON KNABE
Fourth District

MICHAEL D. ANTONOVICH
Fifth District

July 12, 2011

Mr. Mark Gabay
M & A Gabaee, L. P.
c/o Excel Property Mgmt. Services, Inc.
P. O. Box 5357
Beverly Hills, California 90209

Dear Mr. Gabay:

### DEPARTMENT OF PUBLIC SOCIAL SERVICES
### 12000 HAWTHORNE BOULEVARD, HATHORNE
### LEASE NO. 73655

Attached for your reference is a fully executed original copy of the Lease No. 73655, for the Department of Public Social Services at 12000 Hawthorne Boulevard, Hathorne.

Thank you for your courtesy and cooperation in this matter. Should you have any questions, please contact Thomas Shepos of my staff at (213) 974-4364.

Sincerely,

WILLIAM T FUJIOKA
Chief Executive Office

Carlos E. Marquez
Manager, Lease Acquisitions

WTF:CEM
TS:lg
Attachment
c: chron file

(accpt.ls)

*"To Enrich Lives Through Effective And Caring Service"*

**Please Conserve Paper – This Document and Copies are _Two-Sided_**
*Intra-County Correspondence Sent Electronically Only*

73655    Supplement No. 1

## AMENDMENT NO. 1 TO LEASE NO.73655
## DEPARTMENT OF PUBLIC SOCIAL SERVICES
## AND COMMUNITY AND SENIOR SERVICES
## 12000 HAWTHORNE BOULEVARD, HAWTHORNE

This Amendment No.1 to Lease No. 73655 ("Amendment" or "Amendment No. 1") is made and entered into this _____5th_____ day of _July_____,2011 by and between M&A GABAEE, L.P. hereafter referred to as "Lessor" and COUNTY OF LOS ANGELES, a body politic and corporate, hereinafter referred to as "Lessee".

RECITALS:

WHEREAS, Lessor and Lessee entered into Lease No. 73655 dated September 25, 2000, and Memorandum of Acceptance of Expansion Space to the Lease dated January 13, 2004 (collectively, the "Lease") pursuant to which Lessor leased to Lessee those certain Premises No. 1 located in the Building at 12000 Hawthorne Boulevard, Hawthorne California, ("Building") more particularly described as approximately 132,996 rentable square feet of office space consisting of the first and second floors of the Building; and Premises No. 2 located in the Building at 4300 W. 120th Street, Hawthorne, California, ("Building A") more particularly described as approximately 15,500 rentable square feet of childcare facility and ("Building B") more particularly described as approximately 7,500 rentable square feet of office space.

WHEREAS, the parties now wish to amend the Lease in certain respects.

NOW, THEREFORE, in consideration of the foregoing recitals, which are hereby deemed a contractual part hereof and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree the following amendments are effective upon the date first above written:

1.    Paragraph 1 to the Lease is hereby amended by deleting the section entitled Option To Further Expand Premises and the following is hereby added to Lease Paragraph 1 as Description of the Premises, (Premises No. 2):

Premises No. 2:
Premises No. 2 is located in the Building at 4300 W. 120th Street, Hawthorne, California, ("Building B") more particularly described as approximately 7,500 rentable square feet of office space. Effect upon Board of Supervisors approval of amendment No1 to lease No.73655 Lessor and Lessee agree to mutually terminate the Lease as to that part of Premises No. 2 located in the Building at 4300 W. 120th Street, Hawthorne, California, ("Building A") more particularly described as approximately 15,500 rentable square feet of childcare facility.

2.    Paragraph 2(B) to the Lease (Options to Renew) is hereby deleted and replaced with the following:

HOA.726683.1

(B) EXTENSION <u>TERM:</u>   The term of the Lease shall be extended for a period of five (5) years ("Extension Term") beginning September 1, 2012 upon an execution of this Amendment No.1 by Lessee and ending sixty months thereafter.   The parties acknowledge that Lessee currently occupies the Premises prior to the commencement date of the Extension Term.

(C) <u>Option to Renew:</u> Lessee shall have the option to renew this Lease ("Option") for an additional two terms of five (5) years, each term (the "Option Term") under the same terms, conditions and rental rate as contained in the Lease, commencing upon the exercise of the Option by the Board of Supervisors. In the event that Lessee desires to exercise the Option, Lessee shall deliver to Lessor written notice of the intent to exercise the Option not less than One Hundred Eighty (180) days prior to expiration of the Extension Term.  The actual exercise of the Option shall be only by the Board of Supervisors at any time prior to the expiration of the Lease or the expiration date of any holdover period pursuant to Paragraph 6 (HOLDOVER) of the Lease. During the Option Term, Lessee shall continue to pay the Base Rent as adjusted in accordance with the terms of the Lease.

3.     Paragraph 3 of the Lease is hereby deleted and the following inserted:

RENT: Lessee hereby agrees to pay as rent for Premises No.1 effective upon the Board approval of the Extension Term the sum of Two Hundred Fifty Nine Thousand Three Hundred Forty-Two and 22/100 Dollars ($259,342.20) per month or $1.95 per rentable square foot. Lessee hereby agrees to pay as rent for Premises No. 2 during the Extension Term the sum of Fourteen Thousand Two Hundred Sixty-one and 00/100 Dollars ($14,380) per month or $1.92 per rentable square foot.

4.     Paragraph 5 of the Lease is hereby deleted the following inserted;

Lessee shall have the right to cancel Premises No. 1 of this lease anytime after the 48th month of any renewal term under the same terms and conditions as contained in the lease, and shall have the right to cancel Premises No. 2 of this lease separately from Premises No. 1 under the same terms and conditions anytime after August 31, 2012, by giving 120 days prior written notice as contained in the lease.

5.     Paragraph 10 of the Lease is hereby amended by the addition of the following;

Lessee shall be responsible to pay for the cost of electricity and gas consumed by the Lessee at Premises No. 1, provided the same are metered or sub-metered separately, and provided that the meter or sub-meter is installed at the sole cost and expense of Lessor.

6.     Paragraph 19 (Rental Adjustments) shall be amended by changing the Base Rent for Premises No. 1 from $232,743 to $259,342.20 and the Base Rent for Premises No. 2 from $35,650 to $14,380 beginning upon the commencement of this Amendment. In no event shall the monthly rent adjustment based upon the CPI formula set forth in Paragraph 18 result in an annual increase greater than four (4%) percent per year of the

monthly base year rent (of $259,342.20 for Premises No.1, i.e. , $10,373.69 per month annually, and of $14,380 for premises No.2 , i.e., $575.20 per month annually). Additionally, the new rental rate shall not be adjusted until September 1, 2012 and shall be adjusted every twelve (12) months thereafter as per the Lease, Paragraph 19.

7.      Paragraph 30 is hereby deleted and replaced with the following:

PERFORMANCE.:

        Lessor, within sixty (60) days after receipt of a duly executed copy of this Amendment, shall at Lessor's sole expense, participate in an energy solutions program of lighting retrofit throughout the entire Premises, including without limitation the cost of which shall be approximately $5,300 monthly for a period of 24 months. Additionally, Lessor, shall be entitled to all tax deductions and abandonment credit.

Lessor, within ten (10) days after receipt of a duly executed copy of this Lease, as amended, shall at Lessor's sole expense, commence repainting  and replacing the carpeting with carpet tiles throughout the entire Premises, including without limitation the cost of lifting the existing furniture for removal of old carpet and installation of new carpet tiles. Such performance of improvements will be performed one floor at a time (two floors per year). Lessee shall reimburse Lessor the unamortized cost of paint and carpet, at the rate of nine (9) percent annually, should County exercise its cancellation right.

8.      New Paragraphs 31 and 32 are hereby added to the Lease as follows:

        31.    LIMITATION OF AUTHORITY

        Only the Board of Supervisors has the authority, by formally approving and/or executing this Lease, to bind the County to the terms included herein.   Lessor understands that no material terms of this Lease may be altered or deleted, nor may any new material terms be added to this Lease, without the express written approval of the Board of Supervisors, either through an amendment to the Lease or by other formal Board action.  No County officer, employee, agent, or independent contractor has any authority to alter, add or delete the material terms of this Lease; and Lessor may not rely upon any representations to the contrary.

        This limitation of authority applies to all material terms of the Lease including, without limitation, any monetary ceiling established for tenant improvements or other project costs of Lessor which are subject to reimbursement by County.  County shall not reimburse Lessor for any expenses which exceed this ceiling.

        32.    IRREVOCABLE OFFER:

        In consideration for the time and expense that Lessee will invest including but not limited to preliminary space planning, legal review, and preparation and noticing for

HOA.726683.1

presentation to the County Real Estate Management Commission (if applicable) in reliance on Lessor's covenant to lease to Lessee under the terms of this lease offer, the Lessor irrevocably promises to keep this offer open until December 31, 2011.

9.   If there are any inconsistencies, variances or differences between any provision of the Lease and a provision of this Amendment No. 1, the provisions of this Amendment No. 1 will prevail and control.   The Lease, as amended, is ratified, confirmed and approved.   The terms "include" and "including" are not limiting and include the concept of "including but not limited to".

/
/
/
/
/

IN WITNESS WHEREOF, the Lessor has executed this Amendment No. 1 or caused it to be executed, and the County of Los Angeles, by order of its Board of Supervisors, has caused this Amendment No. 1 to be executed on its behalf by the Chair of said Board and attested by the Clerk thereof the day, month, and year first above written.

LESSOR

By: M&A Gabaee, LP *a California limited Partnership*
*by Seacom Inc, general Partner*

By: _____, *President*

ATTESTED:

SACHI A. HAMAI
Executive Officer-Clerk
of the Board of Supervisors

By: *Lachelle Smitherman*
Deputy

LESSEE

COUNTY OF LOS ANGELES

By: _____
Michael D. Antonovich, Mayor

APPROVED AS TO FORM:

ANDREA SHERIDAN ORDIN
COUNTY COUNSEL

By: _____
Amy M. Caves, Senior Deputy

ADOPTED
BOARD OF SUPERVISORS
COUNTY OF LOS ANGELES

14    JUL 5    2011

SACHI A. HAMAI
EXECUTIVE OFFICER

HOA.726683.1

# Exhibit #4

Exhibit #4

## NORELL CONSULTING, INC.

NORELL CONSULTING, INC – FINANCIAL, LITIGATION DUE DILIGENCE, INVESTIGATIVE
PRIVILEGED & CONFIDENTIAL

Chris Montana, mobile telephone (562) 754-5341, was interviewed at his residence, 2545 Roycroft Avenue, Long Beach, California, on 01/27/2019. Montana was advised of the identity of the interviewer and the purpose of the interview. Montana then voluntarily provided the following information:

Montana has never been contacted by the government or anyone associated with the County audit. Montana lost his job over the Tom Shepos matter and he has heard the County has adopted some changes as a result of the Tom Shepos matter. Montana was Shepos' direct supervisor from early 2015 (when Carlos Marquez left) until Shepos left. He had little social interaction with the guy outside of an occasional breakfast. He was unaware of any of Shepos' acceptance of bribes or money.

Montana confirmed that Shepos had no authority to bind the County and no real influence over the leases. In fact, he reiterated that Shepos was very hard on landlords and did not give up anything. He could not have increased and did not increase any rents in connection with any Gabay leases.

Montana agreed to be contacted again if necessary.

# Exhibit #5

Exhibit #5

# NORELL CONSULTING, INC.

NORELL CONSULTING, INC – FINANCIAL, LITIGATION DUE DILIGENCE, INVESTIGATIVE
PRIVILEGED & CONFIDENTIAL

Maurice Salama, home address 584 N. Irving, Los Angeles, California, home telephone
(323) 467-6744, mobile telephone (323) 353-6915, was interviewed at his residence on
11/03/2017. Also present was Tom O'Brien of Paul Hastings. Salama was advised of the
identity of the interviewer and the purpose of the interview. Salama then voluntarily provided
the following information:

Salama worked in the Los Angeles County Department of Real Estate from 1984 to 2011.
Salama was Tom Shepos' boss when Shepos was first hired as a consultant with the real estate
department sometime in the early 2000s. Salama's boss was Cheryl Fuerth. Shepos worked on
county lease projects. Shepos would receive a leasing assignment from his boss which already
had an approved budget. Shepos' job was to find space and negotiate lease terms. Lease
pricing was determined by looking at comps and Los Angeles County was one of the lowest
paying tenants.

Salama was not involved in the Hawthorne property. Salama did one deal for the
county with Armen Gabay. Salama believes it may have been a property in El Monte, but could
not be certain. Salama recalled that any authority on executing a deal did not lie with Armen
Gabay, but with his brother (Marc) and his father. Salama would tell Armen if we agree on
something I don't want you coming back to me and saying your brother or father did not agree.

Salama never saw any ethical issues relating to the Gabays. He always felt like they
performed under the agreements and never offered anything in return.

Salama did become concerned with how close Shepos was with the Gabays. A lot of
leases were going to them. Salama knew Fuerth directed Shepos to deal with the Gabays
whenever possible. When Fuerth left, she was replaced by Carlos Marquez who also told
Shepos to deal with the Gabays whenever possible. Salama asked Shepos why so many deals
were going to the Gabays, and Shepos said because they were able to pay the lowest prices and
provide space which was a premium.

# Exhibit #6

Exhibit #6

## NORELL CONSULTING, INC.

NORELL CONSULTING, INC – FINANCIAL, LITIGATION DUE DILIGENCE, INVESTIGATIVE
PRIVILEGED & CONFIDENTIAL

Cheryl Fuerth-Marx, mobile telephone (562) 438-1320, home address 968 Palo Verde Avenue, Long Beach, California, was interviewed telephonically on 01/31/2018, after an attempt was made to reach her at her residence. Fuerth-Marx was advised of the identity of the interviewer and the purpose of the interview.   Fuerth-Marx then voluntarily provided the following information:

Fuerth-Marx previously worked for the County of Los Angeles in the Real Estate Division, retiring in 2005.

Fuerth-Marx was asked if she recognized the name Tom Shepos.  She said she had not heard that name in years but recalled Shepos worked directly for her in the real estate division. Fuerth-Marx recalled Shepos worked for her for the five (5) years proceeding her retirement in 2005.  She described Shepos as knowledgeable about the Los Angeles real estate market. Fuerth-Marx socialized with Shepos on two (2) occasions at Shepos' residence in Santa Monica, both for holiday parties.  Fuerth-Marx had no other social interaction with Shepos.

Shepos was a direct report to Fuerth-Marx and after she left Shepos reported to Carlos Marquez.

Fuerth-Marx recalled Shepos was hard working.  She never saw anything inappropriate with respect to Shepos.  Fuerth-Marx was not aware of the Gabays.  Fuerth-Marx reviewed all of the leasing contracts the County entered into and never noticed anything unusual about any contracts, including those being processed by Shepos.

Fuerth-Marx has not been interviewed by anyone with respect to Shepos.  She was contacted last November from another former Real Estate Division employee but never spoke with that person.  She is willing to cooperate with any further questions.

Fuerth-Marx is married to Claus Marx who also worked for the County of Los Angeles. Claus would not have had any professional interaction with Shepos.

Exhibit #7

Exhibit #7

# NORELL CONSULTING, INC.

NORELL CONSULTING, INC – FINANCIAL, LITIGATION DUE DILIGENCE, INVESTIGATIVE
PRIVILEGED & CONFIDENTIAL

Chuck West, mobile telephone (307)331-9636, was interviewed telephonically on
12/11/2017, after several attempts were made to reach him and eventually coordinated
through text messaging. West was advised of the identity of the interviewer and the purpose
of the interview. West then voluntarily provided the following information:

West previously worked for the County of Los Angeles in the Real Estate Division,
retiring in March 2011.

West recalled Tom Shepos working in the real estate section. West described Shepos as
very knowledgeable about the Los Angeles real estate market. He was personable and West
socialized with both Shepos and his then-wife outside of their respective job duties. West was
unaware Shepos and his wife divorced.

Shepos was not a direct report to West. He reported to Cheryl Fuerth at one point and
maybe later to Carlos Marquez. Fuerth and Marquez were direct reports to West.

West recalled Shepos was more financially well-off than others. West was not sure if it
was because Shepos' wife had money or because of Shepos' personal investments. West was
aware Shepos and his wife were involving in the remodel of a nice home – the exact location
West could not recall.

West never saw anything inappropriate with respect to Shepos. West was aware of the
Gabays as landlords for the County. He never saw anything inappropriate with respect to the
Gabays or them being awarded contracts. West reviewed all of the leasing contracts the
County entered into and would have noticed if someone received a deal too good for the
landlord.

West has not been interviewed by anyone with respect to Shepos or the Gabays. He is
willing to cooperate with any further questions. West resides in Wyoming.

Exhibit #8

Exhibit #8

## NORELL CONSULTING, INC.

NORELL CONSULTING, INC – FINANCIAL, LITIGATION DUE DILIGENCE, INVESTIGATIVE
PRIVILEGED & CONFIDENTIAL

Carlos Marquez, mobile telephone (626) 260-3562, was interviewed in downtown Covina on 11/03/2017. Also present was Tom O'Brien of Paul Hastings. Salama was advised of the identity of the interviewer and the purpose of the interview. Marquez then voluntarily provided the following information:

Marquez began working of the County of Los Angeles in the early 1980s. He started in the real estate section. He then went to work for the County Recorder's Office in the late 1980s. He was the building manager at the Hall of Records. He then was at the District Attorney's office for a brief stint until returning to the real estate section as a senior real property agent. He was there from 1997-1999.

Marquez recalled Tom Shepos was hired initially as a contractor at the County in the real estate section. At the time and up until about 2002 or 2003, Marquez and Shepos reported to Cheryl Fuerth. Fuerth was arrested at one point for not declaring on her 200 Form her relationship with Klaus Marx. Fuerth was later moved to the Chief Accounting Office at Los Angeles County. After Fuerth left, Chuck West became the Acting Real Estate Section Chief.

In 2005, Marquez was promoted to Section Manager of the Lease and Acquisition and directly supervised Shepos. Shepos was a hard worker and top producer on his evaluations. He always went above and beyond and was the best negotiator for leases for the County. He was creative in getting deals done but was a terrible writer.

Marquez recalled a meeting in Bill Dawson's (Director of Real Estate) office in 2010 or 2011 with Shepos and Dawson. Shepos appeared distraught and Marquez recalled asking him if he was on the take. Shepos assured him he was not on the take but said he just confessed to Karen (his wife) that he had gambled away a significant amount of money that was to be used to refurbish a house inside the gate in Bel Air. Shepos went on to say Karen had re-financed her condominium on Santa Monica - taking out a second loan – and these were the funds that Shepos said he gambled away. Karen threw him out of the house.

Despite this admission, Shepos never lost his work ethic. He did a lot of deals for the County with Armen and Marc Gabay. Marquez was concerned about how close Shepos was getting to the Gabays. The Gabays were considered "B" landlords in terms of property management and tenant improvements. Marquez recalled an Encino location for Child Support Services they were the landlord on.

# NORELL CONSULTING, INC.

Marquez never saw anything inappropriate with respect to Shepos and the Gabays.  No specific advantages were provided by Shepos to the Gabays and he never saw any inside information given to the Gabays on what upcoming requirements were expected.  The Gabays also received below market value for their deals with the County.

On one occasion, Armen Gabay asked Marquez he wanted to build a building in El Monte and wanted a lease from the County.  Marquez told him the County does not "sole source" any of their projects and he would have to go through the normal process once the building was completed.  Gabay did not take issue with this result.

Shepos also did a lot of deals with Frank Visco out of Palmdale.  Marquez recalled Shepos liked to go to Palmdale because he could make money on mileage.  Shepos shopped at second hand stores and had his shoes refinished several times.

Shepos was also close with a furniture leasing guy out of Pasadena.  The guy rode a motorcycle and visited Shepos a lot at the office.  Marquez could not recall any additional information about the furniture guy except he sold Hayworth.  Shepos was also close with a couple of the sale women who did the County's furniture leasing contracts.

Marquez recalled that Shepos had a property management business he owned which he did work on the weekends.  One of his clients was actor Victor Mature.

Shepos was handling the Hawthorne project for the County with the Gabays.  Marquez believes the property and original lease went back to the early 2000s.  In 2008, Armen Gabay showed Marquez plans to build townhomes and convert the mall into usable space.  However, the recession hit and scraped those plans.  Marquez recalled the Gabays received less than market value for the lease on the Hawthorne property.

Marquez has not been interviewed by anyone in connection with Shepos or relating to County leases.

Marquez was recently informed by the Auditor-Controller that Shepos was walked out of the County offices.  The Auditor-Controller told him it was in relation to a forensic audit of real estate transactions and tenant improvements.  Two (2) days after Shepos was walked out, Marquez received a phone call from one of the executive secretaries saying Chris Montana was also walked out.

# Exhibit #9

Exhibit #9

TRULINCS  76335112 - GABAEE, ARMAN - Unit: LOM-D-A

---------------------------------------------------------------------------------------------

FROM: Gabay, Mark
TO: 76335112
SUBJECT: Request
DATE: 11/22/2023 03:36:08 PM

SUBJECT:    Department of Public Social Services
            12000 Hawthorne Blvd, Hawthorne CA
Tenant  County of Los Angeles, a body politic and corporate
Landlord    M&A Gabaee, a California Limited Partnership
Premises    132,966 SF
Use    Government Office Space with public intake providing services including therapy, counseling, dispensing of medication or for other government purposes
Initial Term    Ten (10) Years
Rent Commencement Date    September 1, 2002
Initial Term Rent Schedule

| Initial Term | Period | RSF | $/Month | $/Annum |
|---|---|---|---|---|
| Year 1 | 9/1/2002-8/31/2002 | 1.75 | 232,743.00 | 2,792,916.00 |
| Year 2 | 9/1/2003-8/31/2004 | 1.75 | 232,743.00 | 2,792,916.00 |
| Year 3 | 9/1/2004-8/31/2005 | 1.75 | 232,743.00 | 2,792,916.00 |
| Year 4 | 9/1/2005-8/31/2006 | 1.82 | 242,052.72 | 2,904,632.64 |
| Year 5 | 9/1/2006-8/31/2007 | 1.89 | 251,362.44 | 3,016,349.28 |
| Year 6 | 9/1/2007-8/31/2008 | 1.96 | 260,672.16 | 3,128,065.92 |
| Year 7 | 9/1/2008-8/31/2009 | 2.03 | 269,981.88 | 3,239,782.56 |
| Year 8 | 9/1/2009-8/31/2010 | 2.10 | 279,291.60 | 3,351,499.20 |
| Year 9 | 9/1/2010-8/31/2011 | 2.17 | 288,601.32 | 3,463,215.84 |
| Year 10 | 9/1/2011-8/31/2012 | 2.24 | 297,911.04 | 3,574,932.48 |

*CPI Increase after the 24th month and annually thereafter with 4% CAP

Option  2-5
Rent Adjustment    Adjusted in accordance with the CPI formula set forth in paragraph 19. In no event shall the monthly rent adjustment based upon the CPI formula result in an annual increase greater than four percent (4%) per year of the monthly base year rent
Total Income Yrs 1-10    $31,057,225.92

| Option 1 exercised | See Amendment No. 1 | 1st Option | Period RSF | $/Month | $/Annum |
|---|---|---|---|---|---|
| Year 11 | 9/1/2012-8/31/2013 | 2.00 | 265,370.66 | 3,184,447.88 | |
| Year 12 | 9/1/2013-8/31/2014 | 2.01 | 267,604.62 | 3,211,255.43 | |
| Year 13 | 9/1/2014-8/31/2015 | 2.05 | 272,456.25 | 3,269,474.95 | |
| Year 14 | 9/1/2015-8/31/2016 | 2.07 | 275,557.17 | 3,306,686.04 | |
| Year 15 | 9/1/2016-8/31/2017 | 2.10 | 279,329.29 | 3,351,951.48 | |

*CPI increase with 4% CAP

Total Income Yrs 11-15 $16,323,815.79
Cancellation Right    Any time after the 84th month of this lease by giving Lessor six (6) months prior written notice of its intention to cancel
Holdover Period The rent shall be at the rate prevailing under the terms of this lease
Holdover Period Rent Schedule
(Tenant continued on a month to month)

| Holdover Period | Period | RSF | $/Month | $/Annum |
|---|---|---|---|---|
| Year 16 | 9/1/2017-8/31/2018 | 2.16 | 287,203.53 | 3,446,442.36 |
| Year 17 | 9/1/2018-8/31/2019 | 2.24 | 297,577.22 | 3,570,926.64 |
| Year 18 | 9/1/2019-8/31/2020 | 2.31 | 307,160..42 | 3,685,925.04 |
| Year 19 | 9/1/2020-8/31/2021 | 2.36 | 313,354.44 | 3,760,253.28 |
| Year 20 | 9/1/2021-8/31/2022 | 2.43 | 323,728.13 | 3,884,737.56 |
| Year 21 | 9/1/2022-1/31/2023 | 2.51 | 334,101.82 | 1,670,509.10 |

*CPI Increase with 4% CAP
Total Income Yrs 16-20 & 5 months    $20,018,793.98
Effective Date of Lease Termination    1/31/2023

Exhibit #10

Exhibit #10

COUNTY OF LOS ANGELES
CHIEF EXECUTIVE OFFICE
LEASE AGREEMENT

THIS LEASE ("Lease") is entered into as of the_____ day of _____
_____, 20__ between M&A Gabaee, a California Limited Partnership ("Landlord"),
and COUNTY OF LOS ANGELES, a body politic and corporate ("Tenant").

Landlord and Tenant agree:

1. BASIC LEASE INFORMATION

   1.1. Terms

   The following terms as used herein shall have the meanings provided in
   this Section 1, unless otherwise specifically modified by provisions of this
   Lease:

   a. Landlord's Address for
      Notice:

      M&A Gabaee, a California Limited
      Partnership
      9034 West Sunset Boulevard
      West Hollywood, California 90069

   b. Tenant's Address for
      Notice:

      Board of Supervisors
      Kenneth Hahn Hall of Administration
      Room 383
      500 West Temple Street
      Los Angeles, California 90012

      With a copy to:

      Chief Executive Office
      Real Estate Division
      222 South Hill Street, 3rd Floor
      Los Angeles, California 90012
      Attention: Director of Real Estate
      Fax Number: (213) 830-0926

   c. Premises:

      Approximately 146,000 rentable/gross
      square feet in the Building (defined
      below) as shown on Exhibit A attached
      hereto.

   d. Building:

      The Building located at 12000 Hawthorne
      Boulevard, Hawthorne, California – South
      Annex, which is currently assessed by the

1

Initial

County Assessor as APN 4046-002-014 and described more particularly in Exhibit B attached hereto (the "Property")

e.  Term:

Ten years commencing 30 days after Tenant's Acceptance of the Premises as defined in Section 4.1 (the "Commencement Date"); and terminating at midnight on the day before the tenth anniversary of the Commencement Date (the "Termination Date"), subject to earlier termination by Tenant as provided herein.  The phrase "Term of this Lease" or "the Term hereof" as used in this Lease, or words of similar import, shall refer to the initial Term of this Lease together with any additional Extension Term for which as option has been validly exercised.

f.  Projected Commencement Date:

May 1, 2019

g.  Irrevocable Offer Expiration Date:

August 1, 2017

h.  Base Rent:

$324,120 per month (which is based upon a rental rate of $2.22 per square foot (adjustable only as provided in Section 2.2 and 5 hereof.)

i.  Early Termination

After the 84th month subject to prior written notice received 180 days prior to cancellation date.

j.  Rentable/gross Square Feet in the Premises:

146,000

k.  Use:

The Premises together with all appurtenances belonging to, or in any wise appertaining, shall be used as governmental office space with public intake providing services including, therapy, counseling, dispensing of medication or for other government purposes during normal working hours, after normal working hours, and on

2

Initial

|   |   |   |
|---|---|---|
|   |   | weekends and holidays. |
| l. | Initial Departmental Use: | Public Social Services, Mental Health and Community and Senior Services |
| m. | Parking Spaces: | 781 |
| n. | Normal Working Hours: | 7:00 a.m. to 7:00 p.m., Monday through Friday and 9:00 a.m. to 2:00 p.m. Saturday, except New Year's Day, President's Day, Cesar Chavez Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day, Christmas Day (on the days such holidays are generally observed) and such other holidays as are generally recognized by the County of Los Angeles, California. |
| o. | Asbestos Report: | A report dated ____ prepared by____, a licensed California Asbestos contractor. |
| p. | Disabled Access Survey | A report dated _____ prepared by the Department of Public Works. |
| q. | Seismic Report | A report dated _____ prepared by the Department of Public Works. |

1.2.  Defined Terms Relating to Landlord's Work Letter

| | | |
|---|---|---|
| a. | Base Tenant Improvement Allowance: | $8,176,000 ($56 per RSF) |
| b. | Additional Tenant Improvement Allowance: | $6,570,000 ($45 per RSF) amortized at a rate of 6% per annum. |
| c. | Maximum Change Order Allowance: | Not Applicable |
| d. | Additional Tenant Improvement and Change Order Amortization Rate: | Six percent (6 %) per annum |
| e. | Base Rent Reduction: | Not Applicable |
| f. | Tenant's Work Letter Representative: | Miguel A Covarrubias or an assigned staff person of the Chief Executive Office-Real Estate Division. |

3

Initial

g. Landlord's Work Letter Representative:

An assigned staff person of the Landlord

h. Landlord's Address for Work Letter Notice:

M&A Gabaee, a California Limited
Partnership
c/o Excel Property Management
Services, Inc
9034 West Sunset Boulevard
West Hollywood, California 90069
Attention: Lease Administrator

i. Tenant's Address for Work Letter Notice:

Board of Supervisors
Kenneth Hahn Hall of Administration
Room 383
500 West Temple Street
Los Angeles, California 90012

With a copy to:

Chief Executive Office
Real Estate Division
222 South Hill Street, 3rd Floor
Los Angeles, California 90012
Attention: Director of Real Estate
Fax Number: (213) 830-0926

1.3. Exhibits to Lease:

(Executed concurrently with this Lease and incorporated hereinby this reference):

Exhibit A - Floor Plan of Premises
Exhibit B - Legal Description of Property
Exhibit C - Commencement Date
Memorandum and
Confirmation of Lease Terms
Exhibit D - HVAC Standards
Exhibit E - Cleaning and Maintenance
Schedule

1.4. Landlord's Work Letter:

(Executed concurrently with this Lease and incorporated herein by this reference):

Landlord's Work Letter
Addendum A:   Base Building
Improvements
Addendum B:   Tenant Improvements
Addendum C:   Memorandum of Tenant
Improvements Cost

1.5. Supplemental Lease Documents:

(Delivered to Landlord and

Document I:   Subordination, Non-
Disturbance and
Attornment Agreement
Document II: Tenant Estoppel

4

Initial

incorporated herein by this
reference):

Certificate
Document III: Community Business
            Enterprises Form
Document IV: Memorandum of Lease
Document V: Request for Notice

2.   <u>PREMISES</u>

    2.1.   Landlord does hereby lease to Tenant, and Tenant does hereby lease from Landlord, upon the terms and conditions herein set forth, the Premises described in Section 1 and <u>Exhibit A</u> attached hereto.

    2.2.   Tenant shall have the right within 90 days of approval of this Lease by the Board of Supervisors of the County of Los Angeles ("Board of Supervisors") to field-measure and verify the exact footage of the Premises and/or the Building All measurements shall be taken in accordance with the methods of measuring rentable/gross and usable (net) area as described in the Standard Method for Measuring Floor Area in Office Buildings, ANSI Z65.1-1996, as promulgated by the Building Owners and Management Association ("BOMA") International except that no penthouse mechanical room space shall be included in the measurement. Should this measurement be less than the square footage stated above, Tenant shall have the right to adjust such square footage and reduce the Base Rent in Section 1 accomplished by the mutual execution of a memorandum of understanding between the Landlord and the Tenant. Landlord acknowledges the space has been marketed at the above-indicated rental amount and in the event of subsequent physical measurements, Landlord agrees there will be no adjustment made to either the square footage or the Base Rent in the event the measured square footage exceeds the amount represented by Landlord. Should Landlord and Tenant not agree with respect to the results of the measurement conducted pursuant to this Subsection 2.2 Landlord shall appoint an independent firm or person who is experienced in making such measurements whose determination with respect to which measurement is correct shall be final and binding upon the parties. Landlord and Tenant shall share equally in the fees of such firm.

3.   <u>COMMON AREAS</u>

    Tenant may use the following areas ("Common Areas") in common with Landlord and other Tenants of the Building: the entrances, lobbies and other public areas of the Building, walkways, landscaped areas, driveways necessary for access to the Premises, parking areas and other common facilities designated by Landlord from time to time for common use of all Tenants of the Building. Tenant shall comply with all reasonable, non-discriminatory rules and regulations regarding the use of the Common Area established by Landlord.

4.   <u>COMMENCEMENT AND EXPIRATION DATES</u>

    4.1.   <u>Term</u>

5

Initial

The term of this Lease shall commence upon the Commencement Date and terminate on the Termination Date. Within 30 days of determining the Commencement Date, Landlord and Tenant shall acknowledge in writing the Commencement Date by executing the Commencement Date Memorandum and Confirmation of Lease Terms attached as <u>Exhibit C</u>. The Commencement Date shall begin 30 days after Tenant's Acceptance of the Premises. The term "Tenant's Acceptance of the Premises" as used in this Lease shall mean the date upon which the Premises are Substantially Complete, Tenant has inspected the Premises and Tenant has accepted the Premises. The term "Substantial Completion" as used in this Lease shall mean compliance with all of the following:

a.    The shell and core of the Building are complete and in compliance with all applicable laws and codes, and all of the building systems are operational to the extent necessary to service the Premises;

b.    Landlord has sufficiently completed all the work required to be performed by Landlord in accordance with this Lease, including the installation of modular furniture systems, if so required (except minor punch list items which Landlord shall thereafter promptly complete), such that Tenant can conduct normal business operations from the Premises;

c.    Landlord has obtained a certificate of occupancy for the Building, or a temporary certificate of occupancy for that portion of the Building that includes all of the Premises, or its equivalent;

d.    Tenant has been provided with the number of parking privileges and spaces to which it is entitled under this Lease; and

e.    If Landlord is responsible for the installation of telecommunications systems, then such systems shall be completely operational.

4.2.    <u>Termination Right</u>

If the Commencement Date has not occurred within 60 days from the Projected Commencement Date, subject to Tenant Delays or Force Majeure Delays as provided in Landlord's Work Letter, which has been executed concurrently herewith, Tenant may thereafter, at any time before the Commencement Date occurs, terminate this Lease effective upon the giving of written notice to Landlord and the parties shall have no further obligations to one another hereunder.

4.3.    <u>Early Possession</u>

Tenant shall be entitled to possession of the Premises not less than 30 days prior to the Commencement Date for the purpose of installing Tenant's furniture, fixtures and equipment in the Premises. Such early occupancy shall be subject to all provisions hereof but shall not advance the Termination Date, and Tenant shall not pay Basic Rent for such early occupancy period.

4.4.    <u>Early Termination</u>

6

Initial

Tenant shall have the right to terminate this lease in whole or in part at any time after the Early Termination Notice Date, as defined in Section 1, by giving Landlord not less than 60 days prior written notice executed by the Chief Executive Officer of Tenant.

5.    RENT

Tenant shall pay Landlord the Base Rent stated in Section 1 during the Term hereof within 15 days after a claim therefor for each such month has been filed by Landlord with the Auditor of the County of Los Angeles (the "County") prior to the first day of each month. Base Rent for any partial month shall be prorated in proportion to the number of days in such month. The Base Rent is subject annual Consumer Price Index (CPI) adjustments as follows:

a.    CPI. From and after the fourth anniversary of the Commencement Date, on the first day of the first full calendar month thereafter (the "Adjustment Date") and on every anniversary of the Adjustment Date thereafter, Basic Rent shall be adjusted by applying the CPI Formula set forth below. The "Base Index" shall be the Index published for the month the Lease commences.

b.    CPI Formula. The Index means the Consumer Price Index for all Urban Consumers for the Los Angeles-Anaheim-Riverside area, all items published by the United States Department of Labor, Bureau of Labor Statistics (1982-84=100). The "CPI Formula" means Original Base Rent multiplied by a fraction, the numerator being the Index (the "New Index") published for the month immediately preceding the month the adjustment is to be effective, and the denominator being the Index published for the month the Lease commenced. If the Index is changed so that the Index differs from that used as of the Commencement Date of the Lease, the Index shall be converted in accordance with the conversion factor published by the United States Department of Labor, Bureau of Labor Statistics. If the Index is discontinued or revised during the Term of this Lease, such other governmental Index or computation with which it is replaced shall be used in order to obtain substantially the same results as would be obtained if the Index had not been discontinued or revised.

c.    Illustration of Formula. The formula for determining the new Basic Rent shall be as follows:

New    Index
[Base        x $324,120 (Basic Rent)

7

Initial

Index}

= Monthly Basic Rent

d.    <u>Limitations on CPI Adjustment</u>.  In no event shall the monthly Basic Rent adjustment based upon the CPI Formula result in an annual increase greater than 3.00% of the amount of the Original Basic Rent, i.e.  $9,723.60 per month ($116,683.20 per year).

6.    <u>USES</u>

The Premises are to be used only for the uses set forth in Section 1 and for no other business or purpose; however, Landlord shall not unreasonably withhold its consent to a change of use.

7.    <u>HOLDOVER</u>

If Tenant remains in possession of the Premises or any part thereof after the expiration of the term of this Lease, such occupancy shall be a tenancy which is terminable only upon 90 days written notice from Landlord or 30 days written notice from the Chief Executive Officer of Tenant at the last monthly Base Rent payable under this Lease (as such Base Rent may be adjusted from time to time in accordance with this Lease) plus all other charges payable under this Lease, and subject to all of the terms, covenants and conditions of this Lease.

8.    <u>COMPLIANCE WITH LAW</u>

Tenant shall, at Tenant's expense, comply promptly with all applicable statutes, ordinances, rules, regulations, orders and requirements in effect during the term hereof, regulating the use, occupancy or improvement of the Premises by Tenant.  Landlord, not Tenant, shall, at its sole cost, at all times cause the Premises and the Building to comply with all applicable statutes, ordinances, rules, regulations, orders and requirements in effect and binding upon Tenant or Landlord during the term hereof, including without limitation, the Americans with Disabilities Act, except to the extent such compliance is made necessary as a result of Tenant's particular use of or alterations or improvements to the Premises.

9.    <u>DAMAGE OR DESTRUCTION</u>

9.1.    <u>Damage</u>

In the event any portion of the Premises is damaged by fire or any other cause rendering the Premises totally or partially inaccessible or unusable and the Premises may be restored to a complete architectural unit of the same value, condition and character that existed immediately prior to such casualty in less than 180 days, then Landlord shall promptly, at Landlord's expense, repair such damage and this

8

Initial

Lease shall continue in full force and effect. If all or any portion of the Premises shall be made unusable by fire or other casualty, Landlord shall immediately secure the area to prevent injury to persons and/or vandalism to the improvements. Landlord shall promptly, but in any event within ten days, cause an architect or general contractor selected by Landlord to provide Landlord and Tenant with a written estimate of the amount of time required to substantially complete the repair and restoration of the Premises and make the Premises leasable again using standard working methods. The failure to do so shall be a material default hereunder. Base Rent shall abate to the extent that the Premises are unusable by Tenant. Tenant waives the provisions of California Civil Code Sections 1932(2) and 1933(4) with respect to any partial or total destruction of the Premises.

### 9.2.   Tenant Termination Right

In the event any portion of the Premises is damaged by fire or any other cause rendering the Premises totally or partially inaccessible or unusable and the Premises will not be restored to a complete architectural unit of the same value, condition and character that existed immediately prior to such casualty in less than 180 days for any reason, then Tenant may terminate this Lease by giving written notice within ten days after notice from Landlord specifying such time period of repair; and this lease shall terminate and the Basic Rent shall be abated from the date the Premises became unleasable. In the event that Tenant does not elect to terminate this Lease, Landlord shall promptly commence and diligently prosecute to completion the repairs to the Building or Premises, provided insurance proceeds are available to repair the damages.

### 9.3.   Damage In Last Year

Notwithstanding the foregoing provisions, if any material destruction to the Premises occurs during the last year of the Term, either Landlord or Tenant may terminate this Lease by giving notice to the other not more than 30 days after such destruction, in which case:

    a.   Landlord shall have no obligation to restore the Premises;

    b.   Landlord may retain all insurance proceeds relating to such destruction, and;

    c.   This Lease shall terminate as of the date which is 30 days after such written notice of termination.

### 9.4.   Default By Landlord

If Landlord is required to repair and restore the Premises as provided for in this Section and Landlord should fail to thereafter pursue said repair and restoration work with reasonable diligence to completion, Tenant may:

    a.   Declare a default hereunder or

9

Initial

b.    Perform or cause to be performed the restoration work and deduct the cost thereof plus interest thereon at ten percent (10%) per annum, from the Basic Rent next due as a charge against the Landlord.

## 10.    REPAIRS AND MAINTENANCE

### 10.1.    Landlord Representations

Landlord represents to Tenant that:

a.    The Premises, the Building and all Common Areas (including electrical, heating, ventilating, and air conditioning ("HVAC"), mechanical, plumbing, gas and fire/life safety systems in the Building and similar building service systems) comply with all current laws, codes, and ordinances, including the Americans With Disabilities Act; and are in reasonable good working order and condition;

b.    The Building and Premises comply with all covenants, conditions, restrictions and underwriter's requirement; and

c.    The Premises, Building and Common Areas are free of the presence of Hazardous Materials (as hereinafter defined) and

d.    Landlord has not received any notice from any governmental agency that the Building or the Premises are in violation of any law or regulation.

e.    Based upon a professional inspection of the Premises and the Building and the Asbestos Report that the Premises and the Building contain no asbestos containing materials (other than as may be reflected in the Asbestos Report), Landlord shall, prior to Tenant's occupancy, abate, at Landlord's sole cost and expense, all asbestos containing materials to the extent required by law and provide Tenant with an updated report from a licensed California Asbestos contractor to that effect.

### 10.2.    Landlord Obligations

a.    Landlord shall keep and maintain in good repair and working order and promptly make repairs to and perform maintenance upon and replace as needed.

i.    the structural elements of the Building, including without limitation, all permanent exterior and interior walls, floors and ceilings, roof, concealed plumbing, stairways, concealed electrical systems and telephone intra-building network cable;

ii.    mechanical (including HVAC), electrical, plumbing and fire/life systems serving the Building

iii.    the Common Areas;

iv.    exterior windows of the Building;

v.    elevators serving the Building.

10

Initial

b.    Landlord, at its sole cost and expense, shall also perform all maintenance and repairs to the Premises, and shall keep the Premises in good condition and repair, reasonable wear and tear excepted. Landlord's repair obligations include, without limitation, repairs to:

i.    the floor covering (if such floor covering is carpeting it shall be replaced as needed but not less often than after five years of use);

ii.    interior partitions;

iii.    doors;

iv.    the interior side of demising walls (which shall be repainted as needed but not less often than every five years and

v.    signage

vi.    emergency exit signage and egress battery replacement.

### 10.3.  Tenant Obligations

Without limiting Landlord's Obligations, Tenant shall, at Tenant's sole expense, be responsible for the cost of repairing any area damaged by Tenant or Tenant's agents, employees, invitees and visitors and the repair of low voltage electronic, phone and data cabling and related equipment that is installed by or for the exclusive benefit of Tenant. All repairs and replacements shall:

a.    be made and performed by contractors or mechanics approved by Tenant, which consent shall not be unreasonably withheld or delayed,

b.    be at least equal in quality, value and utility to the original work or installation, and

c.    be in accordance with all laws.

### 10.4.  Tenant's Right to Repair

a.    If Tenant provides written notice (or oral notice in the event of an emergency such as damage or destruction to or of any portion of the Building structure and/or the Building systems and/or anything that could cause material disruption to Tenant's business) to Landlord of an event or circumstance which requires the action of Landlord with respect to repair and/or maintenance, and Landlord fails to provide such action within a reasonable period of time, given the circumstances, after the giving of such notice, but in any event not later than five days after the giving of such notice, then Tenant may proceed to take the required action (provided, however, that no such notice shall be required in the event of an emergency which threatens life or where there is imminent danger to property or a possibility that a failure to take immediate action could cause a material disruption in Tenant's normal and customary business activities). Tenant shall have access to the Building to the extent necessary to perform the work contemplated by this provision. If such action was required under the terms of this Lease to have been taken by Landlord and was not taken by Landlord within such period (unless such notice was not required as provided above), and Tenant took such required action, then Tenant shall be entitled to prompt reimbursement by Landlord of

11

Initial

Tenant's reasonable costs and expenses in having taken such action plus interest thereon at ten percent (10%) per annum. If not reimbursed by Landlord within ten days, Tenant shall be entitled to deduct from Basic Rent payable by Tenant under this Lease the amount set forth in its invoice for such work. The remedies provided in this Section are in addition to the remedies provided in Section 14.

      b.    Tenant at its sole option, acting through the CEO, may request the Landlord to perform, supply and administer any repairs, replacement, or services that are the responsibility of the Tenant and reimburse Landlord for such costs.

## 11. SERVICES AND UTILITIES

### 11.1. Services

      a.    Heating, Ventilation and Air Conditioning (HVAC)

Landlord shall furnish heating, ventilation and air conditioning ("HVAC"), during Normal Working Hours in amounts required for the use and occupancy of the Premises for normal office purposes to a standard comparable to other first-class buildings and not less than the standard set forth in Exhibit D attached hereto.

      b.    Electricity

Landlord shall furnish to the Premises the amount of electric current provided for in the Working Drawings (if applicable) but in any event not less than seven watts of electric current (connected load) per square foot of Rentable/gross Square Feet in the Premises, for power and lighting and electric current for HVAC, and Landlord shall provide the existing or new transformers or sub-panels on each floor of the Premises necessary for Tenant to utilize such capacity in the Premises.

      c.    Elevators

Landlord shall furnish freight and passenger elevator services to the Premises during Normal Working Hours. During all other hours, Landlord shall furnish passenger elevator cab service in the elevator bank serving the Premises on an as needed basis, and, by prior arrangement with Landlord's building manager, freight elevator service.

      d.    Water

Landlord shall make available warm and cold water for normal lavatory and potable water meeting all applicable governmental standards for drinking purposes in the Premises.

      e.    Janitorial

Landlord at its sole cost and expense shall provide janitorial service on five nights per week generally consistent with that furnished in comparable office buildings in the County of Los Angeles, but not less than the services set forth in the specifications set forth in Exhibit E attached hereto.

      f.    Access

Landlord shall furnish to Tenant's employees and agents access to the Building, Premises and Common Areas on a seven day per week, 24 hour per day basis, subject to compliance with such reasonable security measures as shall from time to time be in effect for the Building.

      g.    Pest Control

12

Initial

Landlord at its sole cost and expense shall provide pest control services to the premises per the specifications set forth in <u>Exhibit E</u> attached hereto.

### 11.2. Utilities

Landlord agrees to pay when due all charges for the use of the sewer, effluent treatment, when and if imposed by any governmental authority, all water, sprinkler standby charges, electricity, gas, heating and common area power and lighting, power charges associated with the HVAC, and other utility rents and charges accruing or payable in connection with the Premises during the Term of this Lease or any renewal, extension, or holdover thereof, whether the same are pro-rated or measured by separate meters. In the event Landlord fails or refuses to pay any or all of the charges when due, Tenant may give Landlord ten (10) calendar days prior written notice and thereafter pay directly such charges and deduct the payments from the installments of rent next due as a charge against the Landlord.

## 12. <u>TAXES</u>

Landlord shall pay promptly all real property taxes, assessments and special assessments which may be levied or assessed against the Premises or Building during the term of this Lease or any renewal or holdover period thereof.

In the event Landlord fails or refuses to pay any or all taxes or assessments when due, Tenant may, at its sole discretion, give Landlord thirty (30) calendar days prior written notice and thereafter pay such taxes and assessments and deduct the payments from the installments of rent next due as a charge against the Landlord.

## 13. <u>LANDLORD ACCESS</u>

Tenant shall permit Landlord and its agents to enter the Premises upon prior written notice for the purpose of inspecting the Premises for any reasonable purpose. If Landlord temporarily closes any portion of the Building or Premises, Basic Rent shall be prorated based upon the percentage of the Premises or Building rendered unleasable and not used by Tenant. Landlord shall have the right at any and all times to enter the Premises in the event of an emergency.

## 14. <u>TENANT DEFAULT</u>

### 14.1. <u>Default</u>

The occurrence of any one or more of the following events shall constitute a material default and breach of this Lease by Tenant ("Default"):

a.    the failure by Tenant to make any payment of Base Rent or any other payment required to be made by Tenant hereunder (except to the extent an offset is expressly permitted hereunder), as and when due and if the failure continues for a period of ten days after written notice to Tenant;

13

Initial

b.    the failure by Tenant to observe or perform any of the other covenants, conditions or provisions of this Lease, where such failure shall continue for a period of 30 days after written notice from Landlord specifying in detail the nature of the default; provided, however, if more than 30 days are reasonably required for its cure then Tenant shall not be deemed to be in default if Tenant commences such cure within said 30-day period and thereafter diligently prosecutes such cure to completion.

### 14.2.  Termination

Tenant agrees that if a Default should occur and should not be cured within the time periods set forth above, it shall be lawful for Landlord to terminate this Lease upon the giving of written notice to Tenant. In addition thereto, Landlord shall have such other rights or remedies as may be provided by law.

### 14.3.  No Effect on Indemnity

Nothing in this Article shall be deemed to affect either Landlord or Tenant's right to indemnification under any indemnification clause or clauses set forth in this Lease.

## 15.  LANDLORD DEFAULT

### 15.1.  Remedies

In addition to the provisions for Landlord's default provided by Sections 9.4, 10.3, 19 and 20.2, Landlord shall be in default ("Landlord Default") in the performance of any obligation required to be performed by Landlord under this Lease if Landlord has failed to perform such obligation within five days after the giving of written notice with respect thereto by Tenant (which notice shall be, if appropriate, the same notice given under Section 10.3); provided, however, that if the nature of the Landlord Default is such that the same cannot reasonably be cured within such five day period, Landlord shall not be deemed to be in Landlord Default if Landlord shall within such period commence such cure and thereafter diligently prosecute the same to completion. If the Landlord Default is of such a nature that it materially and substantially interferes with Tenant's occupancy and use of the Premises and if such Landlord Default is not cured within the foregoing cure period, then Tenant shall have the right, at its option, with or without further notice or demand of any kind to Landlord or any other person, to any one or more of the following described remedies in addition to all other rights and remedies provided at law or in equity or elsewhere herein:

a.    to remedy such default or breach and deduct the costs thereof (including but not limited to attorney' fees) plus interest at the rate of ten percent (10%) per annum from the installments of Base Rent next falling due;

b.    to pursue the remedy of specific performance;

14

Initial

c.  to seek money damages for loss arising from Landlord's failure to discharge its obligations under this Lease or offset such damages against Base Rent next coming due; and/or

d.  to terminate this Lease.

### 15.2. Waiver

Nothing herein contained shall relieve Landlord from its duty to effect the repair, replacement, correction or maintenance required to restore any affected services, or to perform any other obligations to the standard prescribed in this Lease, nor shall this Section be construed to obligate Tenant to undertake any such work.

### 15.3. Emergency

Notwithstanding the foregoing cure period, Tenant may cure any default without notice where the failure promptly to cure such default would, in the reasonable opinion of Tenant, create or allow to persist an emergency condition or materially and adversely affect the operation of Tenant's business in the Premises.

## 16.  ASSIGNMENT AND SUBLETTING

Tenant may assign, mortgage, encumber or otherwise transfer this Lease or sublet the whole or any part of the Premises without first obtaining Landlord's prior consent: provided, however, no such assignment, subletting or other transfer shall relieve Tenant of any liability under this Lease unless Landlord has given its written consent thereto, which Landlord shall not unreasonably withhold if the assignee has a financial condition which is reasonably sufficient for it to be responsible for all future obligations under this Lease.

## 17.  ALTERATIONS AND ADDITIONS

### 17.1. Landlord Consent

Tenant shall not make any structural alterations, improvements, additions, or utility installations in or about the Premises (collectively, "Alterations") without first obtaining the written consent of Landlord, which consent shall not be unreasonably withheld, conditioned or delayed.  However, Landlord's consent shall not be required for any Alteration that satisfies all of the following criteria:

a.  complies with all Laws;

b.  is not visible from the exterior of the Premises or Building;

c.  will not materially affect the systems or structure of the Building; and

d.  does not unreasonably interfere with the normal and customary business office operations of other Tenants in the Building.

15

Initial

If Landlord fails to respond in writing within 30 days of such request, Landlord shall be deemed to approve the Alterations.

### 17.2. End of Term

Any Alterations not removed by Tenant shall become the property of Landlord and remain upon and be surrendered with the Premises at the expiration of the Term.

## 18. CONDEMNATION

### 18.1. Controlling Terms

If during the Term, or during the period of time between the execution of this Lease and the Commencement Date, there is any taking of all or any part of the Premises or any interest in this Lease by Condemnation (as defined below), this Section shall determine the rights and obligations of Tenant and Landlord. "Condemnation" shall mean the exercise of any governmental power to take title to any portion of the Premises, whether by legal proceedings or otherwise, by a Condemnor (as defined below) or a voluntary sale or transfer by Landlord to any Condemnor either under threat of a Condemnor's exercise of such power or while legal proceedings are pending for the exercise of such power. "Condemnor" shall mean any public or quasi-public authority, or private corporation or individual, having the power of Condemnation.

### 18.2. Total Taking

If the Premises are totally taken by Condemnation, this Lease shall terminate on the date the Condemnor has a right to possession of the Premises (the "Date of Taking").

### 18.3. Partial Taking

If any portion, but not all, of the Premises is taken by Condemnation, this Lease shall remain in effect, except that Tenant may elect to terminate this Lease if, in Tenant's reasonable judgment, the remaining portion of the Premises (including the space available for parking) is rendered unsuitable for Tenant's continued use of the Premises. If Tenant elects to so terminate this Lease, Tenant must exercise its right to terminate by giving notice to Landlord within 30 days after the date that the nature and the extent of the Condemnation have been determined (the "Determination Date"), which notice shall set forth the date of termination. Such termination date shall not be earlier than 30 days nor later than 90 days after Tenant has notified Landlord of its election to terminate; except that this Lease shall terminate on the Date of Taking if the Date of Taking falls on a date before the date of termination as designated by Tenant. If Tenant does not so notify Landlord within 30 days after the Determination Date, all obligations of Tenant under this Lease shall remain in effect, except that Basic Rent shall be equitably abated.

16

Initial

So long as Tenant is not in default hereunder, Tenant shall have the right to the quiet and peaceful enjoyment and possession of the Premises and the Common Areas during the Term of this Lease, subject to the terms and conditions of this Lease.

30. GENERAL

30.1. Headings

Titles to Sections of this Lease are not a part of this Lease and shall have no effect upon the construction or interpretation of any part hereof.

30.2. Successors and Assigns

All of the covenants, agreements, terms and conditions contained in this Lease shall inure to and be binding upon the Landlord and Tenant and their respective successors and assigns.

30.3. Brokers

Landlord and Tenant each represent and warrant to each other that it has not engaged any broker, finder or other person who would be entitled to any commission or fees in respect of the negotiation, execution or delivery of this Lease other than as disclosed to the other in writing and shall indemnify and hold harmless each other against any loss, cost, liability or expense incurred by the other party as a result of any claim asserted by any such broker, finder or other person on the basis of any arrangements or agreements made or alleged to have been made in variance with this representation. Tenant shall receive from Landlord or Landlord's broker, within ten days after the execution of this Lease, an amount equal to 50% of all commissions due to Landlord's broker as a result of the execution of this Lease.

30.4. Entire Agreement

This Lease (and the Landlord's Work Letter and Supplemental Lease Documents) is the final and complete expression of Landlord and Tenant relating in any manner to the leasing, use and occupancy of the Premises, to Tenant's use of the Building and other matters set forth in this Lease. No prior agreements or understanding pertaining to the same shall be valid or of any force or effect and the covenants and agreements of this Lease shall not be altered, modified or added to except in writing signed by both Landlord and Tenant.

30.5. Severability

Any provision of this Lease which shall prove to be invalid, void or illegal shall in no way affect, impair or invalidate any other provision hereof and the remaining provisions hereof shall nevertheless remain in full force and effect.

23

Initial

### 30.6. Notices

All notices and communications to any party hereunder shall be in writing and shall be deemed properly given if delivered personally, sent by registered or certified mail, postage prepaid, or by a recognized overnight commercial messenger providing proof of delivery, facsimile (electronically confirmed) to Landlord's Address for Notice and Tenant's Address for Notice as set forth in Section 1. Any notice so given shall be deemed to have been given as of the date of delivery (whether accepted or refused) established by U.S. Post Office return receipt or the overnight carrier's proof of delivery, as the case may be. Any such notice not so given shall be deemed given upon receipt of the same by the party to whom the same is to be given.

### 30.7. Governing Law and Forum

This Lease shall be governed by and construed in accordance with the internal laws of the State of California. Any litigation with respect to this Lease shall be conducted in the County of Los Angeles, State of California.

### 30.8. Waivers

No waiver by Landlord or Tenant of any provision hereof shall be deemed a waiver of any other provision hereof or of any subsequent breach by Landlord or Tenant of the same or any other provision. Landlord's or Tenant's consent to or approval of any act shall not be deemed to render unnecessary the obtaining of Landlord's or Tenant's consent to or approval of any subsequent act by Landlord or Tenant.

### 30.9. Time of Essence

Time is of the essence for the performance of all of the obligations specified hereunder.

### 30.10. Consent

Whenever any consent is required by Landlord or Tenant hereunder, such consent shall not be unreasonably withheld, conditioned or delayed and, unless otherwise specifically provided herein, shall be deemed granted if not refused within ten (10) days after written request is made therefore, together with all necessary information.

### 30.11. Community Business Enterprises

Landlord shall complete and deliver to Tenant concurrently with the execution hereof a Community Business Enterprises form set forth as Document III in the Supplemental Lease Documents delivered to Landlord concurrently herewith.

### 30.12. Memorandum of Lease

24



Initial

If requested by Tenant, Landlord and Tenant shall execute and acknowledge a Memorandum of Lease in the form of Document IV in the Supplemental Lease Documents delivered to Landlord concurrently herewith, which Memorandum may be recorded by Tenant in the Official Records of Los Angeles County.

## 31.  AUTHORITY

Only the Board of Supervisors has the authority, by formally approving and/or executing this Lease, to bind the County to the terms included herein.  Each individual executing this Lease on behalf of Tenant represents and warrants that he or she is duly authorized to execute and deliver this Lease on behalf of Tenant, and that this Lease is binding upon Tenant in accordance with its terms.  Landlord understands that no material terms of this Lease may be altered or deleted, nor may any new material terms be added to this Lease, without the express written approval of the Board of Supervisors, either through an amendment to the Lease or by other formal board action.  No County officer, employee, agent or independent contractor has any authority to alter, add or delete the material terms of this Lease and Landlord may not rely upon any representations to the contrary.  This limitation of authority applies to all material terms of the Lease including, without limitation, any monetary ceiling established for Tenant Improvements or other project costs of Landlord which are subject to reimbursement by County.  County shall not reimburse Landlord for any expenses which exceed this ceiling.  Notwithstanding the foregoing, the Chief Executive Officer of the County or its delegee (the "Chief Executive Officer") may take any administrative act on behalf of Tenant hereunder which does not have the effect of increasing Base Rent or other financial obligations of Tenant under this Lease, including without limitation, granting any approvals, terminating this Lease in the manner provided herein by an Early Termination Notice or otherwise, signing estoppel certificates, signing the Commencement Date Memorandum and Confirmation of Lease Terms or subordinating this Lease.  Each individual executing this Lease on behalf of Landlord represents and warrants that he or she is duly authorized to execute and deliver this Lease on behalf of Landlord, and that this Lease is binding upon Landlord in accordance with its terms.

## 32.  ACKNOWLEDGEMENT BY LANDLORD

Landlord acknowledges that it is aware of the following provisions:

### 32.1.  Consideration of GAIN Program Participants

Should Landlord require additional or replacement personnel after the effective date of this Lease, Landlord shall give consideration for any such employment, openings to participants in the County Department of Public Social Services' Greater Avenues for Independence ("GAIN") Program who meet Landlord's minimum qualifications for the open position.  The County will refer GAIN participants by job category to Landlord.

Initial

## 32.2. Solicitation of Consideration

It is improper for any County officer employee or agent to solicit consideration in any form from a Landlord with the implication, suggestion or statement that the Landlord's provision of the consideration may secure more favorable treatment for the Landlord in the award of the Lease or that Landlord's failure to provide such consideration may negatively affect the County's consideration of the Landlord's offer to lease. A Landlord shall not offer or give, either directly or through an intermediary, consideration in any form to a County officer, employee or agent for the purpose of securing favorable treatment with respect to the award of the Lease.

Landlord shall immediately report any attempt by a County officer, employee or agent to solicit such improper consideration. The report shall be made either to the County Manager charged with the supervision of the employee or to the County Auditor-Controller's Employee Fraud Hotline at (213) 974-0914 or (800) 544-6861. Failure to report such solicitation may result in the Landlord's submission being eliminated from consideration.

## 32.3. Landlord Assignment

a. Landlord may assign, transfer, mortgage, hypothecate or encumber Landlord's right, title and interest in and to this Lease or any portion thereof (including the right to receive rental payments but excluding its duties and obligations hereunder), and Landlord may execute any and all instruments providing for the payment of Base Rent directly to an assignee or transferee, but only if the conditions set forth in this Section are met.

b. Any document or agreement purporting to assign, transfer, mortgage, hypothecate or encumber Landlord's right, title and interest in and to this Lease or any portion thereof, is hereinafter referred to as a "Security Agreement." Any Security Agreement which is executed without full compliance with the requirements of this Section shall be void.

c. Each assignee or transferee under the Security Agreement shall certify and agree in writing that such assignee or transferee has read and is familiar with the requirements of Sections 5950-5955 of California Government Code, which prohibits the offer or sale of any security constituting a fractional interest in this Lease or any portion thereof, without the prior written consent of the County. Notwithstanding the foregoing, the County hereby acknowledges and agrees that Landlord shall have the right to encumber the Property with CMBS (collateralized mortgage backed securities) financing or other traditional real estate financing. However, Landlord may not encumber the Property through any type of bond financing vehicle, including but not limited to certificate of participation financing.

d. Violation by Landlord of the provisions of Section 5951 of the California Government Code will constitute a material breach of this Lease, upon which the County may impose damages in an amount equal to the greater of $500,000 or 10% of the aggregate principal portion of all rental payments payable by the County during the entire Term of this Lease, it being expressly agreed that the aforesaid amount shall be

26

Initial

imposed as liquidated damages, and not as a forfeiture or penalty.   It is further specifically agreed that the aforesaid amount is presumed to be the amount of damages sustained by reason of any such violation, because from the circumstances and nature of the violation it would be impracticable and extremely difficult to fix actual damages. In addition, the County may exercise or pursue any other right or remedy it may have under this Lease or applicable law.

      e.     Landlord shall give the County notice and a copy of each Security Agreement and any other instrument relating thereto (including, but not limited to, instruments providing for the payment of Base Rent directly to an assignee or transferee) at least two weeks prior to the effective date thereof.

      f.     Landlord shall not furnish any information concerning County or the subject matter of this Lease (including, but not limited to, offering memoranda, financial statements, economic and demographic information, and legal opinions rendered by the office of counsel for the County) to any person or entity, except with County's prior written consent.  Landlord shall indemnify, defend and hold County and its officers, agents and employees harmless from and against all claims and liability alleged to arise from the inaccuracy or incompleteness of any information furnished by Landlord in violation of this Section.

      g.     The provisions of this Section shall be binding upon and applicable to the parties hereto and their respective successors and assigns.  Whenever in this Section Landlord is referred to, such reference shall be deemed to include Landlord's successors or assigns, and all covenants and agreements by or on behalf of Landlord herein shall bind and apply to Landlord's successors and assigns whether so expressed or not.

## 33.  IRREVOCABLE OFFER

      In consideration for the time and expense that Tenant will invest, including, but not limited to, preliminary space planning, legal review, and preparation and noticing for presentation to the Tenant Real Estate Management Commission of Los Angeles County in reliance on Landlord's agreement to lease the Premises to Tenant under the terms of this Lease, Landlord irrevocably offers to enter into this Lease and not to revoke this offer until the Irrevocable Offer Expiration Date, as defined in Section 1.

## 34.  OPTION TO EXTEND

      (a) Terms of Option   Provided that no material default has occurred and is continuing under the Lease at the time the option is exercised, Tenant shall have two options to renew this Lease for two additional periods of five years each (each, an "Option Term"). Each such option shall be personal to Tenant and not assignable.

      (b) Exercise of Option   Tenant must exercise its option to extend this Lease, if it elects to do so, by giving Landlord written notice of its intent to do so by Chief Executive Office letter no later than 6 months prior to the end of the initial Term, or first option term, as the case may be.

Initial

(c) <u>Terms and Conditions of Extension Term</u>  The Option Term shall be on all the terms and conditions of this Lease, except that Base Rent for each Option Term shall be subject to annual adjustments in accordance with Section 5 hereof.

28

Initial

IN WITNESS WHEREOF this Lease has been executed the day and year first above set forth.

LANDLORD:

M&A Gabaee, a California Limited Partnership

By: _____
Name: _____
Its: _____

TENANT:

COUNTY OF LOS ANGELES
a body politic and corporate

By: _____
    Chair, Board of Supervisors

ATTEST:

Lori Glasgow
Executive Officer-Clerk
of the Board of Supervisors

By: _____
    Deputy

APPROVED AS TO FORM

MARY C. WICKHAM
County Counsel

By: _____
    Deputy County Counsel

29

# EXHIBIT A

## FLOOR PLAN OF PREMISES

# EXHIBIT B

# LEGAL DESCRIPTION OF PREMISES

THE LAND REFERRED TO HEREIN IS SITUATED IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

PARCEL A:

PARCEL 1 OF PARCEL MAP NO. 4743, IN THE CITY OF HAWTHORNE, AS SHOWN ON MAP FILED IN BOOK 65 PAGES 87 TO 96 INCLUSIVE OF PARCEL MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

PARCEL A1:

AN EASEMENT FOR INGRESS AND EGRESS, AUTOMOBILE PARKING, PEDESTRIAN USES, INSTALLATION, OPERATION AND MAINTENANCE OF SEPARATE AND COMMON UTILITY LINES, DEVELOPMENT AND CONSTRUCTION, ATTACHMENT, MAINTENANCE AND REPAIR OF PEDESTRIAN BRIDGES AND OTHER INCIDENTAL USES, ALL AS MORE PARTICULARLY DEFINED AND DESCRIBED IN SECTION 11—"EASEMENTS" OF THAT CERTAIN DOCUMENT ENTITLED "CONSTRUCTIONS, OPERATION AND RECIPROCAL EASEMENT AGREEMENT" DATED MARCH 8, 1976 EXECUTED BY H. B-H ASSOCIATES-HAWTHORNE, A LIMITED PARTNERSHIP, CARTER HAWLEY HALE STORES, INC., A CALIFORNIA CORPORATION, J. C. PENNEY COMPANY, INC., A DELAWARE CORPORATION, MONTGOMERY WARD & CO., INCORPORATED, AN ILLINOIS CORPORATION, THE PARKING AUTHORITY OF THE CITY OF HAWTHORNE, A PUBLIC BODY, CORPORATE AND POLITIC, THE COMMUNITY REDEVELOPMENT AGENCY OF THE CITY OF HAWTHORNE, A PUBLIC BODY, CORPORATE AND POLITIC, AND THE CITY OF HAWTHORNE, A MUNICIPAL CORPORATION, RECORDED MARCH 8, 1976 AS INSTRUMENT NO. 3440 IN BOOK M5274 PAGE 271 OF OFFICIAL RECORDS, FOR THE TERM OF YEARS OR SOONER TERMINATION THEREOF AS SET FORTH IN SAID DOCUMENT, AS GRANTED TO H. B-H ASSOCIATES-HAWTHORNE, A LIMITED PARTNERSHIP, IN SAID DOCUMENT, OVER PARCELS 2, 3, 4, 6, 7, 8, 9, 10, 12, 13 AND 14 OF PARCEL MAP NO. 4743, IN THE CITY OF HAWTHORNE, AS SHOWN ON A MAP FILED IN BOOK 85 PAGES 87 TO 96 INCLUSIVE OF PARCEL MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

PARCEL A2:

AN EASEMENT TO CONSTRUCT, RECONSTRUCT AND USE A STREET OR HIGHWAY FOR GRADE CROSSINGS TO BE USED IN COMMON WITH THE PUBLIC AS GRANTED TO THE CITY OF HAWTHORNE, A MUNICIPAL CORPORATION, IN AN INDENTURE RECORDED JANUARY 27, 1976 IN BOOK D6950 PAGE 730 OF OFFICIAL RECORDS AS INSTRUMENT NO. 1956, TOGETHER WITH AN EASEMENT TO CONSTRUCT, RECONSTRUCT, MAINTAIN AND USE A STREET OR HIGHWAY AND (2) PEDESTRIAN WALKWAYS BY MEANS OF (3) OVERPASSES, TO BE USED IN COMMON WITH THE PUBLIC AS GRANTED TO THE CITY OF HAWTHORNE, A MUNICIPAL CORPORATION, IN AN INDENTURE RECORDED JANUARY 27, 1976 IN BOOK D6950 PAGE 739, OF OFFICIAL RECORDS AS INSTRUMENT NO. 1957, OVER THOSE PORTIONS OF PARCEL NO. 11 OF PARCEL MAP NO. 4743, IN THE CITY OF HAWTHORNE, AS SHOWN ON A MAP FILED IN BOOK 85 PAGES 87 TO 96 INCLUSIVE OF PARCEL MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS:

(1) BEING SHOWN AS GRADE CROSSING EASEMENTS ON SHEET 10 OF 10 OF SAID PARCEL MAP NO. 4743.

(2) BEING SHOWN AS OVERHEAD, CROSSING EASEMENTS ON SHEET 10 OF 10 OF SAID PARCEL MAP NO. 4743.

## EXHIBIT C

## COMMENCEMENT DATE MEMORANDUM
## AND CONFIRMATION OF LEASE TERMS

Reference is made to that certain lease ("Lease") dated _____, 200_, between County of Los Angeles, a body politic and corporate ("Tenant"), and _____, a _____ ("Landlord"), whereby Landlord leased to Tenant and Tenant leased from Landlord certain premises in the building located at ____ _____ ("Premises"),

Landlord and Tenant hereby acknowledge as follow:

1) Landlord delivered possession of the Premises to Tenant in a Substantially Complete condition on _____ ("Possession Date").

2) Tenant has accepted possession of the Premises and now occupies the same;

3) The Lease commenced on _____ ("Commencement Date").

4) The Premises contain _____ rentable/gross square feet of space; and

For clarification and the purpose of calculating future rental rate adjustments:

1) Base Rent per month is _____.

2) The Base Index Month is _____.

3) The Base Index is _____.

4) The New Index Month is _____.

IN WITNESS WHEREOF, this memorandum is executed this __ day of ____ ____, 20_____.

| Tenant: | Landlord: |
|---|---|
| **COUNTY OF LOS ANGELES** a body politic and corporate | a _____ |
| By: _____ Name_____ Its_____ | By: _____ Name_____ Its_____ |

EXHIBIT C – Page 1
COMMENCEMENT DATE MEMORANDUM
AND CONFIRMATION OF LEASE TERMS

# EXHIBIT D

## HEATING, VENTILATION AND AIR CONTITIONING

Landlord shall supply cooling, ventilating and heating with capacity to produce the following results effective during Normal Working Hours established by the Lease and within tolerances normal in comparable office buildings; maintenance of inside space conditions of not greater than 78 degrees Fahrenheit when the outside air temperature is not more than 93 degrees Fahrenheit dry bulb and 70 degrees Fahrenheit wet bulb, and not less than 70 degrees Fahrenheit when the outside air temperature is not lower than 42 degrees Fahrenheit dry bulb. Interior space is designated at a rate of one zone for approximately each 1,000 square feet and one diffuser for each 200 square feet of usable/net square footage within the Premises. If energy requirements prohibit Landlord from complying with these requirements, Tenant shall not unreasonably withhold its consent to temporary waivers or modifications.

EXHIBIT E (continued)
CLEANING AND MAINTENANE SCHEDULE

1. <u>DAILY</u> (Monday through Friday)

   A.  Carpets vacuumed.
   B.  Composition floors dust-mopped.
   C.  Desks, desk accessories and office furniture dusted.  Papers and folders left on desk not to be moved.
   D.  Waste baskets, other trash receptacles emptied.
   E.  Chairs and waste baskets returned to proper position.
   F.  Fingerprints removed from glass doors and partitions.
   G.  Drinking fountains cleaned, sanitized and polished.
   H.  Lavatories, toilets and toilet rooms cleaned and mopped.  Toilet supplies replenished.
   I.  Bulb and tube replacements, as required.
   J.  Emergency exit signage and egress battery replacement (if applicable)
   K.  Graffiti expunged as needed within two working days after notice by Tenant
   L.  Floors washed as needed.
   M.  Kitchen/lunchroom/restroom supplies replenished including paper supplies, soap and.
   N.  Exclusive day porter service from _____ to _____ (if provided by contract).

2. <u>WEEKLY</u>

   A.  Low-reach areas, chair rungs, baseboards and insides of door jambs dusted.
   B.  Window sills, ledges and wood paneling and molding dusted.

3. <u>MONTHLY</u>

   A.  Floors washed and waxed in uncarpeted office area.
   B.  High-reach areas, door frames and tops of partitions dusted.
   C.  Upholstered furniture vacuumed, plastic and leather furniture wiped
   D.  Picture moldings and frames dusted.
   E.  Wall vents and ceiling vents vacuumed.
   F.  Carpet professionally spot cleaned as required to remove stains.
   G.  HVAC chiller water checked for bacteria, water conditioned as necessary.

4. <u>QUARTERLY</u>

   A.  Light fixtures cleaned and dusted, but not less frequently than quarterly.
   B.  Wood furniture polished.
   C.  Draperies or mini-blinds cleaned as required, but not less frequently than quarterly.
   D.  HVAC units serviced for preventative maintenance purposes, all filters changed.

EXHIBIT E – Page 2
CLEANING AND MAINTENANCE SCHEDULE

EXHIBIT E (continued)
CLEANING AND MAINTENANE SCHEDULE

5.  **SEMI-ANNUALLY**

   A.  Windows washed as required inside and outside but not less frequently than twice annually.
   B.  All painted wall and door surfaces washed and stains removed.
   C.  All walls treated with vinyl covering washed and stains removed.

6.  **ANNUALLY**

   A.  Furniture Systems and any other fabric or upholstered surfaces including chairs, couches, walls, etc., spot cleaned, or if determined to be necessary in Tenant's sole discretion, professionally cleaned in their entirety using a water extraction system.
   B.  Bathroom and any other ceramic tile surfaces professionally cleaned using a hand scrub process. All grout and porous surfaces resealed with a professional grade sealant.
   C.  Touch-up paint all interior painted surfaces in a color and finish to match existing.

7.  **AS NEEDED**

   A.  Premises and the sidewalks, driveways, parking areas and all means of access and egress for the Premises should be maintained in good repair, and in clean and safe condition at all times.
   B.  All lawns, shrubbery and foliage on the grounds of the Premises should be maintained in good condition and neat in appearance. Grass and shrubbery must be replanted as needed to maintain the grounds in good appearance and condition.
   C.  Interior and exterior pest control inspections and remediation frequency is to be determined by a licensed exterminator. (TBD).

   D.  Carpets to be cleaned using a non-detergent, low moisture, soil encapsulation system as recommended by the carpet manufacturer. The following schedule will be maintained for carpet cleaning:

      i.   heavy traffic areas as needed with a minimum frequency of bi-monthly [six (6) times per year];
      ii.  moderate traffic areas cleaned as needed with a minimum of once every six (6) months [two (2) times per year]; and
      iii. clean light traffic areas a minimum of once per year.

   Landlord agrees that bonnet cleaning is not an acceptable method of cleaning carpets.

   E.  All walls repainted and wall coverings replaced throughout the Premises. The paint finish should be eggshell or semi-gloss as directed by Tenant and

EXHIBIT E (continued)
CLEANING AND MAINTENANE SCHEDULE

in a color acceptable to Tenant.  In no event will Landlord be required to repaint or replace wall coverings more than one (1) time in a five (5) year period (the "Occurrence") except for touch-up paint as provided in Paragraph 6 C. The initial tenant improvements completed prior to Tenant's occupancy or as a condition to the renewal of the Lease shall not constitute and Occurrence for the purpose of determining the frequency of this work.

F.      All HVAC ducts cleaned as need but no less than every five (5) years.

8.    **GENERAL**

Landlord shall, upon request of Tenant, produce written service contracts as evidence of compliance with the terms of this Cleaning and Maintenance Schedule.

EXHIBIT E – Page 4
CLEANING AND MAINTENANCE SCHEDULE

## TABLE OF CONTENTS

1.    BASIC LEASE INFORMATION ....................................................................................1
    1.1.   TERMS ......................................................................................................1
        a.   Landlord's Address for Notice: ........................................................1
        b.   Tenant's Address for Notice: .............................................................1
        c.   Premises: ...........................................................................................1
        d.   Building: .............................................................................................1
        e.   Term: ...................................................................................................2
        f.   Projected Commencement Date: .......................................................2
        g.   Irrevocable Offer Expiration Date: ....................................................2
        h.   Base Rent: ..........................................................................................2
        i.   Early Termination .............................................................................2
        j.   Rentable/gross Square Feet in the Premises: ..................................2
        k.   Use: .....................................................................................................2
        l.   Initial Departmental Use: ..................................................................2
        m.   Parking Spaces: ................................................................................2
        n.   Normal Working Hours: .....................................................................2
        o.   Asbestos Report: ...............................................................................3
        p.   Disable Access Survey .....................................................................3
        q.   Seismic Report ..................................................................................3
    1.2.   DEFINED TERMS RELATING TO LANDLORD'S WORK LETTER ........................3
        a.   Base Tenant Improvement Allowance: ..............................................3
        b.   Additional Tenant Improvement Allowance: ......................................3
        c.   Maximum Change Order Allowance: ..................................................3
        d.   Additional Tenant Improvement and Change Order Amortization Rate: ................3
        e.   Base Rent Reduction: ........................................................................3
        f.   Tenant's Work Letter Representative: ................................................3
        g.   Landlord's Work Letter Representative: .............................................3
        h.   Landlord's Address for Work Letter Notice: ......................................3
        i.   Tenant's Address for Work Letter Notice: .........................................3
    1.3.   EXHIBITS TO LEASE: ...............................................................................4
    1.4.   LANDLORD'S WORK LETTER: ...................................................................4
    1.5.   SUPPLEMENTAL LEASE DOCUMENTS: .......................................................4

2.    PREMISES .........................................................................................................4

3.    COMMON AREAS ...............................................................................................5

4.    COMMENCEMENT AND EXPIRATION DATES .........................................................5
    4.1.   TERM ......................................................................................................5
    4.2.   TERMINATION RIGHT ...............................................................................6
    4.3.   EARLY POSSESSION ...............................................................................6
    4.4.   EARLY TERMINATION ...............................................................................6

5.    RENT .................................................................................................................6

6.    USES .................................................................................................................6

7.    HOLDOVER .........................................................................................................7

8.    COMPLIANCE WITH LAW .....................................................................................7

9.    DAMAGE OR DESTRUCTION .................................................................................7

9.1.   DAMAGE .................................................................................................... 7
9.2.   TENANT TERMINATION RIGHT ........................................................................ 8
9.3.   DAMAGE IN LAST YEAR ................................................................................. 8
9.4.   DEFAULT BY LANDLORD ................................................................................ 8
10.   REPAIRS AND MAINTENANCE ......................................................................... 8
10.1.   LANDLORD REPRESENTATIONS ..................................................................... 8
10.2.   LANDLORD OBLIGATIONS .............................................................................. 9
10.3.   TENANT OBLIGATIONS ................................................................................ 10
10.4.   TENANT'S RIGHT TO REPAIR ....................................................................... 10
11.   SERVICES AND UTILITIES ............................................................................. 11
11.1.   SERVICES ................................................................................................. 11
       a.   Heating, Ventilation and Air Conditioning (HVAC) ................................. 11
       b.   Electricity ............................................................................................ 11
       c.   Elevators ............................................................................................. 11
       d.   Water .................................................................................................. 11
       e.   Janitorial ............................................................................................. 11
       f.   Access ................................................................................................. 11
       g.   Pest Control ......................................................................................... 11
11.2.   UTILITIES ................................................................................................. 11
12.   TAXES ....................................................................................................... 12
13.   LANDLORD ACCESS ..................................................................................... 12
14.   TENANT DEFAULT ........................................................................................ 12
14.1.   DEFAULT .................................................................................................. 12
14.2.   TERMINATION ............................................................................................ 13
14.3.   NO EFFECT ON INDEMNITY ......................................................................... 13
15.   LANDLORD DEFAULT .................................................................................... 13
15.1.   REMEDIES ................................................................................................ 13
15.2.   WAIVER .................................................................................................... 13
15.3.   EMERGENCY .............................................................................................. 14
16.   ASSIGNMENT AND SUBLETTING .................................................................... 14
17.   ALTERATIONS AND ADDITIONS ...................................................................... 14
17.1.   LANDLORD CONSENT ................................................................................. 14
17.2.   END OF TERM ........................................................................................... 14
18.   CONDEMNATION .......................................................................................... 15
18.1.   CONTROLLING TERMS ................................................................................ 15
18.2.   TOTAL TAKING ........................................................................................... 15
18.3.   PARTIAL TAKING ........................................................................................ 15
18.4.   RESTORATION ........................................................................................... 15
18.5.   AWARD ..................................................................................................... 16
18.6.   WAIVER OF STATUTE .................................................................................. 16
19.   INDEMNIFICATION ....................................................................................... 16
19.1.   TENANT'S INDEMNITY ................................................................................ 16
19.2.   LANDLORD'S INDEMNITY ............................................................................ 16
20.   INSURANCE ................................................................................................ 17

20.1.  LANDLORD'S INSURANCE ........................................................................................ 17
20.2.  INSURANCE REQUIREMENTS ................................................................................... 17
20.3.  CERTIFICATES ......................................................................................................... 18
20.4.  WAIVER OF SUBROGATION ...................................................................................... 18

21.  PARKING ........................................................................................................................ 18

21.1.  TENANT'S RIGHTS .................................................................................................. 18
21.2.  REMEDIES .............................................................................................................. 18

22.  ENVIRONMENTAL MATTERS ......................................................................................... 19

22.1.  HAZARDOUS MATERIALS ........................................................................................ 19
22.2.  LANDLORD INDEMNITY ........................................................................................... 19

23.  ESTOPPEL CERTIFICATES ............................................................................................ 20

24.  TENANT IMPROVEMENTS .............................................................................................. 20

25.  LIENS ............................................................................................................................. 20

26.  SUBORDINATION AND MORTGAGES ............................................................................ 20

26.1.  SUBORDINATION AND NON-DISTURBANCE ............................................................. 20
26.2.  EXISTING DEEDS OF TRUST .................................................................................... 21
26.3.  REQUEST FOR NOTICE ........................................................................................... 21
26.4.  NOTICE OF DEFAULT .............................................................................................. 21

27.  SURRENDER OF POSSESSION ..................................................................................... 21

28.  SIGNAGE ....................................................................................................................... 21

29.  QUIET ENJOYMENT ...................................................................................................... 21

30.  GENERAL ...................................................................................................................... 22

30.1.  HEADINGS .............................................................................................................. 22
30.2.  SUCCESSORS AND ASSIGNS ................................................................................. 22
30.3.  BROKERS ............................................................................................................... 22
30.4.  ENTIRE AGREEMENT .............................................................................................. 22
30.5.  SEVERABILITY ........................................................................................................ 22
30.6.  NOTICES ................................................................................................................ 22
30.7.  GOVERNING LAW AND FORUM ............................................................................... 22
30.8.  WAIVERS ................................................................................................................ 23
30.9.  TIME OF ESSENCE .................................................................................................. 23
30.10. CONSENT ............................................................................................................... 23
30.11. COMMUNITY BUSINESS ENTERPRISES .................................................................. 23
30.12. MEMORANDUM OF LEASE ...................................................................................... 23

31.  AUTHORITY ................................................................................................................... 24

32.  ACKNOWLEDGEMENT BY LANDLORD .......................................................................... 24

32.1.  CONSIDERATION OF GAIN PROGRAM PARTICIPANTS ............................................ 24
32.2.  SOLICITATION OF CONSIDERATION ....................................................................... 24
32.3.  LANDLORD ASSIGNMENT ....................................................................................... 25

33.  IRREVOCABLE OFFER .................................................................................................. 27

34.  OPTION TO EXTEND ...................................................................................................... 27

## EXHIBITS

Exhibit A – Floor Plan of the Premises
Exhibit B – Legal Description of the Property
Exhibit C – Commencement Date memorandum and Confirmation of Lease Terms
Exhibit D – Heating, Ventilation, and Air Conditioning Standards
Exhibit E – Cleaning and Maintenance Schedule

## LANDLORD'S WORK LETTER

Addendum A – Base Building Improvements
Addendum B – Tenant Improvements
Addendum C – Form of Budget
Addendum D – Costs of Tenant Improvements

## SUPPLEMENTAL LEASE DOCUMENTS:

| | |
|---|---|
| Document I: | Subordination, Non-disturbance and Attornment Agreement |
| Document II: | Tenant Estoppel Certificate |
| Document III: | Community Business Enterprises Form |
| Document IV: | Memorandum of Lease Terms |
| Document V | Request for Notice |

# EXHIBIT B

## LEGAL DESCRIPTION OF PREMISES

THE LAND REFERRED TO HEREIN IS SITUATED IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

PARCEL A:

PARCEL 1 OF PARCEL MAP NO. 4743, IN THE CITY OF HAWTHORNE, AS SHOWN ON MAP FILED IN BOOK 65 PAGES 87 TO 96 INCLUSIVE OF PARCEL MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

PARCEL A1:

AN EASEMENT FOR INGRESS AND EGRESS, AUTOMOBILE PARKING, PEDESTRIAN USES, INSTALLATION, OPERATION AND MAINTENANCE OF SEPARATE AND COMMON UTILITY LINES, DEVELOPMENT AND CONSTRUCTION, ATTACHMENT, MAINTENANCE AND REPAIR OF PEDESTRIAN BRIDGES AND OTHER INCIDENTAL USES, ALL AS MORE PARTICULARLY DEFINED AND DESCRIBED IN SECTION 11—"EASEMENTS" OF THAT CERTAIN DOCUMENT ENTITLED "CONSTRUCTIONS, OPERATION AND RECIPROCAL EASEMENT AGREEMENT" DATED MARCH 8, 1978 EXECUTED BY H. B-H ASSOCIATES-HAWTHORNE, A LIMITED PARTNERSHIP, CARTER HAWLEY HALE STORES, INC., A CALIFORNIA CORPORATION, J. C. PENNEY COMPANY, INC., A DELAWARE CORPORATION, MONTGOMERY WARD & CO., INCORPORATED, AN ILLINOIS CORPORATION, THE PARKING AUTHORITY OF THE CITY OF HAWTHORNE, A PUBLIC BODY, CORPORATE AND POLITIC, THE COMMUNITY REDEVELOPMENT AGENCY OF THE CITY OF HAWTHORNE, A PUBLIC BODY, CORPORATE AND POLITIC, AND THE CITY OF HAWTHORNE, A MUNICIPAL CORPORATION, RECORDED MARCH 8, 1978 AS INSTRUMENT NO. 3440 IN BOOK MS274 PAGE 271 OF OFFICIAL RECORDS, FOR THE TERM OF YEARS OR SOONER TERMINATION THEREOF AS SET FORTH IN SAID DOCUMENT, AS GRANTED TO H. B-H ASSOCIATES-HAWTHORNE, A LIMITED PARTNERSHIP, IN SAID DOCUMENT, OVER PARCELS 2, 3, 4, 6, 7, 8, 9, 10, 12, 13 AND 14 OF PARCEL MAP NO. 4743, IN THE CITY OF HAWTHORNE, AS SHOWN ON A MAP FILED IN BOOK 65 PAGES 87 TO 96 INCLUSIVE OF PARCEL MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

PARCEL A2:

AN EASEMENT TO CONSTRUCT, RECONSTRUCT AND USE A STREET OR HIGHWAY FOR GRADE CROSSINGS TO BE USED IN COMMON WITH THE PUBLIC AS GRANTED TO THE CITY OF HAWTHORNE, A MUNICIPAL CORPORATION, IN AN INDENTURE RECORDED JANUARY 27, 1978 IN BOOK D8950 PAGE 730 OF OFFICIAL RECORDS AS INSTRUMENT NO. 1956, TOGETHER WITH AN EASEMENT TO CONSTRUCT, RECONSTRUCT, MAINTAIN AND USE A STREET OR HIGHWAY AND (2) PEDESTRIAN WALKWAYS BY MEANS OF (3) OVERPASSES, TO BE USED IN COMMON WITH THE PUBLIC AS GRANTED TO THE CITY OF HAWTHORNE, A MUNICIPAL CORPORATION, IN AN INDENTURE RECORDED JANUARY 27, 1978 IN BOOK D8950 PAGE 739, OF OFFICIAL RECORDS AS INSTRUMENT NO. 1957, OVER THOSE PORTIONS OF PARCEL NO. 11 OF PARCEL MAP NO. 4743, IN THE CITY OF HAWTHORNE, AS SHOWN ON A MAP FILED IN BOOK 65 PAGES 87 TO 96 INCLUSIVE OF PARCEL MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS:

(1) BEING SHOWN AS GRADE CROSSING EASEMENTS ON SHEET 10 OF 10 OF SAID PARCEL MAP NO. 4743.

(2) BEING SHOWN AS OVERHEAD, CROSSING EASEMENTS ON SHEET 10 OF 10 OF SAID PARCEL MAP NO. 4743.

## EXHIBIT C

## COMMENCEMENT DATE MEMORANDUM
## AND CONFIRMATION OF LEASE TERMS

Reference is made to that certain lease ("Lease") dated _____, 200_, between County of Los Angeles, a body politic and corporate ("Tenant"), and _____, a _____ ("Landlord"), whereby Landlord leased to Tenant and Tenant leased from Landlord certain premises in the building located at ____ _____ ("Premises"),

Landlord and Tenant hereby acknowledge as follow:

1) Landlord delivered possession of the Premises to Tenant in a Substantially Complete condition on _____ ("Possession Date").

2) Tenant has accepted possession of the Premises and now occupies the same;

3) The Lease commenced on _____ ("Commencement Date").

4) The Premises contain _____ rentable/gross square feet of space; and

For clarification and the purpose of calculating future rental rate adjustments:

1) Base Rent per month is _____.

2) The Base Index Month is _____.

3) The Base Index is _____.

4) The New Index Month is _____.

IN WITNESS WHEREOF, this memorandum is executed this __ day of ____ ____, 20_____.

| Tenant: | Landlord: |
|---|---|
| **COUNTY OF LOS ANGELES** a body politic and corporate | a _____ |
| By: _____ Name_____ Its_____ | By: _____ Name_____ Its_____ |

EXHIBIT C – Page 1
COMMENCEMENT DATE MEMORANDUM
AND CONFIRMATION OF LEASE TERMS

# EXHIBIT D

## HEATING, VENTILATION
## AND AIR CONTITIONING

Landlord shall supply cooling, ventilating and heating with capacity to produce the following results effective during Normal Working Hours established by the Lease and within tolerances normal in comparable office buildings; maintenance of inside space conditions of not greater than 78 degrees Fahrenheit when the outside air temperature is not more than 93 degrees Fahrenheit dry bulb and 70 degrees Fahrenheit wet bulb, and not less than 70 degrees Fahrenheit when the outside air temperature is not lower than 42 degrees Fahrenheit dry bulb. Interior space is designated at a rate of one zone for approximately each 1,000 square feet and one diffuser for each 200 square feet of usable/net square footage within the Premises. If energy requirements prohibit Landlord from complying with these requirements, Tenant shall not unreasonably withhold its consent to temporary waivers or modifications.

## EXHIBIT E (continued)
### CLEANING AND MAINTENANE SCHEDULE

1.  **DAILY** (Monday through Friday)

    A.  Carpets vacuumed.
    B.  Composition floors dust-mopped.
    C.  Desks, desk accessories and office furniture dusted.  Papers and folders left on desk not to be moved.
    D.  Waste baskets, other trash receptacles emptied.
    E.  Chairs and waste baskets returned to proper position.
    F.  Fingerprints removed from glass doors and partitions.
    G.  Drinking fountains cleaned, sanitized and polished.
    H.  Lavatories, toilets and toilet rooms cleaned and mopped.  Toilet supplies replenished.
    I.  Bulb and tube replacements, as required.
    J.  Emergency exit signage and egress battery replacement (if applicable)
    K.  Graffiti expunged as needed within two working days after notice by Tenant
    L.  Floors washed as needed.
    M.  Kitchen/lunchroom/restroom supplies replenished including paper supplies, soap and.
    N.  Exclusive day porter service from _____ to _____ (if provided by contract).

2.  **WEEKLY**

    A.  Low-reach areas, chair rungs, baseboards and insides of door jambs dusted.
    B.  Window sills, ledges and wood paneling and molding dusted.

3.  **MONTHLY**

    A.  Floors washed and waxed in uncarpeted office area.
    B.  High-reach areas, door frames and tops of partitions dusted.
    C.  Upholstered furniture vacuumed, plastic and leather furniture wiped
    D.  Picture moldings and frames dusted.
    E.  Wall vents and ceiling vents vacuumed.
    F.  Carpet professionally spot cleaned as required to remove stains.
    G.  HVAC chiller water checked for bacteria, water conditioned as necessary.

4.  **QUARTERLY**

    A.  Light fixtures cleaned and dusted, but not less frequently than quarterly.
    B.  Wood furniture polished.
    C.  Draperies or mini-blinds cleaned as required, but not less frequently than quarterly.
    D.  HVAC units serviced for preventative maintenance purposes, all filters changed.

### EXHIBIT E – Page 2
### CLEANING AND MAINTENANCE SCHEDULE

**EXHIBIT E** (continued)
**CLEANING AND MAINTENANE SCHEDULE**

5.   **SEMI-ANNUALLY**

    A.   Windows washed as required inside and outside but not less frequently than twice annually.

    B.   All painted wall and door surfaces washed and stains removed.

    C.   All walls treated with vinyl covering washed and stains removed.

6.   **ANNUALLY**

    A.   Furniture Systems and any other fabric or upholstered surfaces including chairs, couches, walls, etc., spot cleaned, or if determined to be necessary in Tenant's sole discretion, professionally cleaned in their entirety using a water extraction system.

    B.   Bathroom and any other ceramic tile surfaces professionally cleaned using a hand scrub process.  All grout and porous surfaces resealed with a professional grade sealant.

    C.   Touch-up paint all interior painted surfaces in a color and finish to match existing.

7.   **AS NEEDED**

    A.   Premises and the sidewalks, driveways, parking areas and all means of access and egress for the Premises should be maintained in good repair, and in clean and safe condition at all times.

    B.   All lawns, shrubbery and foliage on the grounds of the Premises should be maintained in good condition and neat in appearance.  Grass and shrubbery must be replanted as needed to maintain the grounds in good appearance and condition.

    C.   Interior and exterior pest control inspections and remediation frequency is to be determined by a licensed exterminator. (TBD).

    D.   Carpets to be cleaned using a non-detergent, low moisture, soil encapsulation system as recommended by the carpet manufacturer.  The following schedule will be maintained for carpet cleaning:

        i.   heavy traffic areas as needed with a minimum frequency of bi-monthly [six (6) times per year];

        ii.   moderate traffic areas cleaned as needed with a minimum of once every six (6) months [two (2) times per year]; and

        iii.   clean light traffic areas a minimum of once per year.

        Landlord agrees that bonnet cleaning is not an acceptable method of cleaning carpets.

    E.   All walls repainted and wall coverings replaced throughout the Premises. The paint finish should be eggshell or semi-gloss as directed by Tenant and

EXHIBIT E (continued)
CLEANING AND MAINTENANE SCHEDULE

in a color acceptable to Tenant.  In no event will Landlord be required to
repaint or replace wall coverings more than one (1) time in a five (5) year
period (the "Occurrence") except for touch-up paint as provided in
Paragraph 6 C. The initial tenant improvements completed prior to Tenant's
occupancy or as a condition to the renewal of the Lease shall not constitute
and Occurrence for the purpose of determining the frequency of this work.

F.     All HVAC ducts cleaned as need but no less than every five (5) years.

8.     <u>GENERAL</u>

Landlord shall, upon request of Tenant, produce written service contracts as
evidence of compliance with the terms of this Cleaning and Maintenance
Schedule.

EXHIBIT 11



**MLS #21615170**
**4180 Barnes Road**
Santa Rosa | 95403

## $1,199,000

🛏 3 beds  🛁 3.0 baths
🏠 2,444.0 SQ/FT

## DESCRIPTION

1868 greek revival farmhouse that was rebuilt and modernized. enjoy the quiet lush gardens and pool, events and vacation rental potential. location makes this an excellent opportunity for private living or income potential. horse barn, arena, two barns with quest studios, surrounded by 200 acres of vineyard. meticulous attention to detail when the owner restored the home in 2006. solar panels for electricity, solar hot water, fruit trees.

## OPEN HOUSES

Total Bedrooms: 3
# of Full Baths: 3
Bathroom Information: Granite,Shower Over Tub,Tub Only
Fireplace Information: 2 Fireplaces,Wood Burning
Heating/Cooling: Attic Fan(s),Fireplace(s),Propane,Radiant

Dining Room Information: Formal
Living Room Information: Fireplace(s)
View: Mountains,Vineyard

Exterior Information: Redwood Siding
Roof Information: Metal
Stories: 2 Story
Water Details: Well Private

Laundry Information: 220 V
# of Spaces in Garage: 7
Lot Size (sqft): 55757.0
Single Family Residence
Foundation Information: Concrete Perimeter
Rent: 0.0

Total Bathrooms: 3.0
# of Half Baths: None
Possible Guest,Workshop:
Flooring Information: Hardwood,Wood
Kitchen Information: 220 V Wiring,Built-In Oven,Dishwasher Incl.,Disposal Incl,Gas Range Incl.,Hood Over Range
Family Room Information: Fireplace(s),Great Room
Structure Size (sqft): 2444.0
Yard Details: Covered Patio(s),Enclosed Patio(s),Garden,Landscaped- Front,Landscaped-Rear,Patio(s),Sprink-Automatic
Pool Information: Gunite,Solar Heat
Style: Farmhouse
Sewer Information: Standard Septic
Energy Saving Information: Ceiling Insulation,Dual Pane Windows,Partial Insulation,Passive Solar,Wall Insulation
Parking Information: 2 Car,3 Car,5 or More Car,Detached
Lot Information: Level,County
Lot Size (acres): 1.28
Year Built: 1868
HOA Fee: None

USAO_089644

**Exhibit 37**
**Page 1 of 19**

EXHIBIT 12



MLS #21701700
**4780 Annadel Heights Drive**
Santa Rosa | 95405

## $1,199,000

🛏 4 beds   🛁 2.5 baths

🏠 3,036.0 SQ/FT

## DESCRIPTION

First time on the market! architect ken o'connor design, space and elegance take on a whole new meaning in this stunningly conceived and elegantly executed california custom that exemplifies the best of north bay architecture. over 3000 square feet in the prestigious annadel heights, this 4 bdrm, 2.5 bath masterpiece features open beam ceilings, rock fireplace, wood floors, plantation shutters and views galore. the 8 acres backs to annadel park!

## OPEN HOUSES

**Total Bedrooms:** 4
**# of Full Baths:** 2
**Bathroom Information:** Remodeled,Skylight(s)
**Fireplace Information:** 2 Fireplaces,Family Room,Living Room,Raised Hearth,Stone,Wood Burning,Wood Stove
**Kitchen Information:** Breakfast Area,Refrigerator Incl.
**Family Room Information:** Fireplace(s),Open Beam
**Structure Size (sqft):** 3036.0
**Yard Details:** Deck(s),Dog Run,Landscaped- Front,Landscaped-Rear
**Stories:** Multi Level
**Water Details:** Water Public
**# of Spaces in Garage:** 2
**Lot Size (sqft):** 350658.0
**Single Family Residence:**
**Building Architect:** Ken OConnor - Stewart & Sacks
**Rent:** 0.0

**Total Bathrooms:** 2.5
**# of Half Baths:** 1
**Storage:**
**Flooring Information:** Hardwood,Tile,W/W Carpet
**Heating/Cooling:** Ceiling Fan(s),Central Heat,Fireplace(s),Gas
**Dining Room Information:** Dining Area
**Living Room Information:** Fireplace(s),Open Beam,Skylight(s)
**View:** City,Hills,Panoramic,Pasture
**Exterior Information:** Wood Siding
**Style:** Custom
**Sewer Information:** Sewer Public
**Laundry Information:** Gas,Hookups only,In Laundry Room
**Lot Information:** Upslope
**Lot Size (acres):** 8.05
**Year Built:** 1989
**HOA Fee:** None

USAO_089660

**Exhibit 37**
**Page 17 of 19**

EXHIBIT 13

## NORELL CONSULTING, INC.

Diane Leckner was interviewed at Paul Hastings (Los Angeles) on 07/12/2017.  Also present was Thomas O'Brien and Nicole Lueddeke of Paul Hastings.  Leckner then voluntarily provided the following information:

In early April 2017, Leckner was asking down the office hall with Gabay when Gabay told her he was thinking of taking a private jet to Northern California.  Gabay did not say why he was going but Leckner assumed it was business related.  Gabay provided no details as to date, where or when.

Leckner recalled on the evening of Monday, April 24, 2017, she went into Gabay's office to discuss the following day's meeting at Hawthorne.  Leckner had recently taken over secretarial work for Gabay and maintained a notebook.  The notebook contained both business and personal information.  Prior to walking into Gabay's office, Leckner wrote down the attendees for the following day's meeting so she could remind Gabay who was attending.  Leckner asked Gabay if he still needed a jet he requested a few weeks prior to go to Northern California.  Gabay told Leckner he had been thinking about doing a deal up there but was not going through with the deal.  Leckner picked up a pencil from Gabay's desk and wrote "NO JET" in her notebook in the space above the attendees' names for the Hawthorne meeting.

Leckner provided the original notebook.

EXHIBIT 14

**Kerry Grove Jones**
Realtor | CA BRE Lic#:01828019

**Pacific Union International**
127 Fourth St | Petaluma Ca. 94952
Cell: 707-775-8264/707-477-8988 | Efax: 415-962-0785

**<u>We are ALWAYS AVAILABLE for ALL your REFERRALS!</u>**

"Life isn't waiting until the storm has passed.
 Life is learning to dance in the rain!"

To View All of our Listings on MLS, visit **<u>www.homesbygael.com</u>**



On Apr 18, 2017, at 11:09 AM, John Carroll <john@giltnerrealty.com> wrote:

Thanks. Checked again and did not get it

**From:** Leonard Kristensen [mailto:len.kristensen@gmail.com]
**Sent:** Tuesday, April 18, 2017 11:05 AM
**To:** Gael Adair Grove <gaelg@homesbygael.com>
**Cc:** John Carroll <john@giltnerrealty.com>
**Subject:** Contract

Gael- the contract was not received. please forward again.

**Len Kristensen**
*Kristensen Enterprises Inc.*
*4510 Coolhaven Ct*
*Westlake Village, CA 91361*
*(818) 209-6001*

EXHIBIT 15

Gael & Kerry THE GROVE GROUP

**Gael Adair Grove, CDPE, SFR, ePro**
Realtor | CA BRE Lic#:00702158

**Kerry Grove Jones**
Realtor | CA BRE Lic#:01828019

**Pacific Union International**
127 Fourth St | Petaluma Ca. 94952
Cell: 707-775-8264/707-477-8988 | Efax: 415-962-0785

**We are ALWAYS AVAILABLE for ALL your REFERRALS!**

"Life isn't waiting until the storm has passed.
Life is learning to dance in the rain!"

To View All of our Listings on MLS, visit **www.homesbygael.com**

On Apr 18, 2017, at 12:01 PM, John Carroll <john@giltnerrealty.com> wrote:

I cannot edit this document as it is write protected and can only save it to PDF one page at a time. Can it be printed and scanned ( I don't have a printer with me) or sent in another format?

**From:** Gael Grove [mailto:gaelg@homesbygael.com]
**Sent:** Tuesday, April 18, 2017 11:45 AM
**To:** John Carroll <john@giltnerrealty.com>
**Cc:** Len Kristensen <len.kristensen@gmail.com>
**Subject:** Re: Contract

Just now resent to you John. Sorry for the mess up

All My Best,

Gael & Kerry THE GROVE GROUP

**Gael Adair Grove, CDPE, SFR, ePro**
Realtor | CA BRE Lic#:00702158

EXHIBIT 16

On Apr 18, 2017, at 12:56 PM, Gael Grove
<gaelg@homesbygael.com> wrote:

Please let me know when I might expect the signed contract so I
can alert the Listing Agent thanks!


All My Best,



**Gael Adair Grove, CDPE, SFR, ePro**
Realtor | CA BRE Lic#:00702158
**Kerry Grove Jones**
Realtor | CA BRE Lic#:01828019
**Pacific Union International**
127 Fourth St | Petaluma Ca. 94952
Cell: 707-775-8264/707-477-8988 | Efax: 415-962-0785

**<u>We are ALWAYS AVAILABLE for ALL your REFERRALS!</u>**

"Life isn't waiting until the storm has passed.
  Life is learning to dance in the rain!"

To View All of our Listings on MLS, visit **www.homesbygael.com**

On Apr 18, 2017, at 12:37 PM, John Carroll
<john@giltnerrealty.com> wrote:

Thanks

**From:** Gael Grove [mailto:gaelg@homesbygael.com]
**Sent:** Tuesday, April 18, 2017 12:21 PM
**To:** John Carroll <john@giltnerrealty.com>
**Cc:** Len Kristensen <len.kristensen@gmail.com>;
Millie@Charles-Company. Com (millie@charles-
company.com) <millie@charles-company.com>; Kerry
Grove Jones <kerry.jones@pacunion.com>
**Subject:** Re: Contract

Hi,

It's a docusign document and once signed can be
printed. The pdf is attached Thanks!

Also please include Kerry my Biz Partner on all
emails regarding this transaction. Thanks much!

All My Best,

4

EXHIBIT 17

**We are ALWAYS AVAILABLE for ALL your REFERRALS!**

"Life isn't waiting until the storm has passed.
  Life is learning to dance in the rain!"

To View All of our Listings on MLS, visit **www.homesbygael.com**

    

On Apr 18, 2017, at 1:43 PM, John Carroll <john@giltnerrealty.com> wrote:

I just sent it back to be reviewed by buyer with comments

Sent from my Verizon, Samsung Galaxy smartphone

-------- Original message --------
From: Gael Grove <gaelg@homesbygael.com>
Date: 4/18/17 1:40 PM (GMT-08:00)
To: John Carroll <john@giltnerrealty.com>
Cc: Len Kristensen <len.kristensen@gmail.com>, "Millie@Charles-Company. Com (millie@charles-company.com)" <millie@charles-company.com>, Kerry Grove Jones <kerry.jones@pacunion.com>
Subject: Re: Contract

I just got word that the listing agent is receiving another offer shortly. Any chance you can get me the signed contract, preapproval letter and personal letter asap?

All My Best,

*Gael & Kerry*  THE GROVE GROUP

**Gael Adair Grove, CDPE, SFR, ePro**
Realtor | CA BRE Lic#:00702158

**Kerry Grove Jones**
Realtor | CA BRE Lic#:01828019

**Pacific Union International**
127 Fourth St | Petaluma Ca. 94952
Cell: 707-775-8264/707-477-8988 | Efax: 415-962-0785
**We are ALWAYS AVAILABLE for ALL your REFERRALS!**

"Life isn't waiting until the storm has passed.
  Life is learning to dance in the rain!"

To View All of our Listings on MLS, visit **www.homesbygael.com**

     

EXHIBIT 18

All My Best,

**Gael Adair Grove, CDPE, SFR, ePro**
Realtor | CA BRE Lic#:00702158

**Kerry Grove Jones**
Realtor | CA BRE Lic#:01828019

**Pacific Union International**
127 Fourth St | Petaluma Ca. 94952
Cell: 707-775-8264/707-477-8988 | Efax: 415-962-0785

**We are ALWAYS AVAILABLE for ALL your REFERRALS!**

"Life isn't waiting until the storm has passed.
  Life is learning to dance in the rain!"

To View All of our Listings on MLS, visit **www.homesbygael.com**

     

On Apr 18, 2017, at 5:07 PM, John Carroll <john@giltnerrealty.com> wrote:

I only review and comment on the document. I cannot tell you the status as I don't know.

**From:** Gael Grove [mailto:gaelg@homesbygael.com]
**Sent:** Tuesday, April 18, 2017 3:58 PM
**To:** John Carroll <john@giltnerrealty.com>
**Cc:** Len Kristensen <len.kristensen@gmail.com>; Millie@Charles-Company. Com (millie@charles-company.com) <millie@charles-company.com>; Kerry Grove Jones <kerry.jones@pacunion.com>
**Subject:** Re: Contract

Hi again,

Hate to be a pest, but since another offer is coming in we want to get ours in asap. What are your thoughts as to when I might expect signatures?

All My Best,

**Gael Adair Grove, CDPE, SFR, ePro**
Realtor | CA BRE Lic#:00702158

**Kerry Grove Jones**
Realtor | CA BRE Lic#:01828019

**Pacific Union International**
127 Fourth St | Petaluma Ca. 94952
Cell: 707-775-8264/707-477-8988 | Efax: 415-962-0785

2

EXHIBIT 19

DocuSign Envelope ID: 156FB58B-3842-40F6-BB8C-B522567B1939



CALIFORNIA
ASSOCIATION
OF REALTORS®

**RESIDENTIAL PURCHASE AGREEMENT
AND JOINT ESCROW INSTRUCTIONS**
(C.A.R. Form RPA-CA, Revised 12/15 )

Date Prepared: _04/18/2017_
1. **OFFER:**
   A. **THIS IS AN OFFER FROM** _Arman Gabay_ ("Buyer").
   B. **THE REAL PROPERTY** to be acquired is _4780 Annadel Heights Drive, Santa Rosa, CA  95405_ , situated in _Santa Rosa_ (City), _Sonoma_ (County), California, _95405_ (Zip Code), Assessor's Parcel No. _049-730-014_ ("Property").
   C. **THE PURCHASE PRICE** offered is _One Million, Thirty-Five Thousand_
      Dollars $ _1,035,000.00_
   D. **CLOSE OF ESCROW** shall occur on ☐ _____ (date)(or ☒ _30_ **Days** After Acceptance).
   E. Buyer and Seller are referred to herein as the "Parties." Brokers are not Parties to this Agreement.
2. **AGENCY:**
   A. **DISCLOSURE:** The Parties each acknowledge receipt of a ☒ "Disclosure Regarding Real Estate Agency Relationships" (C.A.R. Form AD).
   B. **CONFIRMATION:** The following agency relationships are hereby confirmed for this transaction:
      Listing Agent _Better Homes Realty_ (Print Firm Name) is the agent of (check one):
      ☒ the Seller exclusively; or ☐ both the Buyer and Seller.
      Selling Agent _Pacific Union Realtors_ (Print Firm Name) (if not the same as the Listing Agent) is the agent of (check one): ☒ the Buyer exclusively; or ☐ the Seller exclusively; or ☐ both the Buyer and Seller.
   C. **POTENTIALLY COMPETING BUYERS AND SELLERS:** The Parties each acknowledge receipt of a ☒ "Possible Representation of More than One Buyer or Seller - Disclosure and Consent" (C.A.R. Form PRBS).
3. **FINANCE TERMS:** Buyer represents that funds will be good when deposited with Escrow Holder.
   A. **INITIAL DEPOSIT:** Deposit shall be in the amount of . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ _20,250.00_
      (1) Buyer Direct Deposit: Buyer shall deliver deposit directly to Escrow Holder by electronic funds transfer, ☐ cashier's check, ☐ personal check, ☐ other _____ within 3 business days after Acceptance (or _____ );
      ~~OR (2) ☐ Buyer Deposit with Agent: Buyer has given the deposit by personal check (or _____ )~~
      ~~to the agent submitting the offer (or to _____ ), made payable to _____~~
      ~~_____ . The deposit shall be held uncashed until Acceptance and then deposited~~
      ~~with Escrow Holder within 3 business days after Acceptance (or _____ ):~~
      ~~Deposit checks given to agent shall be an original signed check and not a copy.~~
      (Note: Initial and increased deposits checks received by agent shall be recorded in Broker's trust fund log.)
   B. **INCREASED DEPOSIT:** Buyer shall deposit with Escrow Holder an increased deposit in the amount of . . . . . . . $ _20,250.00_
      within _1_ **Days** After Acceptance ~~(or | expiration of Due Diligence Period as defined herein _____ ).~~
      If the Parties agree to liquidated damages in this Agreement, they also agree to incorporate the increased deposit into the liquidated damages amount in a separate liquidated damages clause (C.A.R. Form RID) at the time the increased deposit is delivered to Escrow Holder.
   ~~C. ☐ ALL CASH OFFER: No loan is needed to purchase the Property. This offer is NOT contingent on Buyer obtaining a loan. Written verification of sufficient funds to close this transaction IS ATTACHED to this offer or Buyer shall, within 3 (or _____ ) Days After Acceptance, Deliver to Seller such verification.~~
   D. **LOAN(S):**
      (1) FIRST LOAN: in the amount of . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ _828,000.00_
         This loan will be conventional financing or ☐ FHA, ☐ VA, ☐ Seller financing (C.A.R. Form SFA), ☐ assumed financing (C.A.R. Form AFA), ☐ Other _____ .This loan shall be at a fixed rate not to exceed _1.000_ % or, ☐ an adjustable rate loan with initial rate not to exceed _____ %. ~~Regardless of the type of loan, Buyer shall pay points not to exceed _____ % of the loan amount.~~
      ~~(2) ☐ SECOND LOAN in the amount of . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ _____~~
         ~~This loan will be conventional financing or ☐ Seller financing (C.A.R. Form SFA), ☐ assumed financing (C.A.R. Form AFA), ☐ Other _____ .This loan shall be at a fixed rate not to exceed _____ % or, ☐ an adjustable rate loan with initial rate not to exceed _____ %. Regardless of the type of loan, Buyer shall pay points not to exceed _____ % of the loan amount.~~
      ~~(3) FHA/VA: For any FHA or VA loan specified in 3D(1), Buyer has 17 (or _____ ) Days After Acceptance to Deliver to Seller written notice (C.A.R. Form FVA) of any lender required repairs or costs that Buyer requests Seller to pay for or otherwise correct. Seller has no obligation to pay or satisfy lender requirements unless agreed in writing. A FHA/VA amendatory clause (C.A.R. Form FVAC) shall be a part of this Agreement.~~
   E. ADDITIONAL FINANCING TERMS: _____
   F. BALANCE OF DOWN PAYMENT OR PURCHASE PRICE in the amount of . . . . . . . . . . . . . . . . . . . . . . . . . . $ _166,500.00_
      to be deposited with Escrow Holder pursuant to Escrow Holder instructions.
   G. PURCHASE PRICE (TOTAL): . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ _1,035,000.00_

Buyer's Initials ( _AG_ ) ( _____ )                                        Seller's Initials ( _____ ) ( _____ )

© 1991-2015, California Association of REALTORS®, Inc.

**RPA-CA REVISED 12/15 (PAGE 1 OF 10)**

**CALIFORNIA RESIDENTIAL PURCHASE AGREEMENT (RPA-CA PAGE 1 OF 10)**

DocuSign Envelope ID: 156FB58B-3842-40F6-BB8C-B522567B1939

Property Address: **4780 Annadel Heights Drive, Santa Rosa, CA  95405**                Date: **April 18, 2017**

H. **VERIFICATION OF DOWN PAYMENT AND CLOSING COSTS:** Buyer (or Buyer's lender or loan broker pursuant to paragraph 3J(1)) shall, within ~~3 (or~~ **5** ~~)~~ Days After Acceptance, Deliver to Seller written verification of Buyer's down payment and closing costs. (☐ Verification attached.)

I. **APPRAISAL CONTINGENCY AND REMOVAL:** This Agreement is ~~(or ☐ is NOT)~~ contingent upon a written appraisal of the Property by a licensed or certified appraiser at no less than the purchase price. Buyer shall, as specified in paragraph 14B(3), in writing, remove the appraisal contingency or cancel this Agreement within 17 (or ~~14~~ ) Days After Acceptance.

J. **LOAN TERMS:**
   **(1) LOAN APPLICATIONS:** Within 3 (or ~~2~~ ) **Days** After Acceptance, Buyer shall Deliver to Seller a letter from Buyer's lender or loan broker stating that, based on a review of Buyer's written application and credit report, Buyer is prequalified or preapproved for any NEW loan specified in paragraph 3D. If any loan specified in paragraph 3D is an adjustable rate loan, the prequalification or preapproval letter shall be based on the qualifying rate, not the initial loan rate. (☐ Letter attached.)
   **(2) LOAN CONTINGENCY:** Buyer shall act diligently and in good faith to obtain the designated loan(s). Buyer's qualification for the loan(s) specified above **is a contingency** of this Agreement unless otherwise agreed in writing. If there is no appraisal contingency or the appraisal contingency has been waived or removed, then failure of the Property to appraise at the purchase price does not entitle Buyer to exercise the cancellation right pursuant to the loan contingency if Buyer is otherwise qualified for the specified loan. Buyer's contractual obligations regarding deposit, balance of down payment and closing costs **are not contingencies** of this Agreement.
   **(3) LOAN CONTINGENCY REMOVAL:**
   Within 21 (or ~~14~~ ) **Days** After Acceptance, Buyer shall, as specified in paragraph 14, in writing, remove the loan contingency or cancel this Agreement. If there is an appraisal contingency, removal of the loan contingency shall not be deemed removal of the appraisal contingency.
   **(4)** ☐ ~~NO LOAN CONTINGENCY: Obtaining any loan specified above is NOT a contingency of this Agreement. If Buyer does not obtain the loan and as a result does not purchase the Property, Seller may be entitled to Buyer's deposit or other legal remedies.~~
   **(5) LENDER LIMITS ON BUYER CREDITS:** Any credit to Buyer, from any source, for closing or other costs that is agreed to by the Parties ("Contractual Credit") shall be disclosed to Buyer's lender. If the total credit allowed by Buyer's lender ("Lender Allowable Credit") is less than the Contractual Credit, then (i) the Contractual Credit shall be reduced to the Lender Allowable Credit, and (ii) in the absence of a separate written agreement between the Parties, there shall be no automatic adjustment to the purchase price to make up for the difference between the Contractual Credit and the Lender Allowable Credit.

K. **BUYER STATED FINANCING:** ~~Seller is relying on Buyer's representation of the type of financing specified (including but not limited to, as applicable, all cash, amount of down payment, or contingent or non contingent loan). Seller has agreed to a specific closing date, purchase price and to sell to Buyer in reliance on Buyer's covenant concerning financing.~~ Buyer shall pursue the financing specified in this Agreement. Seller has no obligation to cooperate with Buyer's efforts to obtain any financing other than that specified in the Agreement and the availability of any such alternate financing does not excuse Buyer from the obligation to purchase the Property and close escrow as specified in this Agreement.

4. **SALE OF BUYER'S PROPERTY:**
   **A.** This Agreement and Buyer's ability to obtain financing are NOT contingent upon the sale of any property owned by Buyer.
   **OR B.** ☐ This Agreement and Buyer's ability to obtain financing are contingent upon the sale of property owned by Buyer as specified in the attached addendum (C.A.R. Form COP).

5. **ADDENDA AND ADVISORIES:**
   A. **ADDENDA:**

| | |
|---|---|
| | ☐ Addendum # _____ (C.A.R. Form ADM) |
| ☐ Back Up Offer Addendum (C.A.R. Form BUO) | ☐ Court Confirmation Addendum (C.A.R. Form CCA) |
| ☐ Septic, Well and Property Monument Addendum (C.A.R. Form SWPI) | |
| ☐ Short Sale Addendum (C.A.R. Form SSA) | ☐ Other |

   B. **BUYER AND SELLER ADVISORIES:**

| | |
|---|---|
| | ☒ Buyer's Inspection Advisory (C.A.R. Form BIA) |
| ☐ Probate Advisory (C.A.R. Form PA) | ☒ Statewide Buyer and Seller Advisory (C.A.R. Form SBSA) |
| ☐ Trust Advisory (C.A.R. Form TA) | ☐ REO Advisory (C.A.R. Form REO) |
| ☐ Short Sale Information and Advisory (C.A.R. Form SSIA) | ☐ Other |

6. **OTHER TERMS:**
   _____
   _____
   _____
   _____

7. **ALLOCATION OF COSTS**
   A. **INSPECTIONS, REPORTS AND CERTIFICATES:** Unless otherwise agreed in writing, this paragraph only determines who is to pay for the inspection, test, certificate or service ("Report") mentioned; it **does not determine who is to pay for any work recommended or identified in the Report.**
   **(1)** ☐ Buyer ☒ Seller shall pay for a natural hazard zone disclosure report, including tax ☒ environmental ☐ Other: _____ prepared by **NHD**
   **(2)** ☒ Buyer ☐ Seller shall pay for the following Report **any inspections buyer deems necessary** prepared by _____
   **(3)** ☐ Buyer ☐ ~~Seller shall pay for the following Report~~ _____
   ~~prepared by~~ _____

Buyer's Initials ( **AL** ) ( _____ )                Seller's Initials ( _____ ) ( _____ )

**RPA-CA REVISED 12/15 (PAGE 2 OF 10)**



**CALIFORNIA RESIDENTIAL PURCHASE AGREEMENT  (RPA-CA PAGE 2 OF 10)**

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026  www.zipLogix.com        **Annadel Heights**

DocuSign Envelope ID: 156FB58B-3842-40F6-BB8C-B522567B1939

Property Address: **4780 Annadel Heights Drive, Santa Rosa, CA  95405**                                        Date: **April 18, 2017**

**B. GOVERNMENT REQUIREMENTS AND RETROFIT:**
    **(1)** ☐ Buyer ☒ Seller shall pay for smoke alarm and carbon monoxide device installation and water heater bracing, if required by Law. Prior to Close Of Escrow ("COE"), Seller shall provide Buyer written statement(s) of compliance in accordance with state and local Law, unless Seller is exempt.
    **(2) (i)** ☐ Buyer ☒ Seller shall pay the cost of compliance with any other minimum mandatory government inspections and reports if required as a condition of closing escrow under any Law.
       **(ii)** ☐ Buyer ☒ Seller shall pay the cost of compliance with any other minimum mandatory government retrofit standards required as a condition of closing escrow under any Law, whether the work is required to be completed before or after COE.
       **(iii)** Buyer shall be provided, within the time specified in paragraph 14A, a copy of any required government conducted or point-of-sale inspection report prepared pursuant to this Agreement or in anticipation of this sale of the Property.
**C. ESCROW AND TITLE:**
    **(1) (a)** ☒ Buyer ☒ Seller shall pay escrow fee   | Escrow fee to be split 50/50 between Buyer and Seller |                               ˙
       **(b)** Escrow Holder shall be **Old Republic Title** _____
       **(c)** The Parties shall, within **5 (or ___ ) Days** After receipt, sign and return Escrow Holder's general provisions.
    **(2) (a)** ☒ Buyer ☐ Seller shall pay for **owner's** title insurance policy specified in paragraph 13E _____ ˙
       **(b)** Owner's title policy to be issued by **Old Republic** _____ ˙
       (Buyer shall pay for any title insurance policy insuring Buyer's **lender**, unless otherwise agreed in writing.)
**D. OTHER COSTS:**
    **(1)** ☐ Buyer ☒ Seller shall pay County transfer tax or fee _____ ˙
    **(2)** ☐ Buyer ☒ Seller shall pay City transfer tax or fee _____ ˙
    **(3)** ~~☐ Buyer ☐ Seller shall pay Homeowners' Association ("HOA") transfer fee~~ _____ ˙
    **(4)** ~~Seller shall pay HOA fees for preparing documents required to be delivered by Civil Code §4525.~~
    ~~**(5)** ☐ Buyer ☐ Seller shall pay HOA fees for preparing all documents other than those required by Civil Code §4525.~~
    ~~**(6)** Buyer to pay for any HOA certification fee.~~
    **(7)** ☐ Buyer ☐ Seller shall pay for any private transfer fee _____ ˙
    ~~**(8)** ☐ Buyer ☐ Seller shall pay for~~ _____ ˙
    ~~**(9)** ☐ Buyer ☐ Seller shall pay for~~ _____ ˙
    **(10)** ☐ Buyer ☒ Seller shall pay for the cost, ~~not to exceed $ **600.00**~~ _____ , of a standard (or ☒ upgraded) one-year home warranty plan, issued by **Fidelity HW** _____ , with the following optional coverages: ☒ Air Conditioner ☐ Pool/Spa ☐ Other: _____
       Buyer is informed that home warranty plans have many optional coverages in addition to those listed above. Buyer is advised to investigate these coverages to determine those that may be suitable for Buyer.
    **OR** ☐ ~~Buyer waives the purchase of a home warranty plan. Nothing in this paragraph precludes Buyer's purchasing a home warranty plan during the term of this Agreement.~~
**8. ITEMS INCLUDED IN AND EXCLUDED FROM SALE:**
    **A. NOTE TO BUYER AND SELLER:** Items listed as included or excluded in the MLS, flyers or marketing materials are **not** included in the purchase price or excluded from the sale unless specified in paragraph 8 B or C.
    **B. ITEMS INCLUDED IN SALE:** Except as otherwise specified or disclosed,
       **(1)** All EXISTING fixtures and fittings that are attached to the Property;
       **(2)** EXISTING electrical, mechanical, lighting, plumbing and heating fixtures, ceiling fans, fireplace inserts, gas logs and grates, solar power systems, built-in appliances, window and door screens, awnings, shutters, window coverings, attached floor coverings, television antennas, satellite dishes, air coolers/conditioners, pool/spa equipment, garage door openers/remote controls, mailbox, in-ground landscaping, trees/shrubs, water features and fountains, water softeners, water purifiers, security systems/alarms and the following if checked: ☒ all stove(s), except _____ ; ☒ all refrigerator(s) except _____ ☐ all washer(s) and dryer(s), except _____ .
       **(3)** The following additional items: _____ .
       **(4)** Existing integrated phone and home automation systems, including necessary components such as intranet and Internet-connected hardware or devices, control units (other than non-dedicated mobile devices, electronics and computers) and applicable software, permissions, passwords, codes and access information, are (☐ are NOT) included in the sale.
       **(5) LEASED OR LIENED ITEMS AND SYSTEMS:** Seller shall, within the time specified in paragraph 14A, (i) disclose to Buyer if any item or system specified in paragraph 8B or otherwise included in the sale is leased, or not owned by Seller, or specifically subject to a lien or other encumbrance, and (ii) Deliver to Buyer all written materials (such as lease, warranty, etc.) concerning any such item. Buyer's ability to assume any such lease, or willingness to accept the Property subject to any such lien or encumbrance, is a contingency in favor of Buyer and Seller as specified in paragraph 14B and C.
       **(6)** Seller represents that all items included in the purchase price, unless otherwise specified, (i) are owned by Seller and shall be transferred free and clear of liens and encumbrances, except the items and systems identified pursuant to 8B(5) and _____ , and (ii) are transferred without Seller warranty regardless of value.
    **C. ITEMS EXCLUDED FROM SALE:** Unless otherwise specified, the following items are excluded from sale: (i) audio and video components (such as flat screen TVs, speakers and other items) if any such item is not itself attached to the Property, even if a bracket or other mechanism attached to the component or item is attached to the Property; (ii) furniture and other items secured to the Property for earthquake purposes; and (iii) _____
_____ . **Brackets attached to walls, floors or ceilings for any such component, furniture** or item ~~shall remain with the Property (or~~ ☒ will be removed and holes or other damage shall be repaired, but not painted).

Buyer's Initials ( **KV** ) ( _____ )                                              Seller's Initials ( _____ ) ( _____ )

**RPA-CA REVISED 12/15 (PAGE 3 OF 10)**

DocuSign Envelope ID: 156FB58B-3842-40F6-BB8C-B522567B1939

Property Address: **4780 Annadel Heights Drive, Santa Rosa, CA  95405**                    Date: **April 18, 2017**

**9. CLOSING AND POSSESSION:**

A. Buyer ~~intends (or~~ ☐ does not intend) to occupy the Property as Buyer's primary residence.

B. **Seller-occupied or vacant property:** Possession shall be delivered to Buyer: (i) at 6 PM or ( _**10**_ ☐ AM/☒ PM) on the date of Close Of Escrow; (ii) ☐ no later than ___ calendar days after Close Of Escrow; or (iii) ☐ at ____ ☐ AM/☐ PM on _____ .

C. ~~**Seller remaining in possession After Close of Escrow:** If Seller has the right to remain in possession after Close of Escrow, (i) the Parties are advised to sign a separate occupancy agreement such as ☐ C.A.R. Form SIP, for Seller continued occupancy of less than 30 days, ☐ C.A.R. Form RLAS for Seller continued occupancy of 30 days or more; and (ii) the Parties are advised to consult with their insurance and legal advisors for information about liability and damage or injury to persons and personal and real property; and (iii) Buyer is advised to consult with Buyer's lender about the impact of Seller's occupancy on Buyer's loan.~~

D. **Tenant-occupied property: Property shall be vacant** at least **5 (or ____ ) Days** Prior to Close Of Escrow, unless otherwise agreed in writing. **Note to Seller: If you are unable to deliver Property vacant in accordance with rent control and other applicable Law, you may be in breach of this Agreement.**

OR ☐ Tenant to remain in possession (C.A.R. Form TIP).

E. At Close Of Escrow: Seller assigns to Buyer any assignable warranty rights for items included in the sale; and Seller shall Deliver to Buyer available Copies of any such warranties. Brokers cannot and will not determine the assignability of any warranties.

F. At Close Of Escrow, unless otherwise agreed in writing, Seller shall provide keys, passwords, codes and/or means to operate all locks, mailboxes, security systems, alarms, home automation systems and intranet and Internet-connected devices included in the purchase price, and garage door openers. If the Property is a condominium or located in a common interest subdivision, Buyer may be required to pay a deposit to the Homeowners' Association ("HOA") to obtain keys to accessible HOA facilities.

**10. STATUTORY AND OTHER DISCLOSURES (INCLUDING LEAD-BASED PAINT HAZARD DISCLOSURES) AND CANCELLATION RIGHTS:**

A. **(1)** Seller shall, within the time specified in paragraph 14A, Deliver to Buyer: (i) if required by Law, a fully completed: Federal Lead-Based Paint Disclosures (C.A.R. Form FLD) and pamphlet ("Lead Disclosures"); and **(ii)** unless exempt, fully completed disclosures or notices required by sections 1102 et. seq. and 1103 et. seq. of the Civil Code ("Statutory Disclosures"). Statutory Disclosures include, but are not limited to, a Real Estate Transfer Disclosure Statement ("TDS"), Natural Hazard Disclosure Statement ("NHD"), notice or actual knowledge of release of illegal controlled substance, notice of special tax and/or assessments (or, if allowed, substantially equivalent notice regarding the Mello-Roos Community Facilities Act of 1982 and Improvement Bond Act of 1915) and, if Seller has actual knowledge, of industrial use and military ordnance location (C.A.R. Form SPQ or ESD).

**(2)** Any Statutory Disclosure required by this paragraph is considered fully completed if Seller has answered all questions and completed and signed the Seller section(s) and the Listing Agent, if any, has completed and signed the Listing Broker section(s), or, if applicable, an Agent Visual Inspection Disclosure (C.A.R. Form AVID). Nothing stated herein relieves a Buyer's Broker, if any, from the obligation to (i) conduct a reasonably competent and diligent visual inspection of the accessible areas of the Property and disclose, on Section IV of the TDS, or an AVID, material facts affecting the value or desirability of the Property that were or should have been revealed by such an inspection or (ii) complete any sections on all disclosures required to be completed by Buyer's Broker.

**(3) Note to Buyer and Seller:** Waiver of Statutory and Lead Disclosures is prohibited by Law.

**(4)** Within the time specified in paragraph 14A, **(i)** Seller, unless exempt from the obligation to provide a TDS, shall, complete and provide Buyer with a Seller Property Questionnaire (C.A.R. Form SPQ); **(ii)** if Seller is not required to provide a TDS, Seller shall complete and provide Buyer with an Exempt Seller Disclosure (C.A.R. Form ESD).

**(5)** Buyer shall, within the time specified in paragraph 14B(1), return Signed Copies of the Statutory, Lead and other disclosures to Seller.

**(6)** In the event Seller or Listing Broker, prior to Close Of Escrow, becomes aware of adverse conditions materially affecting the Property, or any material inaccuracy in disclosures, information or representations previously provided to Buyer, Seller shall promptly provide a subsequent or amended disclosure or notice, in writing, covering those items. **However, a subsequent or amended disclosure shall not be required for conditions and material inaccuracies** of which Buyer is otherwise aware, or which are **disclosed in reports provided to or obtained by Buyer or ordered and paid for by Buyer.**

**(7)** If any disclosure or notice specified in paragraph 10A(1), or subsequent or amended disclosure or notice is Delivered to Buyer after the offer is Signed, Buyer shall have the right to cancel this Agreement within **3 Days** After Delivery in person, or **5 Days** After Delivery by deposit in the mail, by giving written notice of cancellation to Seller or Seller's agent.

B. **NATURAL AND ENVIRONMENTAL HAZARD DISCLOSURES AND OTHER BOOKLETS:** Within the time specified in paragraph 14A, Seller shall, if required by Law: **(i)** Deliver to Buyer earthquake guide(s) (and questionnaire), environmental hazards booklet, and home energy rating pamphlet; **(ii)** disclose if the Property is located in a Special Flood Hazard Area; Potential Flooding (Inundation) Area; Very High Fire Hazard Zone; State Fire Responsibility Area; Earthquake Fault Zone; and Seismic Hazard Zone; and **(iii)** disclose any other zone as required by Law and provide any other information required for those zones.

C. **WITHHOLDING TAXES:** Within the time specified in paragraph 14A, to avoid required withholding, Seller shall Deliver to Buyer or qualified substitute, an affidavit sufficient to comply with federal (FIRPTA) and California withholding Law (C.A.R. Form AS or QS).

D. **MEGAN'S LAW DATABASE DISCLOSURE:** Notice: Pursuant to Section 290.46 of the Penal Code, information about specified registered sex offenders is made available to the public via an Internet Web site maintained by the Department of Justice at **www.meganslaw.ca.gov.** Depending on an offender's criminal history, this information will include either the address at which the offender resides or the community of residence and ZIP Code in which he or she resides. (Neither Seller nor Brokers are required to check this website. If Buyer wants further information, Broker recommends that Buyer obtain information from this website during Buyer's inspection contingency period. Brokers do not have expertise in this area.)

E. **NOTICE REGARDING GAS AND HAZARDOUS LIQUID TRANSMISSION PIPELINES:** This notice is being provided simply to inform you that information about the general location of gas and hazardous liquid transmission pipelines is available to the public via the National Pipeline Mapping System (NPMS) Internet Web site maintained by the United States Department of Transportation at **http://www.npms.phmsa.dot.gov/.** To seek further information about possible transmission pipelines near the Property, you may contact your local gas utility or other pipeline operators in the area. Contact information for pipeline operators is searchable by ZIP Code and county on the NPMS Internet Web site.

F. **CONDOMINIUM/PLANNED DEVELOPMENT DISCLOSURES:**

**(1)** ~~**SELLER HAS:** 7 (or ____ ) Days After Acceptance to disclose to Buyer if the Property is a condominium, or is located in a planned development or other common interest subdivision (C.A.R. Form SPQ or ESD).~~

Buyer's Initials ( _~~AV~~_ ) ( _____ )                    Seller's Initials ( _____ ) ( _____ )

**RPA-CA REVISED 12/15 (PAGE 4 OF 10)**

**CALIFORNIA RESIDENTIAL PURCHASE AGREEMENT (RPA-CA PAGE 4 OF 10)**

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026  www.zipLogix.com                    **Annadel Heights**

DocuSign Envelope ID: 156FB58B-3842-40F6-BB8C-B522567B1939

Property Address: **4780 Annadel Heights Drive, Santa Rosa, CA  95405**    Date: **April 18, 2017**

~~(2) If the Property is a condominium or is located in a planned development or other common interest subdivision, Seller has
3 (or ___ ) Days After Acceptance to request from the HOA (C.A.R. Form HOA1): (i) Copies of any documents required by Law;
(ii) disclosure of any pending or anticipated claim or litigation by or against the HOA; (iii) a statement containing the location and
number of designated parking and storage spaces; (iv) Copies of the most recent 12 months of HOA minutes for regular and special
meetings; and (v) the names and contact information of all HOAs governing the Property (collectively, "CI Disclosures"). (vi) private
transfer fees; (vii) Pet fee restrictions; and (viii) smoking restrictions. Seller shall itemize and Deliver to Buyer all CI Disclosures
received from the HOA and any CI Disclosures in Seller's possession. Buyer's approval of CI Disclosures is a contingency of this
Agreement as specified in paragraph 14B(3). The Party specified in paragraph 7, as directed by escrow, shall deposit funds into escrow
or direct to HOA or management company to pay for any of the above.~~

11. **CONDITION OF PROPERTY:** Unless otherwise agreed in writing: **(i)** the Property is sold **(a)** "AS-IS" in its PRESENT
physical condition as of the date of Acceptance and **(b)** subject to Buyer's Investigation rights; **(ii)** the Property, including pool, spa,
landscaping and grounds, is to be maintained in substantially the same condition as on the date of Acceptance; and **(iii)** all debris
and personal property not included in the sale shall be removed by Close Of Escrow.
   A. Seller shall, within the time specified in paragraph 14A, DISCLOSE KNOWN MATERIAL FACTS AND DEFECTS affecting the
Property, including known insurance claims within the past five years, and make any and all other disclosures required by law.
   B. Buyer has the right to conduct Buyer Investigations of the Property and, as specified in paragraph 14B, based upon information
discovered in those investigations: (i) cancel this Agreement; or (ii) request that Seller make Repairs or take other action.
   C. **Buyer is strongly advised to conduct investigations of the entire Property in order to determine its present condition.
Seller may not be aware of all defects affecting the Property or other factors that Buyer considers important. Property
improvements may not be built according to code, in compliance with current Law, or have had permits issued.**

12. **BUYER'S INVESTIGATION OF PROPERTY AND MATTERS AFFECTING PROPERTY:**
   A. Buyer's acceptance of the condition of, and any other matter affecting the Property, is a contingency of this Agreement as specified in
this paragraph and paragraph 14B. Within the time specified in paragraph 14B(1), Buyer shall have the right, at Buyer's expense unless
otherwise agreed, to conduct inspections, investigations, tests, surveys and other studies ("Buyer Investigations"), including, but not
limited to: (i) a general physical inspection; (ii) an inspection specifically for wood destroying pests and organisms. Any inspection for
wood destroying pests and organisms shall be prepared by a registered Structural Pest Control company; shall cover the main building
and attached structures; may cover detached structures; shall NOT include water tests of shower pans on upper level units unless the
owners of property below the shower consent; shall NOT include roof coverings; and, if the Property is a unit in a condominium or other
common interest subdivision, the inspection shall include only the separate interest and any exclusive-use areas being transferred, and
shall NOT include common areas; and shall include a report ("Pest Control Report") showing the findings of the company which shall be
separated into sections for evident infestation or infections (Section 1) and for conditions likely to lead to infestation or infection (Section
2); (iii) inspect for lead-based paint and other lead-based paint hazards; (iv) satisfy Buyer as to any matter specified in the attached
Buyer's Inspection Advisory (C.A.R. Form BIA); (v) review the registered sex offender database; (vi) confirm the insurability of Buyer
and the Property including the availability and cost of flood and fire insurance; and (vii) review and seek approval of leases that may
need to be assumed by Buyer. Without Seller's prior written consent, Buyer shall neither make nor cause to be made: invasive or
destructive Buyer Investigations, except for minimally invasive testing required to prepare a Pest Control Report; or inspections by any
governmental building or zoning inspector or government employee, unless required by Law.
   B. Seller shall make the Property available for all Buyer Investigations. Buyer shall **(i)** as specified in paragraph 14B, complete
Buyer Investigations and either remove the contingency or cancel this Agreement, and **(ii)** give Seller, at no cost, complete
Copies of all such Investigation reports obtained by Buyer, which obligation shall survive the termination of this Agreement.
   C. Seller shall have water, gas, electricity and all operable pilot lights on for Buyer's Investigations and through the date possession `during the Due Diligence Period`
is made available to Buyer.
   D. **Buyer indemnity and seller protection for entry upon property:** Buyer shall: **(i)** keep the Property free and clear of liens; **(ii)** repair
all damage arising from Buyer Investigations; and **(iii)** indemnify and hold Seller harmless from all resulting liability, claims, demands,
damages and costs. Buyer shall carry, or Buyer shall require anyone acting on Buyer's behalf to carry, policies of liability, workers'
compensation and other applicable insurance, defending and protecting Seller from liability for any injuries to persons or property occurring
during any Buyer Investigations or work done on the Property at Buyer's direction prior to Close Of Escrow. Seller is advised that certain
protections may be afforded Seller by recording a "Notice of Non-Responsibility" (C.A.R. Form NNR) for Buyer Investigations and work
done on the Property at Buyer's direction. Buyer's obligations under this paragraph shall survive the termination of this Agreement. `other than due to Seller's negligence or willful misconduct`

13. **TITLE AND VESTING:**
   A. Within the time specified in paragraph 14, Buyer shall be provided a current preliminary title report ("Preliminary Report"). The Preliminary
Report is only an offer by the title insurer to issue a policy of title insurance and may not contain every item affecting title. Buyer's review of
the Preliminary Report and any other matters which may affect title are a contingency of this Agreement as specified in paragraph 14B. The
company providing the Preliminary Report shall, prior to issuing a Preliminary Report, conduct a search of the General Index for all Sellers
except banks or other institutional lenders selling properties they acquired through foreclosure (REOs), corporations, and government
entities. Seller shall within 7 Days After Acceptance, give Escrow Holder a completed Statement of Information.
   B. Title is taken in its present condition subject to all encumbrances, easements, covenants, conditions, restrictions, rights and other
matters, whether of record or not, as of the date of Acceptance except for: **(i)** monetary liens of record (which Seller is obligated to pay
off) unless Buyer is assuming those obligations or taking the Property subject to those obligations; and **(ii)** those matters which Seller
has agreed to remove in writing.
   C. Within the time specified in paragraph 14A, Seller has a duty to disclose to Buyer all matters known to Seller affecting title,
whether of record or not. and
   D. At Close Of Escrow, Buyer shall receive a grant deed conveying title (or, for stock cooperative or long-term lease, an assignment
of stock certificate or of Seller's leasehold interest), including oil, mineral and water rights if currently owned by Seller. Title shall
vest as designated in Buyer's supplemental escrow instructions. THE MANNER OF TAKING TITLE MAY HAVE SIGNIFICANT
LEGAL AND TAX CONSEQUENCES. CONSULT AN APPROPRIATE PROFESSIONAL

`(iii) those title exceptions expressly approved by Buyer in writing during the Due Diligence Period as described in Section 14.B(1). Buyer shall have the right, in its`
`sole and absolute discretion to terminate this Agreement and receive an immediate return of its Deposit in the event Buyer disapproves any title exception during th`
`time period described in Section 14.B(1)`

Buyer's Initials ( __ ) ( __ )          Seller's Initials ( __ ) ( __ )

**RPA-CA REVISED 12/15 (PAGE 5 OF 10)**

**CALIFORNIA RESIDENTIAL PURCHASE AGREEMENT  (RPA-CA PAGE 5 OF 10)**

DocuSign Envelope ID: 156FB58B-3842-40F6-BB8C-B522567B1939

Property Address: **4780 Annadel Heights Drive, Santa Rosa, CA  95405**                    Date: **April 18, 2017**

    E.   Buyer shall receive a CLTA/ALTA "Homeowner's Policy of Title Insurance", if applicable to the type of property and buyer. If not, Escrow Holder shall notify Buyer. A title company can provide information about the availability, coverage, and cost of other title policies and endorsements. If the Homeowner's Policy is not available, Buyer shall choose another policy, instruct Escrow Holder in writing and may pay an increase in cost.

**14. TIME PERIODS; REMOVAL OF CONTINGENCIES; CANCELLATION RIGHTS: The following time periods may only be extended, altered, modified or changed by mutual written agreement. Any removal of contingencies or cancellation under this paragraph by either Buyer or Seller must be exercised in good faith and in writing (C.A.R. Form CR or CC).**

    A.   **SELLER HAS: 7 (or   4   ) Days** After Acceptance to Deliver to Buyer all Reports, disclosures and information for which Seller is responsible under paragraphs 5, 6, 7, 8B(5), 10A, B, C, and F, 11A and 13A. If, by the time specified, Seller has not Delivered any such item, Buyer after first Delivering to Seller a Notice to Perform (C.A.R. Form NSP) may cancel this Agreement.

    B.   (1)   **BUYER HAS: 17 (or ~~14~~ ) Days** After Acceptance, unless otherwise agreed in writing, to: **(i)** complete all Buyer Investigations; review all disclosures, reports, lease documents to be assumed by Buyer pursuant to paragraph 8B(5), and other applicable information, which Buyer receives from Seller; and approve all matters affecting the Property; and **(ii)** Deliver to Seller Signed Copies of Statutory and Lead Disclosures and other disclosures Delivered by Seller in accordance with paragraph 10A.   "Due Diligence Period"

        (2)   Within the time specified in paragraph 14B(1), Buyer may request that Seller make repairs or take any other action regarding the Property (C.A.R. Form RR). Seller has no obligation to agree to or respond to (C.A.R. Form RRRR) Buyer's requests.

        (3)   By the end of the time specified in paragraph 14B(1) (or as otherwise specified in this Agreement), Buyer shall Deliver to Seller a removal of the applicable contingency or cancellation (C.A.R. Form CR or CC) of this Agreement. However, if any report, disclosure or information for which Seller is responsible is not Delivered within the time specified in paragraph 14A, then Buyer has **5 (or ___ ) Days** After Delivery of any such items, or the time specified in paragraph 14B(1), whichever is later, to Deliver to Seller a removal of the applicable contingency or cancellation of this Agreement.

        (4)   **Continuation of Contingency:** Even after the end of the time specified in paragraph 14B(1) and before Seller cancels, if at all, pursuant to paragraph 14D, Buyer retains the right, in writing, to either **(i)** remove remaining contingencies, or **(ii)** cancel this Agreement based on a remaining contingency. Once Buyer's written removal of all contingencies is Delivered to Seller, Seller may not cancel this Agreement pursuant to paragraph 14D(1).

        (5)   Access to Property: Buyer shall have access to the Property to conduct inspections and investigations for **17 (or ____) Days** After Acceptance, whether or not any part of the Buyer's Investigation Contingency has been waived or removed.

    C.   ☐ ~~REMOVAL OF CONTINGENCIES WITH OFFER: Buyer removes the contingencies specified in the attached Contingency Removal form (C.A.R. Form CR). If Buyer removes any contingency without an adequate understanding of the Property's condition or Buyer's ability to purchase, Buyer is acting against the advice of Broker.~~

    D.   **SELLER RIGHT TO CANCEL:**

        (1)   **Seller right to Cancel; Buyer Contingencies:** If, by the time specified in this Agreement, Buyer does not Deliver to Seller a removal of the applicable contingency or cancellation of this Agreement, then Seller, after first Delivering to Buyer a Notice to Buyer to Perform (C.A.R. Form NBP), may cancel this Agreement. In such event, Seller shall authorize the return of Buyer's deposit, except for fees incurred by Buyer.

        (2)   **Seller right to Cancel; Buyer Contract Obligations:** Seller, after first delivering to Buyer a NBP, may cancel this Agreement if, by the time specified in this Agreement, Buyer does not take the following action(s): **(i)** Deposit funds as required by paragraph 3A, or 3B or if the funds deposited pursuant to paragraph 3A or 3B are not good when deposited; **(ii)** Deliver a notice of FHA or VA costs or terms as required by paragraph 3D(3) (C.A.R. Form FVA); **(iii)** Deliver a letter as required by paragraph 3J(1); **(iv)** Deliver verification, or a satisfactory verification if Seller reasonably disapproves of the verification already provided, as required by paragraph 3C or 3H; **(v)** In writing assume or accept leases or liens specified in 8B5; **(vi)** Return Statutory and Lead Disclosures as required by paragraph 10A(5); or **(vii)** Sign or initial a separate liquidated damages form for an increased deposit as required by paragraphs 3B and 21B; or **(viii)** Provide evidence of authority to sign in a representative capacity as specified in paragraph 19. In such event, Seller shall authorize the return of Buyer's deposit, except for fees incurred by Buyer.

    E.   **NOTICE TO BUYER OR SELLER TO PERFORM:** The NBP or NSP shall: **(i)** be in writing; **(ii)** be signed by the applicable Buyer or Seller; and **(iii)** give the other Party at least **2 (or ____) Days** After Delivery (or until the time specified in the applicable paragraph, whichever occurs last) to take the applicable action. A NBP or NSP may not be Delivered any earlier than **2 Days** Prior to the expiration of the applicable time for the other Party to remove a contingency or cancel this Agreement or meet an obligation specified in paragraph 14.

    F.   **EFFECT OF BUYER'S REMOVAL OF CONTINGENCIES:** If Buyer removes, in writing, any contingency or cancellation rights, unless otherwise specified in writing, Buyer shall conclusively be deemed to have: **(i)** completed all Buyer Investigations, and review of reports and other applicable information and disclosures pertaining to that contingency or cancellation right; **(ii)** elected to proceed with the transaction; and **(iii)** assumed all liability, responsibility and expense for Repairs or corrections pertaining to that contingency or cancellation right, or for the inability to obtain financing.

    G.   **CLOSE OF ESCROW:** Before Buyer or Seller may cancel this Agreement for failure of the other Party to close escrow pursuant to this Agreement, Buyer or Seller must first Deliver to the other Party a demand to close escrow (C.A.R. Form DCE). The DCE shall: **(i)** be signed by the applicable Buyer or Seller; and **(ii)** give the other Party at least **3 (or _____) Days** After Delivery to close escrow. A DCE may not be Delivered any earlier than **3 Days** Prior to the scheduled close of escrow.

    H.   **EFFECT OF CANCELLATION ON DEPOSITS:** If Buyer or Seller gives written notice of cancellation pursuant to rights duly exercised under the terms of this Agreement, the Parties agree to Sign mutual instructions to cancel the sale and escrow and release deposits, if any, to the party entitled to the funds, less fees and costs incurred by that party. Fees and costs may be payable to service providers and vendors for services and products provided during escrow. Except as specified below, **release of funds will require mutual Signed release instructions from the Parties, judicial decision or arbitration award.** If either Party fails to execute mutual instructions to cancel escrow, one Party may make a written demand to Escrow Holder for the deposit. (C.A.R. Form BDRD or SDRD). Escrow Holder, upon receipt, shall promptly deliver notice of the demand to the other Party. If, within 10 Days After Escrow Holder's notice, the other Party does not object to the demand, Escrow Holder shall disburse the deposit to the Party making the demand. If Escrow Holder complies with the preceding process, each Party shall be deemed to have released Escrow Holder from any and all claims or liability related to the disbursal of the deposit. Escrow Holder, at its discretion, may nonetheless require mutual cancellation instructions. **A Party may be subject to a civil penalty of up to $1,000 for refusal to sign cancellation instructions if no good faith dispute exists as to who is entitled to the deposited funds (Civil Code §1057.3).**

Buyer's Initials (  **AV**  ) (       )                                   Seller's Initials (  _____  ) (  _____  )

**RPA-CA REVISED 12/15 (PAGE 6 OF 10)**

**CALIFORNIA RESIDENTIAL PURCHASE AGREEMENT  (RPA-CA PAGE 6 OF 10)**

DocuSign Envelope ID: 156FB58B-3842-40F6-BB8C-B522567B1939

Property Address: **4780 Annadel Heights Drive, Santa Rosa, CA  95405**                                    Date: **April 18, 2017**

15. **FINAL VERIFICATION OF CONDITION:** Buyer shall have the right to make a final verification of the Property within **5 (or ☐ ___ ) Days** Prior to Close Of Escrow, NOT AS A CONTINGENCY OF THE SALE, but solely to confirm: **(i)** the Property is maintained pursuant to paragraph 11; **(ii)** Repairs have been completed as agreed; and **(iii)** Seller has complied with Seller's other obligations under this Agreement (C.A.R. Form VP).

16. **REPAIRS:** Repairs shall be completed prior to final verification of condition unless otherwise agreed in writing. Repairs to be performed at Seller's expense may be performed by Seller or through others, provided that the work complies with applicable Law, including governmental permit, inspection and approval requirements. Repairs shall be performed in a good, skillful manner with materials of quality and appearance comparable to existing materials. It is understood that exact restoration of appearance or cosmetic items following all Repairs may not be possible. Seller shall: **(i)** obtain invoices and paid receipts for Repairs performed by others; **(ii)** prepare a written statement indicating the Repairs performed by Seller and the date of such Repairs; and **(iii)** provide Copies of invoices and paid receipts and statements to Buyer prior to final verification of condition.

17. **PRORATIONS OF PROPERTY TAXES AND OTHER ITEMS:** Unless otherwise agreed in writing, the following items shall be PAID CURRENT and prorated between Buyer and Seller as of Close Of Escrow: real property taxes and assessments, interest, rents, HOA regular, special, and emergency dues and assessments imposed prior to Close Of Escrow, premiums on insurance assumed by Buyer, payments on bonds and assessments assumed by Buyer, and payments on Mello-Roos and other Special Assessment District bonds and assessments that are now a lien. The following items shall be assumed by Buyer WITHOUT CREDIT toward the purchase price: prorated payments on Mello-Roos and other Special Assessment District bonds and assessments and HOA special assessments that are now a lien but not yet due. Property will be reassessed upon change of ownership. Any supplemental tax bills shall be paid as follows: **(i)** for periods after Close Of Escrow, by Buyer; and **(ii)** for periods prior to Close Of Escrow, by Seller (see C.A.R. Form SPT or SBSA for further information). TAX BILLS ISSUED AFTER CLOSE OF ESCROW SHALL BE HANDLED DIRECTLY BETWEEN BUYER AND SELLER. Prorations shall be made based on a 30-day month.

18. **BROKERS:**
    **A. COMPENSATION:** Seller or Buyer, or both, as applicable, agree to pay compensation to Broker as specified in a separate written agreement between Broker and that Seller or Buyer. Compensation is payable upon Close Of Escrow, or if escrow does not close, as otherwise specified in the agreement between Broker and that Seller or Buyer.
    **B. SCOPE OF DUTY:** Buyer and Seller acknowledge and agree that Broker: **(i)** Does not decide what price Buyer should pay or Seller should accept; **(ii)** Does not guarantee the condition of the Property; **(iii)** Does not guarantee the performance, adequacy or completeness of inspections, services, products or repairs provided or made by Seller or others; **(iv)** Does not have an obligation to conduct an inspection of common areas or areas off the site of the Property; **(v)** Shall not be responsible for identifying defects on the Property, in common areas, or offsite unless such defects are visually observable by an inspection of reasonably accessible areas of the Property or are known to Broker; **(vi)** Shall not be responsible for inspecting public records or permits concerning the title or use of Property; **(vii)** Shall not be responsible for identifying the location of boundary lines or other items affecting title; **(viii)** Shall not be responsible for verifying square footage, representations of others or information contained in Investigation reports, Multiple Listing Service, advertisements, flyers or other promotional material; **(ix)** Shall not be responsible for determining the fair market value of the Property or any personal property included in the sale; **(x)** Shall not be responsible for providing legal or tax advice regarding any aspect of a transaction entered into by Buyer or Seller; and **(xi)** Shall not be responsible for providing other advice or information that exceeds the knowledge, education and experience required to perform real estate licensed activity. Buyer and Seller agree to seek legal, tax, insurance, title and other desired assistance from appropriate professionals.

19. **REPRESENTATIVE CAPACITY:** If one or more Parties is signing this Agreement in a representative capacity and not for him/herself as an individual then that Party shall so indicate in paragraph 31 or 32 and attach a Representative Capacity Signature Disclosure (C.A.R. Form RCSD). Wherever the signature or initials of the representative identified in the RCSD appear on this Agreement or any related documents, it shall be deemed to be in a representative capacity for the entity described and not in an individual capacity, unless otherwise indicated. The Party acting in a representative capacity (i) represents that the entity for which that party is acting already exists and (ii) shall Deliver to the other Party and Escrow Holder, within **3 Days** After Acceptance, evidence of authority to act in that capacity (such as but not limited to: applicable portion of the trust or Certification Of Trust (Probate Code §18100.5), letters testamentary, court order, power of attorney, corporate resolution, or formation documents of the business entity).

20. **JOINT ESCROW INSTRUCTIONS TO ESCROW HOLDER:**
    **A.** The following paragraphs, or applicable portions thereof, of this Agreement constitute **the joint escrow instructions of Buyer and Seller to Escrow Holder,** which Escrow Holder is to use along with any related counter offers and addenda, and any additional mutual instructions to close the escrow: paragraphs 1, 3, 4B, 5A, 6, 7, 10C, 13, 14G, 17, 18A, 19, 20, 26, 29, 30, 31, 32 and paragraph D of the section titled Real Estate Brokers on page 10. If a Copy of the separate compensation agreement(s) provided for in paragraph 18A, or paragraph D of the section titled Real Estate Brokers on page 10 is deposited with Escrow Holder by Broker, Escrow Holder shall accept such agreement(s) and pay out from Buyer's or Seller's funds, or both, as applicable, the Broker's compensation provided for in such agreement(s). The terms and conditions of this Agreement not set forth in the specified paragraphs are additional matters for the information of Escrow Holder, but about which Escrow Holder need not be concerned. Buyer and Seller will receive Escrow Holder's general provisions, if any, directly from Escrow Holder and will execute such provisions within the time specified in paragraph 7C(1)(c). To the extent the general provisions are inconsistent or conflict with this Agreement, the general provisions will control as to the duties and obligations of Escrow Holder only. Buyer and Seller will execute additional instructions, documents and forms provided by Escrow Holder that are reasonably necessary to close the escrow and, as directed by Escrow Holder, within **3 (or ___ ) Days**, shall pay to Escrow Holder or HOA or HOA management company or others any fee required by paragraphs 7, 10 or elsewhere in this Agreement.
    **B.** A Copy of this Agreement including any counter offer(s) and addenda shall be delivered to Escrow Holder within **3 Days** After Acceptance (or _____). Buyer and Seller authorize Escrow Holder to accept and rely on Copies and Signatures as defined in this Agreement as originals, to open escrow and for other purposes of escrow. The validity of this Agreement as between Buyer and Seller is not affected by whether or when Escrow Holder Signs this Agreement. Escrow Holder shall provide Seller's Statement of Information to Title company when received from Seller. If Seller delivers an affidavit to Escrow Holder to satisfy Seller's FIRPTA obligation under paragraph 10C, Escrow Holder shall deliver to Buyer a Qualified Substitute statement that complies with federal Law.

Buyer's Initials ( **KU** ) ( _____ )                                    Seller's Initials ( _____ ) ( _____ )
**RPA-CA REVISED 12/15 (PAGE 7 OF 10)**

**CALIFORNIA RESIDENTIAL PURCHASE AGREEMENT  (RPA-CA PAGE 7 OF 10)**


EQUAL HOUSING OPPORTUNITY

DocuSign Envelope ID: 156FB58B-3842-40F6-BB8C-B522567B1939

Property Address: **_4780 Annadel Heights Drive, Santa Rosa, CA  95405_**                        Date: **_April 18, 2017_**

C.  Brokers are a party to the escrow for the sole purpose of compensation pursuant to paragraph 18A and paragraph D of the section titled Real Estate Brokers on page 10. Buyer and Seller irrevocably assign to Brokers compensation specified in paragraph 18A, and irrevocably instruct Escrow Holder to disburse those funds to Brokers at Close Of Escrow or pursuant to any other mutually executed cancellation agreement. Compensation instructions can be amended or revoked only with the written consent of Brokers. Buyer and Seller shall release and hold harmless Escrow Holder from any liability resulting from Escrow Holder's payment to Broker(s) of compensation pursuant to this Agreement.

D.  Upon receipt, Escrow Holder shall provide Seller and Seller's Broker verification of Buyer's deposit of funds pursuant to paragraph 3A and 3B. Once Escrow Holder becomes aware of any of the following, Escrow Holder shall immediately notify all Brokers: (i) if Buyer's initial or any additional deposit or down payment is not made pursuant to this Agreement, or is not good at time of deposit with Escrow Holder; or (ii) if Buyer and Seller instruct Escrow Holder to cancel escrow.

E.  A Copy of any amendment that affects any paragraph of this Agreement for which Escrow Holder is responsible shall be delivered to Escrow Holder within 3 Days after mutual execution of the amendment.

**21. REMEDIES FOR BUYER'S BREACH OF CONTRACT:**

A.  Any clause added by the Parties specifying a remedy (such as release or forfeiture of deposit or making a deposit **non-refundable) for failure of Buyer to complete the purchase in violation of this Agreement shall be deemed invalid unless the clause independently satisfies the statutory liquidated damages requirements set forth in the Civil Code.**

B.  **LIQUIDATED DAMAGES:** If Buyer fails to complete this purchase because of Buyer's default, Seller shall retain, as liquidated damages, the deposit actually paid. If the Property is a dwelling with no more than four units, one of which Buyer intends to occupy, then the amount retained shall be no more than 3% of the purchase price. Any excess shall be returned to Buyer. Except as provided in paragraph 14H, release of funds will require mutual, Signed release instructions from both Buyer and Seller, judicial decision or arbitration award. AT THE TIME OF ANY INCREASED DEPOSIT BUYER AND SELLER SHALL SIGN A SEPARATE LIQUIDATED DAMAGES PROVISION INCORPORATING THE INCREASED DEPOSIT AS LIQUIDATED DAMAGES (C.A.R. FORM RID).

Buyer's Initials _____ / _____                        Seller's Initials _____ / _____

**22. DISPUTE RESOLUTION:**

A.  **MEDIATION:** The Parties agree to mediate any dispute or claim arising between them out of this Agreement, or any resulting transaction, before resorting to arbitration or court action through the C.A.R. Real Estate Mediation Center for Consumers (**www.consumermediation.org**) or through any other mediation provider or service mutually agreed to by the Parties. The Parties **also agree to mediate any disputes or claims with Broker(s), who, in writing, agree to such mediation prior to, or within a reasonable time after, the dispute or claim is presented to the Broker.** Mediation fees, if any, shall be divided equally among the Parties involved. If, for any dispute or claim to which this paragraph applies, any Party (i) commences an action without first attempting to resolve the matter through mediation, or (ii) before commencement of an action, refuses to mediate after a request has been made, then that Party shall not be entitled to recover attorney fees, even if they would otherwise be available to that Party in any such action. THIS MEDIATION PROVISION APPLIES WHETHER OR NOT THE ARBITRATION PROVISION IS INITIALED. **Exclusions from this mediation agreement are specified in paragraph 22C.**

B.  ~~ARBITRATION OF DISPUTES:~~

~~The Parties agree that any dispute or claim in Law or equity arising between them out of this Agreement or any resulting transaction, which is not settled through mediation, shall be decided by neutral, binding arbitration. The Parties also agree to arbitrate any disputes or claims with Broker(s), who, in writing, agree to such arbitration prior to, or within a reasonable time after, the dispute or claim is presented to the Broker. The arbitrator shall be a retired judge or justice, or an attorney with at least 5 years of residential real estate Law experience, unless the parties mutually agree to a different arbitrator. The Parties shall have the right to discovery in accordance with Code of Civil Procedure §1283.05. In all other respects, the arbitration shall be conducted in accordance with Title 9 of Part 3 of the Code of Civil Procedure. Judgment upon the award of the arbitrator(s) may be entered into any court having jurisdiction. Enforcement of this agreement to arbitrate shall be governed by the Federal Arbitration Act. Exclusions from this arbitration agreement are specified in paragraph 22C.~~

~~"NOTICE: BY INITIALING IN THE SPACE BELOW YOU ARE AGREEING TO HAVE ANY DISPUTE ARISING OUT OF THE MATTERS INCLUDED IN THE 'ARBITRATION OF DISPUTES' PROVISION DECIDED BY NEUTRAL ARBITRATION AS PROVIDED BY CALIFORNIA LAW AND YOU ARE GIVING UP ANY RIGHTS YOU MIGHT POSSESS TO HAVE THE DISPUTE LITIGATED IN A COURT OR JURY TRIAL. BY INITIALING IN THE SPACE BELOW YOU ARE GIVING UP YOUR JUDICIAL RIGHTS TO DISCOVERY AND APPEAL, UNLESS THOSE RIGHTS ARE SPECIFICALLY INCLUDED IN THE 'ARBITRATION OF DISPUTES' PROVISION. IF YOU REFUSE TO SUBMIT TO ARBITRATION AFTER AGREEING TO THIS PROVISION, YOU MAY BE COMPELLED TO ARBITRATE UNDER THE AUTHORITY OF THE CALIFORNIA CODE OF CIVIL PROCEDURE. YOUR AGREEMENT TO THIS ARBITRATION PROVISION IS VOLUNTARY."~~

~~"WE HAVE READ AND UNDERSTAND THE FOREGOING AND AGREE TO SUBMIT DISPUTES ARISING OUT OF THE MATTERS INCLUDED IN THE 'ARBITRATION OF DISPUTES' PROVISION TO NEUTRAL ARBITRATION."~~

Buyer's Initials _____ / _____                        Seller's Initials _____ / _____

C.  ADDITIONAL MEDIATION ~~AND ARBITRATION~~ TERMS:

(1) **EXCLUSIONS:** The following matters are excluded from mediation ~~and arbitration~~: (i) a judicial or non-judicial foreclosure or other action or proceeding to enforce a deed of trust, mortgage or installment land sale contract as defined in Civil Code §2985; (ii) an unlawful detainer action; and (iii) any matter that is within the jurisdiction of a probate, small claims or bankruptcy court.

Buyer's Initials ( _____ ) ( _____ )                        Seller's Initials ( _____ ) ( _____ )

**RPA-CA REVISED 12/15 (PAGE 8 OF 10)**

DocuSign Envelope ID: 156FB58B-3842-40F6-BB8C-B522567B1939

Property Address: **_4780 Annadel Heights Drive, Santa Rosa, CA  95405_**                Date: **_April 18, 2017_**

    (2) **PRESERVATION OF ACTIONS:** The following shall not constitute a waiver nor violation of the mediation and arbitration provisions: (i) the filing of a court action to preserve a statute of limitations; (ii) the filing of a court action to enable the recording of a notice of pending action, for order of attachment, receivership, injunction, or other provisional remedies; or (iii) the filing of a mechanic's lien.

    (3) **BROKERS:** Brokers shall not be obligated nor compelled to mediate or arbitrate unless they agree to do so in writing. Any Broker(s) participating in mediation or arbitration shall not be deemed a party to this Agreement.

**23. SELECTION OF SERVICE PROVIDERS:** Brokers do not guarantee the performance of any vendors, service or product providers ("Providers"), whether referred by Broker or selected by Buyer, Seller or other person. Buyer and Seller may select ANY Providers of their own choosing.

**24. MULTIPLE LISTING SERVICE ("MLS"):** Brokers are authorized to report to the MLS a pending sale and, upon Close Of Escrow, the sales price and other terms of this transaction shall be provided to the MLS to be published and disseminated to persons and entities authorized to use the information on terms approved by the MLS.

**25. ATTORNEY FEES:** In any action, proceeding, or arbitration between Buyer and Seller arising out of this Agreement, the prevailing Buyer or Seller shall be entitled to reasonable attorney fees and costs from the non-prevailing Buyer or Seller, except as provided in paragraph 22A.

**26. ASSIGNMENT:** Buyer shall not assign all or any part of Buyer's interest in this Agreement without first having obtained the separate written consent of Seller to a specified assignee.  Such consent shall not be unreasonably withheld.  Any total or partial assignment shall not relieve Buyer of Buyer's obligations pursuant to this Agreement unless otherwise agreed in writing by Seller. (C.A.R. Form AOAA).

**27. EQUAL HOUSING OPPORTUNITY:** The Property is sold in compliance with federal, state and local anti-discrimination Laws.

**28. TERMS AND CONDITIONS OF OFFER:**
This is an offer to purchase the Property on the above terms and conditions. The liquidated damages paragraph or the arbitration of disputes paragraph is incorporated in this Agreement if initialed by all Parties or if incorporated by mutual agreement in a counter offer or addendum. If at least one but not all Parties initial, a counter offer is required until agreement is reached. Seller has the right to continue to offer the Property for sale and to accept any other offer at any time prior to notification of Acceptance. The Parties have read and acknowledge receipt of a Copy of the offer and agree to the confirmation of agency relationships. If this offer is accepted and Buyer subsequently defaults, Buyer may be responsible for payment of Brokers' compensation. This Agreement and any supplement, addendum or modification, including any Copy, may be Signed in two or more counterparts, all of which shall constitute one and the same writing.

**29. TIME OF ESSENCE; ENTIRE CONTRACT; CHANGES:**     Time is of the essence. All understandings between the Parties are incorporated in this Agreement. Its terms are intended by the Parties as a final, complete and exclusive expression of their Agreement with respect to its subject matter, and may not be contradicted by evidence of any prior agreement or contemporaneous oral agreement. If any provision of this Agreement is held to be ineffective or invalid, the remaining provisions will nevertheless be given full force and effect. Except as otherwise specified, this Agreement shall be interpreted and disputes shall be resolved in accordance with the Laws of the State of California. **Neither this Agreement nor any provision in it may be extended, amended, modified, altered or changed, except in writing Signed by Buyer and Seller.**

**30. DEFINITIONS:** As used in this Agreement:

    A. **"Acceptance"** means the time the offer or final counter offer is accepted in writing by a Party and is delivered to and personally received by the other Party or that Party's authorized agent in accordance with the terms of this offer or a final counter offer.

    B. **"Agreement"** means this document and any counter offers and any incorporated addenda, collectively forming the binding agreement between the Parties. Addenda are incorporated only when Signed by all Parties.

    C. **"C.A.R. Form"** means the most current version of the specific form referenced or another comparable form agreed to by the parties.

    D. **"Close Of Escrow"**, including "COE", means the date the grant deed, or other evidence of transfer of title, is recorded.

    E. **"Copy"** means copy by any means including photocopy, NCR, facsimile and electronic.

    F. **"Days"** means calendar days. However, after Acceptance, the last **Day** for performance of any act required by this Agreement (including Close Of Escrow) shall not include any Saturday, Sunday, or legal holiday and shall instead be the next Day.

    G. **"Days After"** means the specified number of calendar days after the occurrence of the event specified, not counting the calendar date on which the specified event occurs, and ending at 11:59 PM on the final day.

    H. **"Days Prior"** means the specified number of calendar days before the occurrence of the event specified, not counting the calendar date on which the specified event is scheduled to occur.

    I. **"Deliver"**, **"Delivered"** or **"Delivery"**, unless otherwise specified in writing, means and shall be effective upon: personal receipt by Buyer or Seller or the individual Real Estate Licensee for that principal as specified in the section titled Real Estate Brokers on page 10, regardless of the method used (i.e., messenger, mail, email, fax, other).

    J. **"Electronic Copy"** or **"Electronic Signature"** means, as applicable, an electronic copy or signature complying with California Law. Buyer and Seller agree that electronic means will not be used by either Party to modify or alter the content or integrity of this Agreement without the knowledge and consent of the other Party.

    K. **"Law"** means any law, code, statute, ordinance, regulation, rule or order, which is adopted by a controlling city, county, state or federal legislative, judicial or executive body or agency.

    L. **"Repairs"** means any repairs (including pest control), alterations, replacements, modifications or retrofitting of the Property provided for under this Agreement.

    M. **"Signed"** means either a handwritten or electronic signature on an original document, Copy or any counterpart.

**31. EXPIRATION OF OFFER:** This offer shall be deemed revoked and the deposit, if any, shall be returned to Buyer unless the offer is Signed by Seller and a Copy of the Signed offer is personally received by Buyer, or by _____ **_Gael Grove or Kerry Jones_** ,
who is authorized to receive it, by 5:00 PM on the third Day after this offer is signed by Buyer (or by ☐ _____ **_5:00_** ☐ AM/☒ PM,
on **_April 19, 2017_** _____ (date)).

☐ One or more Buyers is signing this Agreement in a representative capacity and not for him/herself as an individual. See attached Representative Capacity Signature Disclosure (C.A.R. Form RCSD-B) for additional terms.

Date **04/~~16~~/2017** `26`     BUYER _____

(Print name) **_Arman Gabay_**

Date _____     BUYER _____

(Print name) _____

☐ Additional Signature Addendum attached (C.A.R. Form ASA).

Seller's Initials ( _____ ) ( _____ )

**RPA-CA REVISED 12/15 (PAGE 9 OF 10)**

Property Address: *4780 Annadel Heights Drive, Santa Rosa, CA 95405* Date: *April 18, 2017*

**32. ACCEPTANCE OF OFFER:** Seller warrants that Seller is the owner of the Property, or has the authority to execute this Agreement. Seller accepts the above offer, and agrees to sell the Property on the above terms and conditions. Seller has read and acknowledges receipt of a Copy of this Agreement, and authorizes Broker to Deliver a Signed Copy to Buyer.

☐ (If checked) SELLER'S ACCEPTANCE IS **SUBJECT TO ATTACHED COUNTER OFFER (C.A.R. Form SCO or SMCO) DATED:** ______

☐ One or more Sellers is signing this Agreement in a representative capacity and not for him/herself as an individual. See attached Representative Capacity Signature Disclosure (C.A.R. Form RCSD-S) for additional terms.

Date ______ SELLER ______

**(Print name)** *Ken Hartley*

Date ______ SELLER ______

**(Print name)** ______

☐ Additional Signature Addendum attached (C.A.R. Form ASA).

( ____ / ____ ) (Initials) **(Do not initial if making a counter offer.) CONFIRMATION OF ACCEPTANCE:** A Copy of Signed Acceptance was personally received by Buyer or Buyer's authorized agent on (date) ______ at ______ ☐ AM/ ☐ PM. **A binding Agreement is created when a Copy of Signed Acceptance is personally received by Buyer or Buyer's authorized agent whether or not confirmed in this document. Completion of this confirmation is not legally required in order to create a binding Agreement; it is solely intended to evidence the date that Confirmation of Acceptance has occurred.**

**REAL ESTATE BROKERS:**

A. **Real Estate Brokers are not parties to the Agreement between Buyer and Seller.**
B. **Agency relationships are confirmed as stated in paragraph 2.**
C. If specified in paragraph 3A(2), Agent who submitted the offer for Buyer acknowledges receipt of deposit.
D. **COOPERATING BROKER COMPENSATION:** Listing Broker agrees to pay Cooperating Broker **(Selling Firm)** and Cooperating Broker agrees to accept, out of Listing Broker's proceeds in escrow, the amount specified in the MLS, provided Cooperating Broker is a Participant of the MLS in which the Property is offered for sale or a reciprocal MLS. If Listing Broker and Cooperating Broker are not both Participants of the MLS, or a reciprocal MLS, in which the Property is offered for sale, then compensation must be specified in a separate written agreement (C.A.R. Form CBC). Declaration of License and Tax (C.A.R. Form DLT) may be used to document that tax reporting will be required or that an exemption exists.

Real Estate Broker (Selling Firm) *Pacific Union Realtors* CalBRE Lic. # *01866771*
By *Gael Grove & Kerry Jones* CalBRE Lic. # *00702158* Date ______
By ______ CalBRE Lic. # ______ Date ______
Address *127 4th St* City *Petaluma* State *Ca* Zip *94952*
Telephone ______ Fax ______ E-mail *gaelg@homesbygael.com*
Real Estate Broker (Listing Firm) *Better Homes Realty* CalBRE Lic. # *00466313*
By *Greg Stroud* CalBRE Lic. # *01384766* Date ______
By ______ CalBRE Lic. # ______ Date ______
Address *917 College Ave* City *Santa Rosa* State *CA* Zip *95404*
Telephone *(707)291-9793* Fax *(707)524-9636* E-mail *gbstroud2000@yahoo.com*

**ESCROW HOLDER ACKNOWLEDGMENT:**

Escrow Holder acknowledges receipt of a Copy of this Agreement, (if checked, ☐ a deposit in the amount of $ ______ ), counter offer numbers ______ ☐ Seller's Statement of Information and ______, and agrees to act as Escrow Holder subject to paragraph 20 of this Agreement, any supplemental escrow instructions and the terms of Escrow Holder's general provisions.

Escrow Holder is advised that the date of Confirmation of Acceptance of the Agreement as between Buyer and Seller is ______

Escrow Holder ______ Escrow # ______
By ______ Date ______
Address ______
Phone/Fax/E-mail ______
Escrow Holder has the following license number # ______
☐ Department of Business Oversight, ☐ Department of Insurance, ☐ Bureau of Real Estate.

**PRESENTATION OF OFFER:** ( ______ ) Listing Broker presented this offer to Seller on ______ (date).
Broker or Designee Initials

**REJECTION OF OFFER:** ( ______ ) ( ______ ) No counter offer is being made. This offer was rejected by Seller on ______ (date).
Seller's Initials

©1991- 2015, California Association of REALTORS®, Inc. United States copyright law (Title 17 U.S. Code) forbids the unauthorized distribution, display and reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats.
THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS® (C.A.R.). NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, INC.
*a subsidiary of the CALIFORNIA ASSOCIATION OF REALTORS®*
525 South Virgil Avenue, Los Angeles, California 90020

Buyer Acknowledges that page 10 is part of this Agreement ( ____ ) ( ____ ) Buyer's Initials

Reviewed by Broker or Designee ______

DocuSign Envelope ID: 156FB58B-3842-40F6-BB8C-B522567B1939



**CALIFORNIA ASSOCIATION OF REALTORS®**

**RESIDENTIAL PURCHASE AGREEMENT AND JOINT ESCROW INSTRUCTIONS**
(C.A.R. Form RPA-CA, Revised 12/15 )

Date Prepared: __04/18/2017__
1. **OFFER:**
   A. **THIS IS AN OFFER FROM** _____ _Arman Gabay_ _____ ("Buyer").
   B. **THE REAL PROPERTY** to be acquired is __4780 Annadel Heights Drive, Santa Rosa, CA 95405__ , situated in
      __Santa Rosa__ (City), __Sonoma__ (County), California, __95405__ (Zip Code), Assessor's Parcel No. __049-730-014__ ("Property").
   C. **THE PURCHASE PRICE** offered is _One Million, Thirty-Five Thousand_
                                                                          Dollars $ _1,035,000.00_
   D. **CLOSE OF ESCROW** shall occur on [_____] (date)(or [X] __30__ Days After Acceptance).
   E. Buyer and Seller are referred to herein as the "Parties." Brokers are not Parties to this Agreement.
2. **AGENCY:**
   A. **DISCLOSURE:** The Parties each acknowledge receipt of a [X] "Disclosure Regarding Real Estate Agency Relationships" (C.A.R. Form AD).
   B. **CONFIRMATION:** The following agency relationships are hereby confirmed for this transaction:
      Listing Agent _____ _Better Homes Realty_ _____ (Print Firm Name) is the agent of (check one):
      [X] the Seller exclusively; or [ ] both the Buyer and Seller.
      Selling Agent _____ _Pacific Union Realtors_ _____ (Print Firm Name) (if not the same as the
      Listing Agent) is the agent of (check one): [X] the Buyer exclusively; or [ ] the Seller exclusively; or [ ] both the Buyer and Seller.
   C. **POTENTIALLY COMPETING BUYERS AND SELLERS:** The Parties each acknowledge receipt of a [X] "Possible Representation of More than One Buyer or Seller - Disclosure and Consent" (C.A.R. Form PRBS).
3. **FINANCE TERMS:** Buyer represents that funds will be good when deposited with Escrow Holder.
   A. **INITIAL DEPOSIT:** Deposit shall be in the amount of ............................................. $ _____ 20,250.00
      (1) Buyer Direct Deposit: Buyer shall deliver deposit directly to Escrow Holder by electronic funds transfer, [ ] cashier's check, [ ] personal check, [ ] other _____ within 3 business days after Acceptance (or _____ );
      OR (2) [ ] Buyer Deposit with Agent: Buyer has given the deposit by personal check (or _____ ) to the agent submitting the offer (or to _____ ), made payable to _____ . The deposit shall be held uncashed until Acceptance and then deposited with Escrow Holder within 3 business days after Acceptance (or _____ ).
      Deposit checks given to agent shall be an original signed check and not a copy.
      (Note: Initial and increased deposits checks received by agent shall be recorded in Broker's trust fund log.)
   B. **INCREASED DEPOSIT:** Buyer shall deposit with Escrow Holder an increased deposit in the amount of ...... $ _____ 20,250.00
      within __1__ **Days** After Acceptance (or [ ] [ ] [expiration of Due Diligence Period as defined herein] ).
      If the Parties agree to liquidated damages in this Agreement, they also agree to incorporate the increased deposit into the liquidated damages amount in a separate liquidated damages clause (C.A.R. Form RID) at the time the increased deposit is delivered to Escrow Holder.                                                                          | ok? |
   C. [ ] **ALL CASH OFFER:** No loan is needed to purchase the Property. This offer is NOT contingent on Buyer obtaining a loan. Written verification of sufficient funds to close this transaction IS ATTACHED to this offer or [ ] Buyer shall, within 3 (or _____ ) Days After Acceptance, Deliver to Seller such verification.
   D. **LOAN(S):**
      (1) **FIRST LOAN:** in the amount of ............................................................ $ _____ 828,000.00
          This loan will be conventional financing or [ ] FHA, [ ] VA, [ ] Seller financing (C.A.R. Form SFA), [ ] assumed financing (C.A.R. Form AFA), [ ] Other _____ .This loan shall be at a fixed rate not to exceed __1.000__ % or, [ ] an adjustable rate loan with initial rate not to exceed _____ %. Regardless of the type of loan, Buyer shall pay points not to exceed _____ % of the loan amount.
          (2) [ ] **SECOND LOAN** in the amount of ......................................................... $ _____
          This loan will be conventional financing or [ ] Seller financing (C.A.R. Form SFA), [ ] assumed financing (C.A.R. Form AFA), [ ] Other _____ . This loan shall be at a fixed rate not to exceed _____ % or, [ ] an adjustable rate loan with initial rate not to exceed _____ %. Regardless of the type of loan, Buyer shall pay points not to exceed _____ % of the loan amount.
          (3) FHA/VA: For any FHA or VA loan specified in 3D(1), Buyer has 17 (or _____ ) Days After Acceptance to Deliver to Seller written notice (C.A.R. Form FVA) of any lender-required repairs or costs that Buyer requests Seller to pay for or otherwise correct. Seller has no obligation to pay for or satisfy lender requirements unless agreed in writing. A FHA/VA amendatory clause (C.A.R. Form FVAC) shall be a part of this Agreement.
   E. **ADDITIONAL FINANCING TERMS:** _____
   F. **BALANCE OF DOWN PAYMENT OR PURCHASE PRICE** in the amount of ........................... $ _____ 166,500.00
      to be deposited with Escrow Holder pursuant to Escrow Holder instructions.
   G. **PURCHASE PRICE (TOTAL):** ...................................................................... $ _____ 1,035,000.00

(Annotations in margin: "Not going to happen" next to line D(1); "Not going to happen")

Buyer's Initials ( _____ ) ( _____ )                                        Seller's Initials ( _____ ) ( _____ )

© 1991-2015, California Association of REALTORS®, Inc.
**RPA-CA REVISED 12/15 (PAGE 1 OF 10)**
**CALIFORNIA RESIDENTIAL PURCHASE AGREEMENT (RPA-CA PAGE 1 OF 10)**

Pacific Union, 127 Fourth Street Petaluma, CA 94952                Phone: 707-775-8264        Fax: 415.962.0785        Annadel Heights
Gael Adair Grove                       Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026  www.zipLogix.com

DocuSign Envelope ID: 156FB58B-3842-40F6-BB8C-B522567B1939

Property Address: **4780 Annadel Heights Drive, Santa Rosa, CA  95405**_____ Date: **April 18, 2017**

H. **VERIFICATION OF DOWN PAYMENT AND CLOSING COSTS:** Buyer (or Buyer's lender or loan broker pursuant to paragraph 3J(1)) shall, within 3 (or  5  ) Days After Acceptance, Deliver to Seller written verification of Buyer's down payment and closing costs. ( ☐ Verification attached.)

I. **APPRAISAL CONTINGENCY AND REMOVAL:** This Agreement is (or ☐ is NOT) contingent upon a written appraisal of the Property by a licensed or certified appraiser at no less than the purchase price. Buyer shall, as specified in paragraph 14B(3), in writing, remove the appraisal contingency or cancel this Agreement within 17 (or  14  ) Days After Acceptance.

J. **LOAN TERMS:**
   **(1) LOAN APPLICATIONS:** Within 3 (or  2  ) Days After Acceptance, Buyer shall Deliver to Seller a letter from Buyer's lender or loan broker stating that, based on a review of Buyer's written application and credit report, Buyer is prequalified or preapproved for any NEW loan specified in paragraph 3D. If any loan specified in paragraph 3D is an adjustable rate loan, the prequalification or preapproval letter shall be based on the qualifying rate, not the initial loan rate. ( ☐ Letter attached.)    `Pretty fast`

   **(2) LOAN CONTINGENCY:** Buyer shall act diligently and in good faith to obtain the designated loan(s). Buyer's qualification for the loan(s) specified above **is a contingency** of this Agreement unless otherwise agreed in writing. If there is no appraisal contingency or the appraisal contingency has been waived or removed, then failure of the Property to appraise at the purchase price does not entitle Buyer to exercise the cancellation right pursuant to the loan contingency if Buyer is otherwise qualified for the specified loan. Buyer's contractual obligations regarding deposit, balance of down payment and closing costs **are not contingencies** of this Agreement.

   **(3) LOAN CONTINGENCY REMOVAL:**
   Within 21 (or  14  ) Days After Acceptance, Buyer shall, as specified in paragraph 14, in writing, remove the loan contingency or cancel this Agreement. If there is an appraisal contingency, removal of the loan contingency shall not be deemed removal of the appraisal contingency.

   **(4)** ☐ ~~NO LOAN CONTINGENCY: Obtaining any loan specified above is NOT a contingency of this Agreement. If Buyer does not obtain the loan and as a result does not purchase the Property, Seller may be entitled to Buyer's deposit or other legal remedies.~~

   **(5) LENDER LIMITS ON BUYER CREDITS:** Any credit to Buyer, from any source, for closing or other costs that is agreed to by the Parties ("Contractual Credit") shall be disclosed to Buyer's lender. If the total credit allowed by Buyer's lender ("Lender Allowable Credit") is less than the Contractual Credit, then (i) the Contractual Credit shall be reduced to the Lender Allowable Credit, and (ii) in the absence of a separate written agreement between the Parties, there shall be no automatic adjustment to the purchase price to make up for the difference between the Contractual Credit and the Lender Allowable Credit.

K. **BUYER STATED FINANCING:** ~~Seller is relying on Buyer's representation of the type of financing specified (including but not limited to, as applicable, all cash, amount of down payment, or contingent or non-contingent loan). Seller has agreed to a specific closing date, purchase price and to sell to Buyer in reliance on Buyer's covenant concerning financing.~~ Buyer shall pursue the financing specified in this Agreement. Seller has no obligation to cooperate with Buyer's efforts to obtain any financing other than that specified in the Agreement and the availability of any such alternate financing does not excuse Buyer from the obligation to purchase the Property and close escrow as specified in this Agreement.

4. **SALE OF BUYER'S PROPERTY:**
   A. This Agreement and Buyer's ability to obtain financing are NOT contingent upon the sale of any property owned by Buyer.
OR B. ☐ This Agreement and Buyer's ability to obtain financing are contingent upon the sale of property owned by Buyer as specified in the attached addendum (C.A.R. Form COP).

5. **ADDENDA AND ADVISORIES:**
   A. ADDENDA:

| | |
|---|---|
| ☐ Back Up Offer Addendum (C.A.R. Form BUO) | ☐ Addendum #_____ (C.A.R. Form ADM) |
| ☐ Septic, Well and Property Monument Addendum (C.A.R. Form SWPI) | ☐ Court Confirmation Addendum (C.A.R. Form CCA) |
| ☐ Short Sale Addendum (C.A.R. Form SSA) | ☐ Other_____ |

   B. BUYER AND SELLER ADVISORIES:

| | |
|---|---|
| ☐ Probate Advisory (C.A.R. Form PA) | ☒ Buyer's Inspection Advisory (C.A.R. Form BIA) |
| ☐ Trust Advisory (C.A.R. Form TA) | ☒ Statewide Buyer and Seller Advisory (C.A.R. Form SBSA) |
| ☐ Short Sale Information and Advisory (C.A.R. Form SSIA) | ☐ REO Advisory (C.A.R. Form REO) |
| | ☐ Other_____ |

6. **OTHER TERMS:** _____
_____
_____
_____

7. **ALLOCATION OF COSTS**
   A. **INSPECTIONS, REPORTS AND CERTIFICATES:** Unless otherwise agreed in writing, this paragraph only determines who is to pay for the inspection, test, certificate or service ("Report") mentioned; it **does not determine who is to pay for any work recommended or identified in the Report.**

     (1) ☐ Buyer ☒ Seller shall pay for a natural hazard zone disclosure report, including tax ☒ environmental ☐ Other: _____ prepared by **NHD**_____

     (2) ☒ Buyer ☐ Seller shall pay for the following Report **any inspections buyer deems necessary**_____ prepared by_____

     (3) ☐ ~~Buyer~~ ☐ ~~Seller shall pay for the following Report~~_____ ~~prepared by~~_____

Buyer's Initials ( _AB_ ) ( _____ )          Seller's Initials ( _____ ) ( _____ )

**RPA-CA REVISED 12/15 (PAGE 2 OF 10)**



**CALIFORNIA RESIDENTIAL PURCHASE AGREEMENT  (RPA-CA PAGE 2 OF 10)**

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026  www.zipLogix.com          **Annadel Heights**

EXHIBIT 20

DocuSign Envelope ID: 156FB58B-3842-40F6-BB8C-B522567B1939

**CALIFORNIA**
**ASSOCIATION**
**OF REALTORS®**

## DISCLOSURE REGARDING
## REAL ESTATE AGENCY RELATIONSHIP
### (Selling Firm to Buyer)
### (As required by the Civil Code)
### (C.A.R. Form AD, Revised 12/14)

☐ (If checked) This form is being provided in connection with a transaction for a leasehold interest exceeding one year as per Civil Code section 2079.13(k) and (m).

When you enter into a discussion with a real estate agent regarding a real estate transaction, you should from the outset understand what type of agency relationship or representation you wish to have with the agent in the transaction.

**SELLER'S AGENT**

A Seller's agent under a listing agreement with the Seller acts as the agent for the Seller only. A Seller's agent or a subagent of that agent has the following affirmative obligations:
To the Seller: A Fiduciary duty of utmost care, integrity, honesty and loyalty in dealings with the Seller.
To the Buyer and the Seller:
    (a)Diligent exercise of reasonable skill and care in performance of the agent's duties.
    (b)A duty of honest and fair dealing and good faith.
    (c)A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the parties. An agent is not obligated to reveal to either party any confidential information obtained from the other party that does not involve the affirmative duties set forth above.

**BUYER'S AGENT**

A selling agent can, with a Buyer's consent, agree to act as agent for the Buyer only. In these situations, the agent is not the Seller's agent, even if by agreement the agent may receive compensation for services rendered, either in full or in part from the Seller. An agent acting only for a Buyer has the following affirmative obligations:
To the Buyer: A fiduciary duty of utmost care, integrity, honesty and loyalty in dealings with the Buyer.
To the Buyer and the Seller:
    (a)Diligent exercise of reasonable skill and care in performance of the agent's duties.
    (b)A duty of honest and fair dealing and good faith.
    (c)A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the parties.
An agent is not obligated to reveal to either party any confidential information obtained from the other party that does not involve the affirmative duties set forth above.

**AGENT REPRESENTING BOTH SELLER AND BUYER**

A real estate agent, either acting directly or through one or more associate licensees, can legally be the agent of both the Seller and the Buyer in a transaction, but only with the knowledge and consent of both the Seller and the Buyer.
In a dual agency situation, the agent has the following affirmative obligations to both the Seller and the Buyer:
    (a)A fiduciary duty of utmost care, integrity, honesty and loyalty in the dealings with either the Seller or the Buyer.
    (b)Other duties to the Seller and the Buyer as stated above in their respective sections.
In representing both Seller and Buyer, the agent may not, without the express permission of the respective party, disclose to the other party that the Seller will accept a price less than the listing price or that the Buyer will pay a price greater than the price offered.
The above duties of the agent in a real estate transaction do not relieve a Seller or Buyer from the responsibility to protect his or her own interests. You should carefully read all agreements to assure that they adequately express your understanding of the transaction. A real estate agent is a person qualified to advise about real estate. If legal or tax advice is desired, consult a competent professional.

Throughout your real property transaction you may receive more than one disclosure form, depending upon the number of agents assisting in the transaction. The law requires each agent with whom you have more than a casual relationship to present you with this disclosure form. You should read its contents each time it is presented to you, considering the relationship between you and the real estate agent in your specific transaction. **This disclosure form includes the provisions of Sections 2079.13 to 2079.24, inclusive, of the Civil Code set forth on page 2. Read it carefully. I/WE ACKNOWLEDGE RECEIPT OF A COPY OF THIS DISCLOSURE AND THE PORTIONS OF THE CIVIL CODE PRINTED ON THE BACK (OR A SEPARATE PAGE).**

| | | | | | |
|---|---|---|---|---|---|
| ☒ Buyer ☐ Seller ☐ Landlord ☐ Tenant | | | | Date | 4-20-17 |
| *Arman Gabay* | | | | | |
| ☐ Buyer ☐ Seller ☐ Landlord ☐ Tenant | | | | Date | |

Agent _____ ***Pacific Union Realtors*** _____ BRE Lic. # *01866771*
                       Real Estate Broker (Firm)
By _____ BRE Lic. # *00702158* _____ Date _____
    (Salesperson or Broker-Associate)    ***Gael Grove & Kerry Jones***

Agency Disclosure Compliance (Civil Code §2079.14):
• When the listing brokerage company also represents Buyer/Tenant: The Listing Agent shall have one AD form signed by Seller/Landlord and a different AD form signed by Buyer/Tenant.
• When Seller/Landlord and Buyer/Tenant are represented by different brokerage companies: (i) the Listing Agent shall have one AD form signed by Seller/Landlord and (ii) the Buyer's/Tenant's Agent shall have one AD form signed by Buyer/Tenant and either that same or a different AD form presented to Seller/Landlord for signature prior to presentation of the offer. If the same form is used, Seller may sign here:

| Seller/Landlord | Date | Seller/Landlord | Date |
|---|---|---|---|
| *Ken Hartley* | | | |

The copyright laws of the United States (Title 17 U.S. Code) forbid the unauthorized reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats. Copyright © 1991-2010, CALIFORNIA ASSOCIATION OF REALTORS®, INC. ALL RIGHTS RESERVED.

Reviewed by _____ Date _____

EQUAL HOUSING OPPORTUNITY

**AD REVISED 12/14 (PAGE 1 OF 2)**

**DISCLOSURE REGARDING REAL ESTATE AGENCY RELATIONSHIP (AD PAGE 1 OF 2)**

## CIVIL CODE SECTIONS 2079.24 (2079.16 APPEARS ON THE FRONT)

**2079.13** As used in Sections 2079.14 to 2079.24, inclusive, the following terms have the following meanings: **(a)** "Agent" means a person acting under provisions of Title 9 (commencing with Section 2295) in a real property transaction, and includes a person who is licensed as a real estate broker under Chapter 3 (commencing with Section 10130) of Part 1 of Division 4 of the Business and Professions Code, and under whose license a listing is executed or an offer to purchase is obtained. **(b)** "Associate licensee" means a person who is licensed as a real estate broker or salesperson under Chapter 3 (commencing with Section 10130) of Part 1 of Division 4 of the Business and Professions Code and who is either licensed under a broker or has entered into a written contract with a broker to act as the broker's agent in connection with acts requiring a real estate license and to function under the broker's supervision in the capacity of an associate licensee. The agent in the real property transaction bears responsibility for his or her associate licensees who perform as agents of the agent. When an associate licensee owes a duty to any principal, or to any buyer or seller who is not a principal, in a real property transaction, that duty is equivalent to the duty owed to that party by the broker for whom the associate licensee functions. **(c)** "Buyer" means a transferee in a real property transaction, and includes a person who executes an offer to purchase real property from a seller through an agent, or who seeks the services of an agent in more than a casual, transitory, or preliminary manner, with the object of entering into a real property transaction. "Buyer" includes vendee or lessee. **(d)** "Commercial real property" means all real property in the state, except single-family residential real property, dwelling units made subject to Chapter 2 (commencing with Section 1940) of Title 5, mobilehomes, as defined in Section 798.3, or recreational vehicles, as defined in Section 799.29. **(e)** "Dual agent" means an agent acting, either directly or through an associate licensee, as agent for both the seller and the buyer in a real property transaction. **(f)** "Listing agreement" means a contract between an owner of real property and an agent, by which the agent has been authorized to sell the real property or to find or obtain a buyer. **(g)** "Listing agent" means a person who has obtained a listing of real property to act as an agent for compensation. **(h)** "Listing price" is the amount expressed in dollars specified in the listing for which the seller is willing to sell the real property through the listing agent. **(i)** "Offering price" is the amount expressed in dollars specified in an offer to purchase for which the buyer is willing to buy the real property. **(j)** "Offer to purchase" means a written contract executed by a buyer acting through a selling agent that becomes the contract for the sale of the real property upon acceptance by the seller. **(k)** "Real property" means any estate specified by subdivision (1) or (2) of Section 761 in property that constitutes or is improved with one to four dwelling units, any commercial real property, any leasehold in these types of property exceeding one year's duration, and mobilehomes, when offered for sale or sold through an agent pursuant to the authority contained in Section 10131.6 of the Business and Professions Code. **(l)** "Real property transaction" means a transaction for the sale of real property in which an agent is employed by one or more of the principals to act in that transaction, and includes a listing or an offer to purchase. **(m)** "Sell," "sale," or "sold" refers to a transaction for the transfer of real property from the seller to the buyer, and includes exchanges of real property between the seller and buyer, transactions for the creation of a real property sales contract within the meaning of Section 2985, and transactions for the creation of a leasehold exceeding one year's duration. **(n)** "Seller" means the transferor in a real property transaction, and includes an owner who lists real property with an agent, whether or not a transfer results, or who receives an offer to purchase real property of which he or she is the owner from an agent on behalf of another. "Seller" includes both a vendor and a lessor. **(o)** "Selling agent" means a listing agent who acts alone, or an agent who acts in cooperation with a listing agent, and who sells or finds and obtains a buyer for the real property, or an agent who locates property for a buyer or who finds a buyer for a property for which no listing exists and presents an offer to purchase to the seller. **(p)** "Subagent" means a person to whom an agent delegates agency powers as provided in Article 5 (commencing with Section 2349) of Chapter 1 of Title 9. However, "subagent" does not include an associate licensee who is acting under the supervision of an agent in a real property transaction.

**2079.14** Listing agents and selling agents shall provide the seller and buyer in a real property transaction with a copy of the disclosure form specified in Section 2079.16, and, except as provided in subdivision (c), shall obtain a signed acknowledgement of receipt from that seller or buyer, except as provided in this section or Section 2079.15, as follows: **(a)** The listing agent, if any, shall provide the disclosure form to the seller prior to entering into the listing agreement. **(b)** The selling agent shall provide the disclosure form to the seller as soon as practicable prior to presenting the seller with an offer to purchase, unless the selling agent previously provided the seller with a copy of the disclosure form pursuant to subdivision (a). **(c)** Where the selling agent does not deal on a face-to-face basis with the seller, the disclosure form prepared by the selling agent may be furnished to the seller (and acknowledgement of receipt obtained for the selling agent from the seller) by the listing agent, or the selling agent may deliver the disclosure form by certified mail addressed to the seller at his or her last known address, in which case no signed acknowledgement of receipt is required. **(d)** The selling agent shall provide the disclosure form to the buyer as soon as practicable prior to execution of the buyer's offer to purchase, except that if the offer to purchase is not prepared by the selling agent, the selling agent shall present the disclosure form to the buyer not later than the next business day after the selling agent receives the offer to purchase from the buyer.

**2079.15** In any circumstance in which the seller or buyer refuses to sign an acknowledgement of receipt pursuant to Section 2079.14, the agent, or an associate licensee acting for an agent, shall set forth, sign, and date a written declaration of the facts of the refusal.

**2079.16** Reproduced on Page 1 of this AD form.

**2079.17 (a)** As soon as practicable, the selling agent shall disclose to the buyer and seller whether the selling agent is acting in the real property transaction exclusively as the buyer's agent, exclusively as the seller's agent, or as a dual agent representing both the buyer and the seller. This relationship shall be confirmed in the contract to purchase and sell real property or in a separate writing executed or acknowledged by the seller, the buyer, and the selling agent prior to or coincident with execution of that contract by the buyer and the seller, respectively. **(b)** As soon as practicable, the listing agent shall disclose to the seller whether the listing agent is acting in the real property transaction exclusively as the seller's agent, or as a dual agent representing both the buyer and seller. This relationship shall be confirmed in the contract to purchase and sell real property or in a separate writing executed or acknowledged by the seller and the listing agent prior to or coincident with the execution of that contract by the seller.

**(c)** The confirmation required by subdivisions (a) and (b) shall be in the following form.

_____ is the agent of (check one): ☐ the seller exclusively; or ☐ both the buyer and seller.
(DO NOT COMPLETE. SAMPLE ONLY)
(Name of Listing Agent)

_____ is the agent of (check one): ☐ the buyer exclusively; or ☐ the seller exclusively; or
(DO NOT COMPLETE. SAMPLE ONLY)                                            ☐ both the buyer and seller.
(Name of Selling Agent if not the same as the Listing Agent)

**(d)** The disclosures and confirmation required by this section shall be in addition to the disclosure required by Section 2079.14.

**2079.18** No selling agent in a real property transaction may act as an agent for the buyer only, when the selling agent is also acting as the listing agent in the transaction.

**2079.19** The payment of compensation or the obligation to pay compensation to an agent by the seller or buyer is not necessarily determinative of a particular agency relationship between an agent and the seller or buyer. A listing agent and a selling agent may agree to share any compensation or commission paid, or any right to any compensation or commission for which an obligation arises as the result of a real estate transaction, and the terms of any such agreement shall not necessarily be determinative of a particular relationship.

**2079.20** Nothing in this article prevents an agent from selecting, as a condition of the agent's employment, a specific form of agency relationship not specifically prohibited by this article if the requirements of Section 2079.14 and Section 2079.17 are complied with.

**2079.21** A dual agent shall not disclose to the buyer that the seller is willing to sell the property at a price less than the listing price, without the express written consent of the seller. A dual agent shall not disclose to the seller that the buyer is willing to pay a price greater than the offering price, without the express written consent of the buyer. This section does not alter in any way the duty or responsibility of a dual agent to any principal with respect to confidential information other than price.

**2079.22** Nothing in this article precludes a listing agent from also being a selling agent, and the combination of these functions in one agent does not, of itself, make that agent a dual agent.

**2079.23** A contract between the principal and agent may be modified or altered to change the agency relationship at any time before the performance of the act which is the object of the agency with the written consent of the parties to the agency relationship.

**2079.24** Nothing in this article shall be construed to either diminish the duty of disclosure owed buyers and sellers by agents and their associate licensees, subagents, and employees or to relieve agents and their associate licensees, subagents, and employees from liability for their conduct in connection with acts governed by this article or for any breach of a fiduciary duty or a duty of disclosure.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, INC.
a subsidiary of the California Association of REALTORS®
525 South Virgil Avenue, Los Angeles, California 90020

| Reviewed by _____ Date _____ |


EQUAL HOUSING
OPPORTUNITY

**AD REVISED 12/14 (PAGE 2 OF 2)**

## DISCLOSURE REGARDING REAL ESTATE AGENCY RELATIONSHIP (AD PAGE 2 OF 2)

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026   www.zipLogix.com                Annadel Heights

DocuSign Envelope ID: 156FB58B-3842-40F6-BB8C-B522567B1939



CALIFORNIA
ASSOCIATION
OF REALTORS®

## POSSIBLE REPRESENTATION OF MORE THAN ONE BUYER OR SELLER - DISCLOSURE AND CONSENT
(C.A.R. Form PRBS, 11/14)

A real estate broker (Broker), whether a corporation, partnership or sole proprietorship, may represent more than one buyer or seller. This multiple representation can occur through an individual licensed as a broker or salesperson or through different individual broker's or salespersons (associate licensees) acting under the Broker's license. The associate licensees may be working out of the same or different office locations.

**Multiple Buyers:** Broker (individually or through its associate licensees) may be working with many prospective buyers at the same time. These prospective buyers may have an interest in, and make offers on, the same properties. Some of these properties may be listed with Broker and some may not. Broker will not limit or restrict any particular buyer from making an offer on any particular property whether or not Broker represents other buyers interested in the same property.

**Multiple Sellers:** Broker (individually or through its associate licensees) may have listings on many properties at the same time. As a result, Broker will attempt to find buyers for each of those listed properties. Some listed properties may appeal to the same prospective buyers. Some properties may attract more prospective buyers than others. Some of these prospective buyers may be represented by Broker and some may not. Broker will market all listed properties to all prospective buyers whether or not Broker has another or other listed properties that may appeal to the same prospective buyers.

**Dual Agency:** If Seller is represented by Broker, Seller acknowledges that broker may represent prospective buyers of Seller's property and consents to Broker acting as a dual agent for both seller and buyer in that transaction. If Buyer is represented by Broker, Buyer acknowledges that Broker may represent sellers of property that Buyer is interested in acquiring and consents to Broker acting as a dual agent for both buyer and seller with regard to that property.

In the event of dual agency, seller and buyer agree that: **(a)** Broker, without the prior written consent of the Buyer, will not disclose to seller that the Buyer is willing to pay a price greater than the offered price; **(b)** Broker, without the prior written consent of the seller, will not disclose to the buyer that seller is willing to sell property at a price less than the listing price; and **(c)** other than as set forth in (a) and (b) above, a dual agent is obligated to disclose known facts materially affecting the value or desirability of the property to both parties.

**Offers not necessarily confidential:** Buyer is advised that seller or listing agent may disclose the existence, terms, or conditions of buyer's offer unless all parties and their agent have signed a written confidentiality agreement. Whether any such information is actually disclosed depends on many factors, such as current market conditions, the prevailing practice in the real estate community, the listing agent's marketing strategy and the instructions of the seller.

Buyer and seller understand that Broker may represent more than one buyer or more than one seller and even both buyer and seller on the same transaction and consents to such relationships.

**Seller and/or Buyer acknowledges reading and understanding this Possible Representation of More Than One Buyer or Seller - Disclosure and Consent and agrees to the agency possibilities disclosed.**

Seller _____ *Ken Hartley* Date _____
Seller _____ Date _____
Buyer _____ *Arman Gabay* Date 4-20-17
Buyer _____ Date _____
Real Estate Broker (Firm) *Better Homes Realty* CalBRE Lic # *00466313* Date _____
By _____ CalBRE Lic # *01384766* Date _____
  *Greg Stroud*
Real Estate Broker (Firm) *Pacific Union Realtors* CalBRE Lic # *01866771* Date _____
By _____ CalBRE Lic # *00702158* Date _____
  *Gael Grove & Kerry Jones*

© 2014, California Association of REALTORS®, Inc. United States copyright law (Title 17 U.S. Code) forbids the unauthorized distribution, display and reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats.
THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS® (C.A.R.). NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL.
This form is made available to real estate professionals through an agreement with or purchase from the California Association of REALTORS®. It is not intended to identify the user as a REALTOR®. REALTOR® is a registered collective membership mark which may be used only by members of the NATIONAL ASSOCIATION OF REALTORS® who subscribe to its Code of Ethics.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, INC.
a subsidiary of the California Association of REALTORS®
525 South Virgil Avenue, Los Angeles, California 90020

Reviewed by _____ Date _____



PRBS 11/14 (PAGE 1 OF 1)
**POSSIBLE REPRESENTATION OF MORE THAN ONE BUYER OR SELLER (PRBS PAGE 1 OF 1)**

Pacific Union, 127 Fourth Street Petaluma, CA 94952          Phone: 707-775-8164    Fax: 415.962.0785    Annadel Heights
Gael Adair Grove          Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026  www.zipLogix.com

DocuSign Envelope ID: 156FB58B-3842-40F6-BB8C-B522567B1939



**CALIFORNIA ASSOCIATION OF REALTORS®**

## BUYER'S INSPECTION ADVISORY
(C.A.R. Form BIA, Revised 11/14)

Property Address: **4780 Annadel Heights Drive, Santa Rosa, CA 95405** _____ ("Property").

**1. IMPORTANCE OF PROPERTY INVESTIGATION:** The physical condition of the land and improvements being purchased is not guaranteed by either Seller or Brokers. You have an affirmative duty to exercise reasonable care to protect yourself, including discovery of the legal, practical and technical implications of disclosed facts, and the investigation and verification of information and facts that you know or that are within your diligent attention and observation. A general physical inspection typically does not cover all aspects of the Property nor items affecting the Property that are not physically located on the Property. If the professionals recommend further investigations, including a recommendation by a pest control operator to inspect inaccessible areas of the Property, you should contact qualified experts to conduct such additional investigations.

**2. BROKER OBLIGATIONS:** Brokers do not have expertise in all areas and therefore cannot advise you on many items, such as those listed below. If Broker gives you referrals to professionals, Broker does not guarantee their performance.

**3. YOU ARE STRONGLY ADVISED TO INVESTIGATE THE CONDITION AND SUITABILITY OF ALL ASPECTS OF THE PROPERTY, INCLUDING BUT NOT LIMITED TO THE FOLLOWING. IF YOU DO NOT DO SO, YOU ARE ACTING AGAINST THE ADVICE OF BROKERS.**

   **A. GENERAL CONDITION OF THE PROPERTY, ITS SYSTEMS AND COMPONENTS:** Foundation, roof (condition, age, leaks, useful life), plumbing, heating, air conditioning, electrical, mechanical, security, pool/spa (cracks, leaks, operation), other structural and nonstructural systems and components, fixtures, built-in appliances, any personal property included in the sale, and energy efficiency of the Property.

   **B. SQUARE FOOTAGE, AGE, BOUNDARIES:** Square footage, room dimensions, lot size, age of improvements and boundaries. Any numerical statements regarding these items are APPROXIMATIONS ONLY and have not been verified by Seller and cannot be verified by Brokers. Fences, hedges, walls, retaining walls and other barriers or markers do not necessarily identify true Property boundaries.

   **C. WOOD DESTROYING PESTS:** Presence of, or conditions likely to lead to the presence of wood destroying pests and organisms.

   **D. SOIL STABILITY:** Existence of fill or compacted soil, expansive or contracting soil, susceptibility to slippage, settling or movement, and the adequacy of drainage.

   **E. WATER AND UTILITIES; WELL SYSTEMS AND COMPONENTS;WASTE DISPOSAL:** Water and utility availability, use restrictions and costs. Water quality, adequacy, condition, and performance of well systems and components. The type, size, adequacy, capacity and condition of sewer and septic systems and components, connection to sewer, and applicable fees.

   **F. ENVIRONMENTAL HAZARDS:** Potential environmental hazards, including, but not limited to, asbestos, lead-based paint and other lead contamination, radon, methane, other gases, fuel oil or chemical storage tanks, contaminated soil or water, hazardous waste, waste disposal sites, electromagnetic fields, nuclear sources, and other substances, materials, products, or conditions (including mold (airborne, toxic or otherwise), fungus or similar contaminants).

   **G. EARTHQUAKES AND FLOODING:** Susceptibility of the Property to earthquake/seismic hazards and propensity of the Property to flood.

   **H. FIRE, HAZARD AND OTHER INSURANCE:** The availability and cost of necessary or desired insurance may vary. The location of the Property in a seismic, flood or fire hazard zone, and other conditions, such as the age of the Property and the claims history of the Property and Buyer, may affect the availability and need for certain types of insurance. Buyer should explore insurance options early as this information may affect other decisions, including the removal of loan and inspection contingencies.

   **I. BUILDING PERMITS, ZONING AND GOVERNMENTAL REQUIREMENTS:** Permits, inspections, certificates, zoning, other governmental limitations, restrictions, and requirements affecting the current or future use of the Property, its development or size.

   **J. RENTAL PROPERTY RESTRICTIONS:** Some cities and counties impose restrictions that limit the amount of rent that can be charged, the maximum number of occupants, and the right of a landlord to terminate a tenancy. Deadbolt or other locks and security systems for doors and windows, including window bars, should be examined to determine whether they satisfy legal requirements.

   **K. SECURITY AND SAFETY:** State and local Law may require the installation of barriers, access alarms, self-latching mechanisms and/or other measures to decrease the risk to children and other persons of existing swimming pools and hot tubs, as well as various fire safety and other measures concerning other features of the Property.

   **L. NEIGHBORHOOD, AREA, SUBDIVISION CONDITIONS; PERSONAL FACTORS:** Neighborhood or area conditions, including schools, law enforcement, crime statistics, registered felons or offenders, fire protection, other government services, availability, adequacy and cost of internet connections or other technology services and installations, commercial, industrial or agricultural activities, existing and proposed transportation, construction and development that may affect noise, view, or traffic, airport noise, noise or odor from any source, wild and domestic animals, other nuisances, hazards, or circumstances, protected species, wetland properties, botanical diseases, historic or other governmentally protected sites or improvements, cemeteries, facilities and condition of common areas of common interest subdivisions, and possible lack of compliance with any governing documents or Homeowners' Association requirements, conditions and influences of significance to certain cultures and/or religions, and personal needs, requirements and preferences of Buyer.

**By signing below, Buyers acknowledge that they have read, understand, accept and have received a Copy of this Advisory. Buyers are encouraged to read it carefully.**

Buyer _____     Buyer _____
_Arman Gabay_

© 1991-2004, California Association of REALTORS®, Inc. THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS® (C.A.R.). NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, INC.
a subsidiary of the California Association of REALTORS®
525 South Virgil Avenue, Los Angeles, California 90020

Reviewed by _____ Date _____

BIA REVISED 11/14 (PAGE 1 OF 1)



**BUYER'S INSPECTION ADVISORY (BIA PAGE 1 OF 1)**